### DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN
### IN SUPPORT OF SETTLEMENT APPROVAL AND FEE PETITION

I, WILLIAM B. RUBENSTEIN, declare:

Class counsel have secured a common fund of at least $65 million and up to $85 million for 3.2 million low-wage workers scattered across 30 different states, a settlement this Court is now asked to approve.  Moreover, in a class action lawsuit that culminates with the creation of a common monetary fund, class counsel is entitled to a percentage of that fund to compensate them for the work they performed on behalf of the class.  In calculating the proper fee award, this Court must determine both what would be an appropriate percentage and what amount that should be a percentage of.  Class counsel has retained me to submit an expert Declaration addressing the following three pertinent questions:

(1) *When experienced counsel, in an arms-length negotiation, secure a $65 million-$85 million common fund in a complex multi-state class suit where class certification was denied, and only 13 of 3.2 million class members object, should the settlement be approved by the Court?*  My brief answer to this question is that the settlement is "fair, adequate, reasonable, and not a product of collusion"[1] and should be approved by the Court.  Indeed, put simply, I believe this settlement is a remarkable resolution of the class members' claims when the amount of the settlement is considered in light of the risks of further litigation (particularly given this Court's denial of class certification and the unlikelihood of reversal on appeal); such a strong settlement reflects the fact

---

[1] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988) (stating that "Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.")

Rubenstein Declaration                                                              Page 2
October 1, 2009

that it was negotiated by experienced lawyers with very in-depth knowledge of the issues at hand,

and at arms-length, specifically under the aegis of a widely-respected professional mediator who is

a former federal judge.  It does not surprise me that only 13 of the 3.2 million class members have

objected to this settlement nor that their objections raise no meaningful concerns about the

settlement; this lack of real opposition to the settlement is further testament to its strength.  This

should be an easy settlement for the Court to approve.

      (2)    *When counsel secures a common fund for class members, what percentage of the fund*

*is counsel generally awarded?*  My brief answer to this question is that the Ninth Circuit uses 25%

as a benchmark figure but permits upward adjustments in appropriate circumstances.   Such

circumstances exist in this case because of the remarkable results achieved by class counsel:

specifically, counsel collected into one action, at great effort, actions from dozens of states

throughout the country, including states in which courts had previously denied class certification,

brought them together in this multi-district litigation proceeding ("MDL"), lost a class certification

motion here, but nonetheless persevered to secure a $65 million fixed fund and the possibility of $85

million for a class of 3.2 million low-wage workers in 30 states scattered throughout the United

States.  They did this at great risk of their own resources, while dealing with significant litigation

complexities in the action, yet managed to succeed utilizing a reasonable amount of their own time,

as reflected in their lodestar.  If ever there were an action that defied the adage that "you cannot

make a silk purse out of a sow's ear," this would be it.  A 33% fee is appropriate for the silk purse

counsel has created here.

Rubenstein Declaration                                                                                          Page 3
October 1, 2009

(3)    *When counsel's fee is a percentage of a common fund, what is it a percentage of: the total amount of the fund (here the "ceiling") or the amount of money specifically claimed by the class or disgorged from the defendant (here probably the "floor")?*  My brief answer to this question is that the method that counsel propose to ascertain their fee – taking a percentage of the full benefit made available to the class (the $85 million ceiling) – is consistent with a manner in which courts, including the Ninth Circuit, have approved fees in these types of class action settlements.  Furthermore,  giving counsel a percentage of the total fund they create generally provides them an incentive to push for a larger fund; while in certain circumstances that may not be the case, no red flags are presented by this settlement.  Finally, in a series of similar Wal-Mart settlements, courts have approved this method, although the net fees in those cases were far higher as a percentage of the recovery than that sought by counsel here.  Class counsel here therefore secured more money for the class as a percentage of the total recovery than did counsel in these related Wal-Mart proceedings, even though they took on states with difficult procedural histories and weak wage and hour laws.   In sum, Ninth Circuit precedent, general policies supporting small claims practice, and comparable approved settlements all support providing counsel 33% of the $85 million fund that they made available for the class, even if only $65 million is ever actually disgorged from Wal-Mart.

* * *

Before reviewing these questions in greater depth, I first set forth my qualifications as an expert and describe my preparation for making this declaration (Part I) and then present a brief

description of the facts underlying this settlement (Part II).   While it would be logical to proceed

through the three questions above in order presented – from settlement approval to fees – in this

case, my fee analysis entails a thorough review of the record of this case.   That thorough fee analysis

ends up touching upon each of the factors the Court must review in determining whether to approve

the settlement itself.   I therefore begin by working through the fee analysis (Part III) and then return

to the question of settlement approval (Part IV) using the early analysis to demonstrate that the

settlement itself should be approved by the Court.


# I
# BACKGROUND AND QUALIFICATIONS

1.      I am a Professor of Law at Harvard Law School.   I graduated *magna cum laude* from

Yale College in 1982 and *magna cum laude* from Harvard Law School in 1986.   I clerked for the

Hon. Stanley Sporkin in the United States District Court for the District of Columbia following my

graduation from law school.   Before joining the Harvard faculty as a tenured professor in 2007, I

was a law professor at UCLA School of Law for a decade, and an adjunct faculty member at

Harvard, Stanford, and Yale Law Schools while a litigator in private practice during the preceding

decade.   I am admitted to practice law in the Commonwealth of Massachusetts, the state of

California, the Commonwealth of Pennsylvania (inactive), the District of Columbia (inactive), the

United States Supreme Court, four U.S. Courts of Appeals, and two U.S. District Courts.

2.      My principal area of scholarship is complex civil litigation, with a special emphasis

on class action law.   I am the author, co-author, or editor of four books and more than a dozen

scholarly articles, as well as many shorter publications (a full bibliography appears in my c.v.

attached as Exhibit A to this Declaration).  Much of this work concerns various aspects of class

action law.  I am the sole author of the leading national treatise on class action law, *Newberg on

Class Actions*.  I also publish a monthly column entitled, *Expert's Corner*, in the publication, CLASS

ACTION ATTORNEY FEE DIGEST.  My work has been excerpted in leading casebooks on complex

litigation.[2]

      3.     My expertise on procedural matters is recognized by scholars and lawyers in private

practice throughout the country for whom I regularly provide consulting advice and educational

training programs.  The American Law Institute selected me to be one of nine law professors in the

United States to serve as an Adviser on a Restatement-like project developing the *Principles of the

Law of Aggregate Litigation*.  In 2007, I was the co-chair of the Class Action Subcommittee of the

Mass Torts Committee of the ABA's Litigation Section. I am on the Advisory Board of the

publication, *Class Action Law Monitor*.  I present continuing legal education programs on class

action law at law firms and conferences.  For example, I am a regular participant at the ABA's

annual *National Class Action Institute* and, at the 2006 International Law Association meeting, I was

asked to present a talk about the international aspects of class action law.

      4.     My teaching focuses on procedure and complex litigation.  I regularly teach the basic

civil procedure course to first year law students and a variety of advanced courses on complex

litigation, remedies, and federal litigation.  I have received honors for my teaching activities,

including the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law

---

[2]*See, e.g.*, THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION 447-49, 597
(Richard A. Nagareda ed. 2009); COMPLEX LITIGATION 63, 72, 390, 393, 429, 506, 523 (Kevin R.
Johnson, Catherine A. Rogers, & John Valery White eds., 2009); COMPLEX LITIGATION AND THE
ADVERSARY SYSTEM 120-123 (Jay Tidmarsh & Roger Trangsrud eds., 1998).

during the 2001-2002 school year, and the John Bingham Hurlbut Award for Excellence in

Teaching, as the best teacher at Stanford Law School during the 1996-1997 school year.

5.       In the past few years, I have been retained as an expert witness in more than a dozen

class action cases and as an expert consultant in about another dozen cases.  These cases have been

in state and federal courts throughout the United States, including a number of MDL proceedings.

I have been retained to testify as an expert witness on issues ranging from the propriety of class

certification, to the reasonableness of settlement and fees.

6.       I have been retained in this case to provide an opinion on the questions outlined

above.  I am being compensated for my work.

7.       In analyzing these issues, I have discussed the case with counsel for the plaintiff

class.  I have reviewed many documents from this litigation, a list of which is attached hereto as

Exhibit B.  I have also reviewed the applicable case law and scholarship on the topics of this

Declaration.

8.       I have not analyzed the merits of the substantive contentions in plaintiffs' complaint

nor have I undertaken an independent investigation of their claims.  I take no position on whether

the plaintiffs or defendants would prevail were this case to be fully tried on the merits.  I offer this

affidavit to bring to the Court the perspective of an expert on attorney's fee practices.

Rubenstein Declaration                                                                 Page 7
October 1, 2009

## II
## THIS LITIGATION[3]

9.      This consolidated action involves the wage and hour claims of a class of over

3,200,000 current and former Wal-Mart employees from 30 states.[4]  Specifically, the plaintiffs allege

that Wal-Mart altered their time records by shaving off time the employees worked  through the use

of several techniques, such as having managers manually clock out employees one minute after their

shift started.   The plaintiffs also allege that they were forced to work through their rest and meal

breaks and that they were not paid for the overtime hours they worked.  Affected employees brought

suits in courts throughout the country, alleging, *inter alia*, breach of contract, breach of the covenant

of good faith and fair dealing, conversion, unjust enrichment, and violation of state statutory wage

and hour provisions.

10.      On February 17, 2006, the Judicial Panel on Multidistrict Litigation ("JPML")

transferred six pending cases to this Court for coordinated or consolidated pretrial proceedings.

Within the following year and a half, the JPML transferred over 20 additional cases to this Court

for coordinated or consolidated pretrial proceedings, eventually bringing together cases from the 30

states that are involved in this settlement.

11.      On June 30, 2006, defendants filed a Motion to Dismiss or in the Alternative for

Summary Judgment with respect to the plaintiffs' unjust enrichment, conversion, and statutory wage

claims.   In a May 23, 2007 Order, the Court granted in part and denied in part this motion.

---

[3]The facts in this section are culled from the documents listed in Exhibit B.

[4]The state settlement class contains 29 states; the California settlement class adds California
employees for certain purposes.  I therefore utilize the short-hand of 30 states throughout my
Declaration.

Rubenstein Declaration                                                                       Page 8
October 1, 2009

12.      On November 13, 2006, plaintiffs filled a Motion for Class Certification of the First

Phase Cases.  In a June 20, 2008 Order, the Court denied plaintiffs' certification motion.

13.      On October 13, 2008, the Court issued an Order granting defendant's Motion to

Dismiss Plaintiffs' Class Action Complaint with regard to the breach of fiduciary duty claim, but

denied the defendant's Motion to Dismiss in all other respects.

14.      After several mediation sessions with the Hon. Layn Philips, a former federal judge

now in private practice as a mediator, the parties reached a settlement agreement which was filed

with this Court for preliminary approval on May 26, 2009.

15.      The settlement creates a fund of $85 million available to the class (a "ceiling"), of

which a minimum amount of $65 million will necessarily be disgorged from the Defendants (a

"floor").  The settlement provides for variable relief for class members depending on the length of

their employment.  The settlement also establishes two claiming procedures, a Long and a Short

Claim Form, again depending on length of employment. Class members who worked at Wal-Mart

for fewer than six pay periods during the time covered by the settlement (approximately six months),

are only eligible to submit a Short Claim Form, while class members who worked for more than six

pay periods have the option of submitting either the Long or Short Claim Form.  Class members who

choose to submit the Short Claim Form will automatically be given one of the following fixed sums,

according to the length of their employment during the eligible time period:

- $25 for under 1 year;
- $50 for 1-2 years;
- $75 for 2-4 years;
- $100 for 4+ years.

Class members who choose to submit the Long Claim Form must answer a series of questions

Rubenstein Declaration                                                                                Page 9
October 1, 2009

relating to their work experiences at Wal-Mart. Depending on their answers to these questions, class

members will be eligible to receive one of the following amounts:

- up to $50 for 3-12 months;
- up to $150 for 1-3 years;
- up to $250 for 3-5 years;
- up to $300 for 5+ years.

All claims will be paid out of the $65 million floor set on the settlement fund, a fund that could

expand to up to $85 million if claims exceed the floor.[5]

17.     The settlement agreement, in addition to making the $85 million fund available to

the class, also requires that the defendant, for a period of three years, continue to implement

technology that will ensure that an employee is on the clock before he or she can use any in-store

electronic device. The defendant has also agreed to implement and continue to use technology that

will allow managers and employees to have the opportunity to take all meal and rest breaks as

required by law and by their employment contracts.

18.     The Settlement Agreement provides that the following requested payments will be

taken out of the $65 million settlement floor assuming they are approved by this Court:

- Up to $1,500,000 in notice and administrative costs, with any amount of
  these costs that exceeds $1,500,000 to be counted against the $85 million
  ceiling;[6]

---

[5]The value of class members' claims could be greater than the numbers listed here if not all of
the $65 million floor is otherwise distributed, as what is left in the floor will then be re-distributed
pro rata among those class members who do make claims, up to $1,000/class member. *See infra*
¶19.

[6]Counsel has informed me that the additional administrative costs are roughly $2.75 million.
Since Wal-Mart has agreed to pay these, the "floor" of the settlement is best conceptualized as
$67.75 million in that Wal-Mart will necessarily be disgorged of this amount. I utilize this number
as the "floor" number later in my Declaration in discussing how to calculate relevant percentage
awards. *See infra* at ¶32 et seq. and Table 1.

- $15,000 incentive award to each of four deposed class representatives;
- $10,000 incentive award to each of 39 other class representatives;
- $10,000 each to the dismissing named plaintiffs who have agreed to dismiss their overlapping actions against the defendant; and
- attorneys' fees and costs.

19.     If there remains a balance in the settlement floor after all of the above expenses have been taken into account, then the Settlement Agreement provides for a pro-rata distribution to claiming class members, up to $1,000, depending on the length of their employment at Wal-Mart.

20.     As compensation for their efforts in this litigation, Class Counsel are requesting fees of 33.333% of the total $85 million settlement amount made available to the class, for a total of $28,333,050.  Class counsel are also requesting reimbursement for their out-of-pocket expenses during the course of the litigation.  Class counsel have informed me that they have a lodestar amount of at least $11-12 million in this matter.  This means that the percentage fee they seek would be, roughly speaking, two and a half times their lodestar, or, in other words, that the fee would embody a multiplier ranging from 2.36 (at a $12 million lodestar) to 2.58 (at a $11 million lodestar); a higher lodestar would mean that the multiplier would be even lower.

21.     Any funds that may remain one year after all fees and expenses have been taken out of the fund and all pro-rata distributions have been made to class members will be disgorged from the defendant and distributed to a charity agreed on by the parties and approved by the court.

22.     In exchange for these remedies, the settlement agreement states that plaintiffs will fully release defendants from all liability for all claims arising out of the subject matter of this class action.

Rubenstein Declaration                                                                                    Page 11
October 1, 2009

## III
## CLASS COUNSEL ARE ENTITLED TO 33.333% OF THE $85 MILLION AVAILABLE FUND GIVEN THE EXCEPTIONAL RESULTS THEY HAVE PRODUCED IN THIS LITIGATION

### *Introduction*

23.       The class attorneys seek $28,333,050 in fees for their efforts in this matter, an amount equivalent to 33.333%[7] of the cash benefits available under the settlement.  Under Ninth Circuit law,[8] 25% has been established as a benchmark for reasonable fees.[9]  However, courts are permitted to adjust the percentage upwards or downwards, taking all circumstances into account, in order to ensure that counsel is awarded an appropriate fee.  In light of the individual circumstances in this litigation, the fee requested by counsel, which represents 33% of the funds made available to the class, is reasonable.

24.       Courts tend to employ one of two methods in arriving at fee awards – the lodestar

---

[7]For short-hand purposes, I refer to this as 33% throughout my Declaration.

[8]Because this Court's jurisdiction arises under a federal statute (the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2)) that specifically deals with attorneys fees, 28 U.S.C. §1712, because the common fund created by this settlement is under the supervision of this federal court, and because federal claims are being released, federal fees law may govern the determination of the appropriate counsel's fee; this conclusion is not altered by the fact that many state law claims will also be released if this Court approves the proposed settlement.  *See Hoffman v. Construction Protective Services, Inc.*, 2006 WL 6105638, at *3 (C.D. Cal. 2006) (stating that "[w]here the Complaint invokes both state and federal law, the method of calculating attorney's fees rests in the Court's discretion," and adopting federal approach to calculating fees) (*citing Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir.1975) (employing the same principle but using discretion to adopt state fee approach).  *Cf. Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("Jurisdiction over the fund involved in the litigation allows a court to . . . assess[] attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.") (*citing Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 394 (1970)).

[9]*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).

method (which is essentially a variation on an hourly fee adjusted for the risk of the case) and the

percentage method.  The percentage method is strongly preferred in class action jurisprudence;

indeed, one commentator has argued that due process concerns *require* utilization of the percentage

method.[10]  Thus, the *Manual for Complex Litigation* reports that, "After a period of experimentation

with the lodestar method . . . the vast majority of courts of appeals now permit or direct district

courts to use the percentage-fee method in common fund cases."[11]  Courts favor the percentage

method for several reasons.[12]  The percentage method tends to align counsel's incentives with those

of the class – the more the class recovers, the higher the fee for its agent.  By aligning class and

counsel interests, the percentage method decreases concerns that counsel will sell out the class for

a higher fee.  The lodestar method awards counsel the same fee regardless of recovery as it is based

on an hourly rate; if anything, it creates incentives for counsel to perpetuate litigation so as to run

up fees, thus creating a conflict between counsel and class members.  The percentage method is

simple to administer.  The lodestar method is cumbersome.  A court must scrutinize counsel's hours

and then attempt to establish a proper multiplier to account for the risks counsel took in undertaking

the case.  The percentage method makes recoveries more certain for class counsel, thus reducing

---

[10]*See* Charles Silver, *Due Process and the Lodestar Method:  You Can't Get There From Here*, 74 TULANE L. REV. 1809 (2000).

[11]FEDERAL JUDICIAL CENTER, MANUAL FOR COMPLEX LITIGATION, FOURTH §14.121 at 187 (2004) (citations omitted) (hereafter "*Manual for Complex Litigation*").

[12]*See Manual for Complex Litigation, supra* note 10, at 188 ("the lodestar method is difficult to apply, time-consuming to administer, inconsistent in result, and capable of manipulation"); Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 258 (1985) (characterizing the lodestar formula as a "cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions").  *See generally In re Copley Pharmaceutical, Inc.*, 1 F.Supp.2d 1407 (D. Wy. 1998) (enumerating advantages of percentage method).

their risk and making them more willing to undertake cases that might otherwise not be initiated.

25.    In applying the percentage method, a court must determine two things: "What percentage?" and "Percentage of what?"  I will discuss each in part, showing that counsel's fee request of 33% of the $85 million settlement ceiling is reasonable and supported by both law and policy.

**A..**
**The 33% Fee Plaintiffs Seek Is Reasonable**
**in Light of the Particular Circumstances of this Case**

26.    Generally speaking, class counsel fees have paralleled the fees private attorneys charge in contingent fee practices.  It is common in American legal practice that a contingent attorney will take at least a third of the recovery (plus costs).  Similarly, in class action cases, the available empirical data on the subject suggests a majority of fee awards are in the 20-30% range, with percentages tending to decrease as the size of the fund increases.[13]

27.    The Ninth Circuit has established 25% as the benchmark for common fund

---

[13]*See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1050 n.4 (9th Cir. 2002), *cert. denied*, 537 U.S. 1018 (2002) (summarizing appendix of percentage fee awards from 34 common fund settlements of $50-200 million from 1996-2001); THOMAS WILLGING, ET AL., EMPIRICAL STUDY OF CLASS ACTIONS IN FOUR FEDERAL DISTRICT COURT:  FINAL REPORT TO THE ADVISORY COMMITTEE ON CIVIL RULES 69 (1996) (reporting median fee awards in class actions "rang[ing] from 27% to 30%"); DENISE MARTIN, ET AL., RECENT TRENDS III:  WHAT EXPLAINS SETTLEMENTS IN SHAREHOLDER CLASS ACTIONS?  (NERA, June 1995) (reporting data from nearly 300 securities class action settlements showing that the average fee award was approximately 32% and that it did not decrease as the size of the class's benefit increased); 4 WILLIAM B. RUBENSTEIN, ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS §14:6 (4th ed.) (2002) (noting that "[e]mpirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery").

Rubenstein Declaration                                                                              Page 14
October 1, 2009

percentage fee awards.[14]   This 25% benchmark is a "starting point," with higher or lower

percentages being appropriate based on all the circumstances in a given case.[15]   Counsel here seeks

33%, an enhancement of the benchmark.  Courts in the Ninth Circuit have looked at several factors

to determine whether an enhancement is appropriate, including:

- the exceptional results achieved for the class,[16]
- complexity of the issues,[17]
- risk of nonpayment assumed by class counsel,[18] and
- effort expended by counsel, and comparison with counsel's lodestar.[19]

Each of these four factors argues in favor of an enhancement in this matter.

         27.     *Exceptional results achieved for the class.*  Courts in this Circuit have designated "the

---

[14]*Hanlon*, 150 F.3d at 1029.

[15]*See Vizcaino*, 290 F.3d at 1048 (noting that [t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases," and that selection of the appropriate percentage must be "supported by findings that take into account all of the circumstances of the case"); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (establishing that the "benchmark percentage should be adjusted…when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors").

[16]*See Vizcaino*, 290 F.3d at 1048; *Six (6) Mexican Workers*, 904 F.2d at 1311 (justifying the fee award because of, among other factors, the "substantial" success achieved by class counsel).

[17]*See In re Pacific Enterprises Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (noting that the benchmark can be adjusted due to the "complexity of the issues and the risks").

[18]*See Vizcaino*, 290 F.3d at 1048 (noting that "risk is a relevant circumstance"); *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994) (overturning the district court's denial of awarding a risk multiplier, after confirming the district court's initial finding that the case was "fraught with risk and recovery was far from certain").

[19]*See In re Heritage Bong Litig.*, 2005 WL 1594403, at *18 (C.D. Cal. 2005) (listing the factors that courts may consider when determining whether the benchmark should be adjusted, including result obtained for the class, counsel's skill and experience, complexity of the issues, risk of non-payment, and comparison with counsel's lodestar).

results achieved for the class" as "the most critical factor in granting a fee award."[20]  In this case, the results achieved by counsel for the class are extraordinary and deserving of an enhanced fee.

      a.    *The Exceptional Work Counsel Did To Achieve This Result.*  Most of the wage and hour cases at issue in this MDL were, frankly, unwinnable because of the confluence of three key litigation factors.  *First*, the employees' claims were small, perhaps a few hundred dollars.  No lawyer would take such a case on a contingent fee basis because the portion of the recovery she would be entitled to would not pay the costs of litigating the claim.  In other words, the underlying wage and hour claims in this case are "negative value claims."  Thus, the only way in which plaintiffs would likely get relief, assuming the validity of their claims, was through aggregation into a class action.[21]  *Second*, however, class certification was made difficult, even on a state-wide level where the same law applied across the class, by the fact that the claims were intensely fact based.  Many courts that addressed class certification in the component state actions concluded that

---

[20]*See, e.g., In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2009).

[21]It is plausible that in some states, public agencies were authorized to seek relief on behalf of workers in this situation, though none seems to have done so in the cases in this MDL.  The class action mechanism (and attendant fee award) authorize (and reward) a "private" attorney general to pursue the class's claims as an alternative to such public pursuit.  The work of private attorneys general is especially important in cases such as this one, where public attorneys general throughout the country have not acted to remedy the underlying employment problems.  *See Deposit Guar. Bank v. Roper*, 445 U.S. 326, 339 (1980) ("The aggregation of individual claims in a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of the government.  Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device.").  *See generally* William B. Rubenstein, *Why Enable Litigation?  A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. Rev. 709 (2006) (explaining theory behind creating class action litigation for small claims cases where no litigation would occur absent the class suit); William B. Rubenstein, *On What a "Private Attorney General" Is – And Why It Matters*, 57 Vand. L. Rev. 2129 (2004).

individual issues tended to predominate over common ones, precluding class certification.  Of the

30 states in this action, class certification had been denied in about a dozen underlying state courts.

*Third*, pursuing these cases in federal court and merging them into one large case through the MDL

process did not immediately improve the plaintiffs' odds.  Issues such as choice of law and case

management concerns became complexified, while the problems with class certification did not

disappear:  this Court denied class certification in the first set of states brought forward here; the

reasoning of this Court's decision suggested that certification would have been unlikely in any of

the 30 states at issue.  It is also fair to assume that the Ninth Circuit would have affirmed this

Court's decision had an appeal been permitted and pursued, if for no other reason than that reversals

of class certification denials are rarely granted.  In sum, the combination of negative value claims

that were un-certifiable as a class suit made the prognosis for this case remarkably bleak.  Yet

counsel nonetheless negotiated a $65-$85 million settlement.  How did they do this?  Several factors

likely account for class counsel's success.  Although Wal-Mart may have calculated that the Ninth

Circuit would not reverse this Court's certification denial, if the Ninth Circuit did do so, the risk

Wal-Mart faced was large given the scope of the case that class counsel had smartly assembled here.

Moreover, the risk of reversal was significantly magnified when the Massachusetts Supreme Judicial

Court reversed that state's denial of class certification and ordered a certified case against Wal-Mart

to proceed to trial.[22]  Worse still for Wal-Mart, the very lawyers who produced that result in

Massachusetts were their adversaries in the MDL, which meant that they were up against a highly

informed, very determined, and – given the Massachusetts reversal – legally-skilled adversary.

---

[22]*See Salvas v. Wal-Mart Stores, Inc.*, 893 N.E.2d 1187 (Mass. 2008).

While it is impossible to know for sure all of the factors that brought Wal-Mart to the bargaining table here (beyond the fact that a jury may well have found its position on the underlying issues untenable, as juries had elsewhere), it is fair to presume that counsel's structuring and committed pursuit of this action, coupled with its legally-savvy timely victory in Massachusetts, played a significant role. The odds of counsel's success at the outset of this action given the confluence of confounding factors may have been akin to the odds of passing a camel through the eye of a needle – but counsel essentially did just that.

        b.    *The Exceptional Nature of the Result Achieved.* Not only did counsel exhibit exceptional lawyering to achieve a positive result here, the result they achieved is itself exceptional. The terms of the settlement provide that all class members, regardless of the time worked at Wal-Mart, are entitled to some form of monetary relief. In addition to the initial monetary relief provided by the settlement, the settlement also provides for a *pro rata* re-distribution of the funds left in the settlement after all costs, fees, and claims have been made. Due to historically low claiming rates in small claims common fund cases such as this one, there is a likelihood of a *pro rata* re-distribution of up to $1,000 to claiming class members. Assuming that most class members received an hourly wage around $7 per hour while employed by Wal-Mart, a $1,000 award would represent the equivalent of approximately 143 hours worked, which, for a 20-hour a week employee, is nearly two months of pay. In light of the denial of class certification, that this settlement guarantees significant money damages to a large group of low-paid employees with small claims is by no means routine or usual. Nor should a low claiming rate – enabling a higher reward for those who do claim – be seen as a meaningful problem with the settlement: small claims class actions typically have low claiming rates for the simple reason that not a lot of money is made available per claimant; generally

speaking, therefore, it is the deterrent rather than compensatory aspect of these cases that is most

important,[23] and here counsel achieved appropriate deterrence both by ensuring a distribution of over

$65 million and by securing injunctive relief.

28.    *Complexity of the issues*.  A host of procedural and substantive factors complexified

the nature of this suit.

a.    *Procedural Complexity.*  This is an MDL matter encompassing 30 underlying

state-based, state-wide class suits.  In some jurisdictions, there had been prior litigation of the claims

in this matter, in others there had not; in some jurisdictions there were multiple, overlapping lawsuits

concerning similar causes of action, in other jurisdictions just a single suit.  Some of the underlying

state cases have been part of this MDL since its inception, others have come in more recently.  The

Judicial Panel on Multidistrict Litigation enabled this procedural structure by sending these related

actions to this MDL court for coordinated pre-trial proceedings.  While the goal of MDL practice

is to make litigation more efficient by ensuring that similar pre-trial matters do not need to be

repeated multiple times, the consolidation of such matters into one large MDL case makes that

particular proceeding bulky and complex.  This is especially true in the unique circumstances of this

action.  Specifically, class counsel at the MDL were technically charged with pursuing pre-trial

motions and discovery in a consolidated action, yet each of the underlying cases in fact remained

a state-wide class action based on that state's law.  This created complicated questions about how

to proceed:  Should class certification be done all at once, or in groups of states?  If the latter, which

groups?  What about discovery?  How would motions to dismiss be handled, in clumps of states

with similar laws or state by state?  Once a settlement was being negotiated, how should it be

---

[23]*See* Rubenstein, *Why Enable Litigation?, supra* note 20, *passim.*

structured, with one class, 30 classes, or an intermediate number of sub-classes?  One might expect

there to be accepted answers to these procedural complexities, but in fact they were largely issues

of first impression – a lawsuit generally could not have been structured in this manner (the

consolidation of 30 different state-wide state-law-based class suits into one pre-trial federal MDL

proceeding) until Congress enacted the Class Action Fairness Act of 2005 ("CAFA").  Prior to

CAFA, each of the small claims class actions making up this MDL would have remained in their

home state courts because they lacked federal claims, each plaintiff did not meet the $75,000

amount-in-controversy requirement, and the law did not permit them to aggregate their claims to

meet that amount.[24]  After CAFA went into effect, however, it provided federal jurisdiction over

state law cases with more than 100 class members and $5 million in controversy, and by so doing,

it has given rise to new procedural monsters such as this case – though all of the procedural,

certification, and choice of law questions remain relatively novel.  It is fair to say that this case is

at the cutting edge of multi-state litigation and that the lawyers and this Court confronted procedural

complexities rarely seen in federal court MDL practice before 2006.

---

[24]That was the rule of *Zahn v. International Paper Co.,* 414 U.S. 291 (1973), which governed the aggregation question from the early 1970s until recently.  In 2005, the Supreme Court ruled that the supplemental jurisdiction statue, 28 U.S.C. §1367, overruled *Zahn,* holding that if at least one named plaintiff did meet the amount in controversy requirement, the supplemental jurisdiction statute authorized jurisdiction over the claims of other plaintiffs even if they are less than the amount in controversy.  *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005).  While supplemental jurisdiction is therefore another route by which diversity class actions – even from multiple states – could now end up in federal courts and hence in an MDL proceeding, in fact that will rarely happen:  as in this case, most class suits are for small claims where no named plaintiff has more than $75,000 in controversy and so there is no original federal jurisdiction to "supplement."  Moreover, Congress's enactment of CAFA shortly before *Exxon* was decided removed the need to turn to supplemental jurisdiction as a basis for federal jurisdiction in most class suits.  In short, a litigation structure like this one could not have reached federal court prior to *Exxon* and is unlikely ever to do so based on *Exxon* – underscoring the uniqueness of these proceedings.

Rubenstein Declaration                                                                      Page 20
October 1, 2009

      b.     *Substantive Complexity.  C*ounsel had to manage 30 different state legal regimes, each with their particular application of wage and hour laws to the claims in that state, each with their own statutes of limitations, each with (or without) their own public regulatory mechanisms, each with their own set of complicated affirmative defenses – as well as a class consisting of over 3,200,000 current and former employees of Wal-Mart scattered throughout the United States, each with his or her own work history.  Counsel had to undertake an individualized analysis of each state's statutes and affirmative defenses in opposing the motion to dismiss, in preparing the motions for class certification, and in structuring the settlement.  The nature of the time-shaving and missed meal and rest break claims necessitated a thorough analysis of the defendant's time records for the 3,200,000 class members, which entailed hiring statistical experts and required extensive briefing for the litigation motions.  Not surprisingly, though not easily, millions of documents were obtained and reviewed.  Finally, preparing a settlement agreement for this matter was significantly complex given its multi-state nature, the different length of time class members worked, the need to develop a notice program for a large and somewhat itinerant group of class members, and the need to ensure approval of the settlement by 30 state and local counsel and class representatives.

      c.     *Not A Normal Class Suit.*  The complexities involved here become even more apparent when this case is compared to typical class actions settlements such as securities or antitrust matters.  Often in such cases there is one set of actions defendants did or did not undertake (such as a misrepresentation in a securities matter or collusive activity in an antitrust case); one set of legal requirements is applied (federal law in securities and anti-trust cases); often there are few individual issues to be adjudicated as, for example, the Supreme Court has held that individual

reliance need not be demonstrated in securities fraud suits;[25] and often (though not invariably) there

are few individualized issues that complicate settlement and claiming programs.  The litigation of

this consolidation of 30 state-wide class actions based on 30 different state wage and hour regimes

involving 3.2 million individual class members with distinct work histories – and its resolution –

was significantly more complex than a standard federal class action.

29.    *Risk of nonpayment assumed by class counsel*.  Counsel assumed representation of

the plaintiffs on a contingent fee basis.  Class counsel pursued these actions despite the fact that in

many states, even those within this matter, class certification motions had previously been denied

by state courts and the chances of winning (and hence of getting paid) looked quite slim.  Counsel

also continued to pursue this case despite the denial of class certification with regard to the First

Phase cases and defendant's successful dismissal of some unjust enrichment, conversion, and

statutory wage and hour claims.  But perhaps the biggest risk of all inhered in the fact that counsel

were litigating against the largest corporation *in the world*.  The resources available to Wal-Mart to

combat this action were virtually unlimited.  It is one thing to take on a difficult case, another to take

it on after certification denials in many of the underlying states' courts, another to keep going after

certification has been denied, but yet another thing altogether to take these risks against a

corporation with the size and tenacity of Wal-Mart.  It is fair to conclude that the risk of non-

payment counsel undertook here is quite significant.

30.    *Comparison with lodestar*.  Counsel have represented to me that their lodestar for this

case is at least $11-12 million.  Counsel's requested fee would result in a lodestar multiplier of at

---

[25]*See Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (adopting the "fraud on the market" theory to
permit a presumption of reliance by individual investors).

most 2.58.[26]  This multiplier is below the average multiplier for common fund class actions such as

this one and is especially appropriate in light of the particular circumstances of this case.  The most

comprehensive study of lodestar multipliers shows that in settlements of $50-$75 million dollars,

the average multiplier is 2.75, while in settlements of $75-$100 million, the average multiplier is

3.93.[27]  Counsel's multiplier range comes in below the average multipliers whether this is considered

a $65 million or $85 million settlement.  Moreover, the fact that counsel's lodestar need be

multiplied to reach its percentage award is partially[28] a reflection of the fact that counsel's lodestar

is arguably lower than usual due to their efficient lawyering – and such lawyering should be

rewarded.  In particular, class counsel created significant efficiencies in at least two distinct ways.

First, because of counsel's participation in many Wal-Mart cases involving these issues over many

years and in many states, counsel had prior knowledge of many of the issues and practices and did

not have to "reinvent the wheel" while litigating this case.  For example, class counsel here took a

related case in Massachusetts to trial several years earlier (although that case is still pending and

about to go to trial a second time), the preparation for which required intense analysis of all of the

issues in these wage and hour matters, all of Wal-Marts defenses, and all of the expert testimony;

---

[26]As noted above, *see supra* ¶20, the multiplier would range from 2.36 (at a $12 million lodestar)
to 2.58 (at an $11 million lodestar).  If a higher lodestar is employed, a lower multiplier results.

[27]Stuart Logan, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION
REP. 167 (2003).  One of the objectors points to this same study to demonstrate that the fee
percentage sought here is higher than the fee percentages for comparable sized settlements identified
in the study.  *See* Objection of Deborah A. Maddox at 3 and Exhibit A.  While this is true, it is my
opinion that the multiplier is the more important point of reference than the fee percentage itself.
Put simply, the multiplier is the reward counsel get for doing a good job and counsel here, by
seeking an average multiplier, seek no greater reward than is typically given in such a case.

[28]The multiplier also serves as counsel's reward – above just recouping the time it put into the
case – for the risk they took and the results they achieved.  *See infra* ¶36.

counsel thereby gained intimate knowledge of all of the witness and expert witness testimony on the

general substantive issues in this matter.  To say that counsel here could "hit the ground running"

would be an understatement; they achieved real litigation efficiencies by taking advantage of their

in-depth knowledge of the issues in this case and by bringing that experience and skill to bear here.

Second, by collecting class actions from 30 states and consolidating them, counsel was able to

achieve economies of scale and avoid duplicative discovery efforts that otherwise would have

occurred had the cases proceeded separately.  These time savings, therefore, are not reflected in

counsel's lodestar and thus justify an average multiplier – and certainly justify the below average

one counsel seeks – to reflect accurately the value of counsel's efforts.

31.     An examination of the above factors indicates that an enhancement to the benchmark

in this case is reasonable and necessary to provide counsel with a reasonable fee.

**B.**
**When Class Counsel Produces a Fixed Monetary Fund,**
**Percentage Fees Are Typically a Percentage of the Entire Fund**

32.     The second question in this case is not what percentage to apply, but rather what this

should be a percentage of.

a.     *Fixed Distribution Cases.*  In many class actions, counsel secure a fixed fund

and the percentage method is easily applied – it is a percentage of the fund secured.  The fund may

be fixed for one of three reasons: because the class is easily ascertainable and can be simply sent its

recovery (e.g., securities class action where shareholders are known); or because whatever is not

claimed by class members in the first round of claiming is then distributed to those who did make

claims on a pro-rata basis thereafter so the full fund is distributed; or because whatever is not

claimed by class members is then sent to a third party via the "*cy pres*" doctrine so that the full fund

is again distributed.  Since, under any of these scenarios, the defendant is necessarily disgorged of

the full amount of the fund, assessing the size of the disgorgement or class's take and fixing the fee

as a percentage is straightforward – the fee can be either a percentage of the amount made available

or the amount disgorged from the defendant because both are the same amount.[29]

       b.    *Reversionary Fund Cases.*  In some actions, counsel do not secure an amount

of money from the defendant which is known at the time of settlement, but rather a potential

amount, perhaps with a ceiling attached, with the final dollar amount of disbursement depending

upon how many class members step forward to claim recovery (a "claims-made" settlement) and/or

with the left-over monies then reverting to the defendant (if a "reversionary fund" were established).

In reversionary fund cases, courts are confronted with the question of whether the percent award

should be a percentage of the "actual amount claimed" or of the "total amount available."

       c.    *This Hybrid Case.*  This case has characteristics of both types of settlements:

the "floor" of $67.75 million ensures that this much money will necessarily be disgorged from the

defendant while the "ceiling" of $85 million makes more monies hypothetically available to the

class, but only if they come forward in such numbers as to claim that much money.  Counsels' fee

can therefore be calculated in one of two ways:  as a percentage of the $85 million made available

---

[29]A third possibility would be to set counsel's percentage as a percentage solely of the amount going to class members and not include those monies that might be paid out to third parties via a *cy pres* award.  This approach is rarely employed because even the *cy pres* award, though not going directly to the plaintiffs, is nonetheless disgorged from the defendants due to the counsel's efforts, creating a deterrent effect for which counsel are rightly rewarded.  In any case, this approach is unlikely to matter here because it is likely that there will be only a small amount (if any) of the floor distributed *cy pres* given that there are re-distributions up to $1,000 for those class members who do file claims.

to the class (the "total fund" approach) or as a percentage of the $67.75 million which will necessary

be disgorged from the defendant (the "actual recovery" approach).  Of course, if $85 million is

actually claimed by the class, this case is no longer a hybrid case, but a case in which the total fund

method and actual recovery method converge and the Court need not worry about choosing between

them:  counsel would be entitled to a percentage (33% in my opinion) of $85 million.  The

remainder of this section of my Declaration is based on the assumption that only $65 million will

be claimed and hence the Court would have to decide between taking a percentage of the total $85

million fund or of the actual $67.75 million disgorgement.

  33.  While courts have used both the total fund and actual recovery approaches,[30] the

Ninth Circuit and the Second Circuit have both reversed district court decisions that used the actual

recovery method as an abuse of discretion.[31]  In  *Williams v. MGM-Pathe Communications Co.*, 129

F.3d 1026 (9th Cir. 1997),  the parties settled a class suit with the creation of a $4.5 million common

fund; class counsel sought one-third of that fund as a fee.  *Id.* at 1027.  The district court instead

---

[30]*Compare  Masters v. Wilhelmina Model Agency, Inc*., 473 F.3d 423 (2d Cir. 2007) (reversing district court for using the actual recovery method rather than the total fund method); *Waters v. Int'l. Precious Metals Corp*., 190 F.3d 1291 (11th Cir. 1999) (affirming order that used percentage of potential distribution), *cert. denied*, 530 U.S. 1223 (2000);*Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026 (9th Cir. 1997) (same), *with Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844 (5th Cir. 1998) (affirming order that looked at actual distribution in employing lodestar method); *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039 (Del. 1996) (affirming order that looked at actual distribution when calculating percentage award, though award taken out of common fund).  *Cf. Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 n.5 (1980) (permitting fee based on size of common fund, even if many class members do not make claims from fund, but not deciding "whether a class-action judgment that simply requires the defendant to give security against all potential claims would support recovery of attorney's fees under the common-fund doctrine.").

[31]*See Masters v. Wilhelmina Model Agency, Inc*., 473 F.3d 423 (2d Cir. 2007) (reversing district court for using the actual recovery method rather than the total fund method); *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026 (9th Cir. 1997) (same).

awarded one-third of the class's claims, which amounted to only $3,300. *Id.* Reversing, the Ninth

Circuit held that "the district court abused its discretion by basing the fee on the class members'

claims against the fund rather than on a percentage of the entire fund or the lodestar." *Id.* The court

noted that the defendants were aware that counsel would seek a third of the total fund and stated that

"the Defendants had some responsibility to negotiate at the outset for a smaller settlement fund if

they wished to limit the fees." *Id.* In this case, defendants have agreed to a settlement structure that

enables class counsel to seek 33% of the total available funds.

Like the Ninth Circuit, the Second Circuit recently reversed a federal district court decision

that employed the actual recovery method, ordering the court to instead apply the total fund

approach. *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007). *Masters*

was an anti-trust class action alleging price fixing of commission rates among modeling agencies.

The settlement agreement established a fund of nearly $22 million. The agreement permitted the

court to distribute unclaimed portions of the fund in its discretion. The District Court awarded the

unused funds via the *cy pres* method to various eating disorder and women's health organizations.[32]

The District Court awarded counsel 40% of the roughly $9.3 million in *claims made by class

members* against the fund; this $3.8 million amounted to only 17% of the $22 million *total fund*.

The District Court held that to give counsel a percentage of the total fund would provide a windfall

since the class itself did not realize the value of the total fund and since Congress seemed, in both

---

[32]The Second Circuit remanded this portion of the opinion, implying that the District Court
should have distributed the funds directly to the plaintiffs *pro rata* rather than to third parties via the
*cy pres* method.

the Private Securities Litigation Reform Act of 1995 (PSLRA)[33] and the Class Action Fairness Act

of 2005 (CAFA),[34] to express a preference for the fee to be set as a percentage of recovery not

availability.   The Second Circuit dismissed these statutory arguments as inapposite, in that the

PSLRA did not apply to this antitrust action and that CAFA's only fee provision concerns *coupon*

settlements, which this was not.   Rather than relying on either statute, the Circuit concluded that

counsel's work had created "[t]he entire Fund, and not some portion thereof" and hence counsel

should be rewarded for that full accomplishment, even if some of the fund ends up via the *cy pres*

doctrine going to non-class members.

34.     The central concern about the total fund approach is that it could set up a conflict

between counsel and the class by creating an incentive for counsel to accept a settlement unlikely

to yield a high claiming rate – *e.g.*, a coupon – in exchange for being guaranteed a percentage of

a large reversionary fund made available, but unlikely to be claimed.   By such a deal, defendants

pay less and class counsel makes more – at the plaintiffs' expense.[35]   While such a settlement

---

[33]The PSLRA states that: "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. §78u-4(a)(6).

[34]The CAFA states that: "If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. §1712(a).

[35]*See, e.g., International Precious Metals Corp. v. Waters*, 530 U.S. 1223 (statement of O'Connor, J., respecting the denial of the petition for a writ of certiorari).   *But see* Hailyn Chen, *Attorneys' Fees and Reversionary Fund Settlements in Small Claims Consumer Class Actions*, 50 U.C.L.A. L. REV. 879 (2003) (responding to Justice O'Connor's concerns).

structure could raise a "red-flag," this settlement does not do so for a variety of reasons:[36]

        a.     *First*, and most importantly, this settlement is not a true reversionary fund settlement in that it has a floor guaranteeing that $67.75 million will be disgorged from the defendant no matter what.  The $17.25 million above that which goes into the ceiling might revert to the defendant if it is not claimed, but even if it does, 80% of the total available fund of $85 million will necessarily be disgorged.

        b.     *Second*, there is no sign here that counsel sold out the class by creating a cumbersome claiming process that would likely produce little claiming from the fund:  the award is money, not a coupon; the claiming process is simple, not complicated; the parties could reasonably have concluded that the only simpler alternative – just mail checks to all plaintiffs in the class – was problematic given the fact that current addresses are not available for many of the class members and hence the potential for fraud might have been significant.   Any lack of full claiming here is likely attributable to the small size of the underlying claims and resulting recovery, not to any hurdles class counsel collusively agreed to build in to the claiming process.

        c.     *Third*, class counsel advised me that they negotiated the fee only after completing negotiations on the settlement – negotiations that were overseen by a respected and seasoned mediator.  The separation of the fee discussions from the merits relief and the supervision of a retired federal judge make it less likely that class counsel could trade off a lower recovery for the class in exchange for a higher fee.

---

[36]For a good description of why the total fund method has advantages in the absence of red-flags, *see generally* Chen, *supra* note 34, *passim* (rebutting arguments against total fund method and enumerating its advantages in small claims cases).

     d.    *Fourth*, the benefits that counsel secured for the plaintiffs were not illusory – they exist to satisfy the claims of any and all class members who step forward. Although the full ceiling amount of $85 million will likely not be claimed, no class member's individual recovery is thereby decreased. Negotiating the $85 million potential ceiling, therefore, "created a benefit on behalf of the entire class." *Waters*, 190 F.3d at 1297.

    35.    The settlement structure here – a ceiling/floor with the fee being a percentage of the ceiling but coming out of the floor – has been approved by other courts in recent Wal-Mart settlements even though the numbers in those settlements are more exaggerated than in this one. The data in the following table[37] show that with a larger gap between the ceiling and the floor, the fee calculated according to the ceiling but taken from the floor ends up allocating a quite significant percentage of the floor to the attorneys. Many of these Wal-Mart settlements had ceilings set twice as high as the floor; when a third of the ceiling was taken out of the floor as a fee, it often meant that more than two-thirds of the floor ended up going to the attorneys. This data is displayed in the following table:

---

[37]I here present all of the data on recent Wal-Mart settlements that I have been able to obtain, rather than holding back data that may be less favorable to the MDL attorneys. I requested from these attorneys all information about collateral Wal-Mart settlements that they had. My research assistants and I also searched public data bases and the web to locate other settlements. This represents the current universe of recent Wal-Mart settlements that we have been able to locate. The settlements for each can be located (and hence citations found) by taking the two letter state identifier and replacing it for the XX in this generic link: www.walmartXXclassaction.com.

Rubenstein Declaration                                                                    Page 30
October 1, 2009

**TABLE 1**
Fee Awards in Recent Wal-Mart Settlements

|  | Settlement Ceiling | Settlement Floor | Fee Granted /*Requested*[38] | % Ceiling | **% Floor** |
|---|---|---|---|---|---|
| Oklahoma | 42,500,000 | 21,500,000 | 17,000,000 | 40 | **80.00** |
| Missouri | 90,000,000 | 45,000,000 | 34,700,000 | 38.38 | **76.60** |
| Minnesota | 54,250,000 | 29,000,000 | 21,000,000 | 38.71 | **72.41** |
| Kansas | 13,000,000 | 6,500,000 | 4,550,000 | 35 | **70.00** |
| South Carolina | 49,000,000 | 24,500,000 | 16,333,333 | 33.33 | **66.67** |
| New Mexico | 18,000,000 | 9,000,000 | 5,999,400 | 33.33 | **66.67** |
| Florida | 148,000,000 | 75,000,000 | 49,333,333 | 33.33 | **65.78** |
| Kentucky | 35,000,000 | 19,000,000 | *11,665,500* | 33.33 | **61.40** |
| New Jersey | 28,000,000 | 15,500,000 | *9,332,400* | 33.33 | **60.21** |
| Illinois | 25,000,000 | 14,500,000 | 8,332,500 | 33.33 | **57.47** |
| Indiana | 28,000,000 | 18,000,000 | 9,332,400 | 33.33 | **51.85** |
| Washington | 35,000,000 | 17,500,000 | 8,671,343 | 24.78 | **49.55** |
| Iowa | 11,000,000 | 7,500,000 | *3,630,000* | 33 | **48.40** |
| MDL | 85,000,000 | 67,750,000 | *28,333,050* | 33.33 | **41.82** |

---

[38]Those fee awards that have been approved are in regular type; those that are requested and pending are in italics.

Rubenstein Declaration                                                      Page 31
October 1, 2009

By contrast to these other Wal-Mart settlements, class counsel here appear to have been successful in raising the floor and narrowing the gap to the ceiling; this means that more money will go to the class and less will revert to Wal-Mart *and* that counsel's final fee percentage, even if only the floor is claimed by the class, is within reasonable boundaries.[39]  Indeed, a bar chart rendering the data in the ultimate column from Table 1 demonstrates that ***the attorneys here did worse for themselves and better for their class then did the attorneys in every other Wal-Mart settlement***.

GRAPH 1
Percentage of Floor Attributed to Attorney's Fees in Recent Wal-Mart Settlement[40]



---

[39]While 42% is on the high side of regular fee awards, it is not so wildly excessive that it cautions against use of the total fund method.  For example, in noting the problems with the total fund method,  a leading treatise warns that such a method might produce fees "*far in excess of the actual amount collected by the class members*." WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D §1803.1 (2005) (emphasis added).  Here the fees are less than the class distribution.  *Compare Wise v. Popoff*, 835 F. Supp. 977 (E.D. Mich. 1993) (although rejecting total fund approach because lawyers would have received 169% of class's recovery, court nonetheless awards a fee amounting to 45.3% of the actual recovery).

[40]Those fee awards that have been approved are represented with black bars; those that are requested and pending are represented by gray bars.

36.      While the percentage counsel seeks and the method for calculating it are both

reasonable, courts nonetheless sometimes undertake a "lodestar cross-check" to ensure the

reasonableness of the resulting fee.  Class counsel has advised me that their combined lodestar is

at least $11-12 million.  This alone is an unexceptional amount of money to pay private attorneys

to produce the public benefits for the roughly 3,200,000 class members in this suit.  Counsel then

ask that their lodestar be multiplied to account for the contingent nature of their success and the high

quality of their work.  This is the type of case in which a multiplier is justified.  Private investment

in this matter created benefits for the class members, yet was a risky endeavor by class counsel.

This was a small claims matter, the bread-and-butter of class action law, but one with little chance

of success – and hence one that could easily have been passed over by plaintiffs' attorneys.  These

counsel and these counsel alone were willing to invest their resources – and they were successful

in doing so.    They should be rewarded for their efforts in the hopes that they will do this again,

investing some of the multiplied award in future cases of this type.    A multiplier is that reward.  As

discussed above, the multiplier of at most 2.58 that they seek is consistent with multipliers courts

often use in such situations.[41]

---

[41]*See supra* ¶30 & n.26 (citing Logan study).  *See also Stop & Shop v Smithkline*, No. Civ.A. 03-4578, 2005 WL 1213926 (E.D. Pa. 2005) (multiplier of 15.6); *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y. 1999) (noting that "in recent years multipliers of between 3 and 4.5 have been common in federal securities cases") (citation omitted);  *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 198 (S.D.N.Y.1997) (multiplier of 5.5); *Rabin v. Concord Assets Group, Inc.,* 1997 WL 275757 (S.D.N.Y.) (multiplier of 4.4); *Weiss v. Mercedes-Benz*, 889 F.Supp. 1297 (N.J.), aff'd, 66 F.3d 314 (3d Cir. 1995) (multiplier of 9.3); *In re RJR Nabisco, Inc. Sec. Litig.*, [1992 Transfer Binder] Fed. Sec. *400 L.Rep. (CCH) ¶96,984 (S.D.N.Y.1992) (Mukasey, J.) (multiplier of 6); *In re Beverly Hills Fire Litig.*, 639 F.Supp. 915, 924 (E.D.Ky.1986) (multiplier of 5).

## IV.
## THE COURT SHOULD APPROVE THE SETTLEMENT ITSELF

37.     The Ninth Circuit has stated that: "Assessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.[42]  As noted at the outset of my Declaration and as should now be clear, my fee analysis has touched on most of these points and hence has shown not only that the fee is reasonable, but also why the settlement itself should be approved.  I therefore will not rehearse those conclusions again at length, but only touch upon their meaning in the context of settlement approval.

38.     The first sets of factors (the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; and the amount offered in settlement) collapse into one another in this matter.  This Court denied class certification as to the first phase cases in a decision that likely made certification unlikely for any of the state cases.  The meant that the risk of the action was great – much turned on unlikely reversal by the Ninth Circuit.  Worse still, had the cases gone forward, they would have been remarkably complex in that each is a class suit based on its own state's laws (and defenses) and on much factual evidence.[43]  Given

---

[42]*Hanlon*, 150 F.3d at 1026.

[43]*See supra* ¶¶28-29.

those hurdles, the amount of settlement monies and injunctive relief secured by class counsel, as

noted throughout this Declaration, is truly significant.

39.    The second set of factors (the extent of discovery completed and the stage of the

proceedings; the experience and views of counsel; the presence of a governmental participant) also

cut strongly in favor of settlement approval.  There is no doubt class counsel knew the facts of this

case inside out as they have been working on these cases for many years and took a related case in

Massachusetts to trial once already, and are preparing to do so again.[44]  Their experience and views

on Wal-Mart wage and hour litigation are unparalleled.  It is worth noting, as I do above as well,[45]

that public officials have not stepped forward to remedy the harms claimed in these matters.  Their

absence made counsel's efforts both more difficult and more noteworthy.  There is every sense that

this Court can rely on the fact that class counsel knew the nature of this case well, fully understood

the parameters of the terms of the settlement, and fought hard to secure the relief it thought possible

in these circumstances.  Indeed, as I noted above, it is my conclusion based on review of parallel

Wal-Mart proceedings, that these lawyers did better for their class and worse for themselves than

did those in the other Wal-Mart proceedings I reviewed.[46]

40.    The final *Hanlon* factor focuses the Court on "the reaction of the class members to

the proposed settlement."  It is stunning that only 13 members of this 3.2 million worker class have

filed objections; that is a remarkably low number even for a small claims class suit.  Three common

themes emerged in the objections – too small a fund, too high a fee, and problematic notice.  As to

---

[44]*See supra* ¶27 & n.22; ¶30.

[45]*See supra* n.21.

[46]*See supra* ¶35.

the first point (too small a class recovery) it is understandable that class members make the mistake of comparing the small amount of money they receive individually to fee award for the whole class. Here, for example, class members take a minimum of about $25 of value while class counsel is entitled to millions of dollars in fees no matter what method is employed. However, such a comparison is, of course, unenlightening. The relevant comparison should be between counsel's fee and the total amount class counsel has made available, or secured, for the class. Indeed, the small amount class members receive in a case such as this one is an argument *for*, not against, a significant attorney fee. In small claims cases, class action counsel must have sufficient incentives to take the financial risks involved in overcoming the collective action problem of the class if they are to serve the important public functions of such suits. As to the second point (too high a fee), the objectors raise points that I have covered thoroughly in this Declaration and that do not need to be repeated. These objections appeared to be uninformed by the precise nature of this case, its comparison to other relevant Wal-Mart settlements, or to the applicable Ninth Circuit case law; they read as canned objections. I found nothing argued there that alters the conclusions I have drawn here. As to the third point (notice problems) I have offered no opinion here on the notice program but I note that it was executed by trained professionals and nothing in the objections appeared to raise any real concern about it. In short, the quantity of objections is minute and the punch they pack no greater.

41.    For the reasons noted throughout this Declaration, this is a very strong settlement in a very difficult lawsuit. All of the factors identified by the Ninth Circuit cut in favor of this Court providing final approval for the settlement.

42.    In sum, it is my opinion:

a.    that the proposed fee percentage of 33.33% in this case is within the range of acceptable percentages used by courts in class action cases and is reasonable in light of the special circumstances present in this case;

b.    that when, as here, counsel creates a common monetary fund without red-flags, attorneys' fees should be calculated as a percentage of the entire fund made available to the class; and

c.    that the Court should grant final approval to settlement in this matter.

I declare that the foregoing is true and correct.

Executed on October 1, 2009,                    _____
at Cambridge, Massachusetts.                          William B. Rubenstein

# EXHIBIT A

# PROFESSOR WILLIAM B. RUBENSTEIN

Harvard Law School - A323                                              617.496.7320 (P)
1545 Massachusetts Avenue                                             617.496.4865 (F)
Cambridge, MA 02138                                          rubenstein@law.harvard.edu

### ACADEMIC EMPLOYMENT

HARVARD LAW SCHOOL, CAMBRIDGE MA
    Professor of Law                                                            2007-
    Bruce Bromley Visiting Professor of Law                                 2006-2007
    Visiting Professor of Law                                    2003-2004, 2005-2006
    Lecturer in Law                                                        1990-1996
        *Courses:*    Civil Procedure; Class Action Law; Remedies

UCLA SCHOOL OF LAW, LOS ANGELES CA
    Professor of Law                                                       2002-2007
    Acting Professor of Law                                                 1997-2002
        *Courses*:    Civil Procedure; Complex Litigation; Remedies
        *Awards*:    2002 Rutter Award for Excellence in Teaching
                Top 20 California Lawyers Under 40, *Calif. Law Business* (2000)

STANFORD LAW SCHOOL, STANFORD CA
    Acting Associate Professor of Law                                       1995-1997
        *Courses*:    Civil Procedure; Federal Litigation
        *Awards*:    1997 John Bingham Hurlbut Award for Excellence in Teaching

YALE LAW SCHOOL, NEW HAVEN CT
    Lecturer in Law                                                      1994, 1995

BENJAMIN N. CARDOZO SCHOOL OF LAW, NEW YORK NY
    Visiting Professor                                                   Summer 2005

### LITIGATION-RELATED EMPLOYMENT

AMERICAN CIVIL LIBERTIES UNION, NATIONAL OFFICE, NEW YORK NY
    Project Director and Staff Counsel                                      1987-1995
        Litigated impact cases in federal and state courts throughout the US.  Supervised a
        staff of attorneys at the national office, oversaw work of ACLU attorneys around the
        country, and coordinated work with private cooperating counsel nationwide.
        Significant experience in complex litigation practice and procedural issues; appellate
        litigation; litigation coordination, planning and oversight.

HON. STANLEY SPORKIN, U.S. DISTRICT COURT, WASHINGTON DC
    Law Clerk                                                               1986-87

PUBLIC CITIZEN LITIGATION GROUP,   WASHINGTON DC
    Intern                                                               Summer 1985

EDUCATION

HARVARD LAW SCHOOL, CAMBRIDGE MA
         J.D., 1986, *magna cum laude*

YALE COLLEGE, NEW HAVEN CT
         B.A., 1982, *magna cum laude*
                   Editor-in-Chief, YALE DAILY NEWS


SELECTED COMPLEX LITIGATION EXPERIENCE

*Professional Service*

◊    *Sole Author,* NEWBERG ON CLASS ACTIONS (4th ed. updates since 2008 and 5th ed. (forthcoming 2010-2015))

◊    *Adviser,* American Law Institute, *Project on the Principles of the Law of Aggregate Litigation*, Philadelphia, Pennsylvania, 2004-

◊    *"Expert's Corner" (Monthly Column), Class Action Attorney Fee Digest,* 2007-

◊    *Advisory Board, Class Action Law Monitor* (Strafford Publications), 2008-

◊    *Co-Chair,* American Bar Association, Litigation Section, Mass Torts Committee, Class Action Sub-Committee, 2007

◊    *Planning Committee,* American Bar Association, Annual National Institute on Class Actions Conference, 2006-2007


*Expert Witness*

◊    Submitted an expert witness declaration concerning fee application in national MDL class action proceeding (*In re Dept. of Veterans Affairs (VA) Data Theft Litigation.*, MDL Docket No. 1796, U.S. District Court for the District of Columbia (2009))

◊    Submitted an expert witness declaration concerning common benefit fee in mass tort MDL proceeding in federal court (*In re Kugel Mesh Products Liability Litigation*, MDL Docket No. 1842, U.S. Dist. Ct., District of Rhode Island (2009))

◊    Submitted an expert witness declaration and supplemental declaration concerning common benefit fee in consolidated mass tort proceedings in state court (*In re All Kugel Mesh Individual Cases*, Master Docket No. PC-2008-9999, Superior Court, State of Rhode Island (2009))

◊    Submitted an expert witness declaration concerning process for selecting lead counsel in complex multi-district antitrust class action (*In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL

Docket No. 1869, U.S. Dist. Ct., District of Columbia (2008))

◇  Retained, deposed, and testified in court as expert witness on procedural issues in complex class action (*Hoffman v. American Express*, Case No. 2001-022881, California Superior Court, Alameda County, CA (2008))

◇  Submitted an expert witness declaration concerning fee application in wage and hour class action (*Warner v. Experian Information Solutions, Inc.*, Case No. BC362599, California Superior Court, Los Angeles County, CA (2009))

◇  Submitted an expert witness declaration concerning fee application in wage and hour class action (*Salsgiver v. Yahoo! Inc.*, Case No. BC367430, California Superior Court, Los Angeles County, CA (2008))

◇  Submitted an expert witness declaration concerning fee application in wage and hour class action (*Voight v. Cisco Systems, Inc.*, Case No. 106CV075705, California Superior Court, Santa Clara County, CA (2008))

◇  Retained and deposed as expert witness on fee issues in attorney fee dispute (*Stock v. Hafif,* Case No. KC034700, California Superior Court, Los Angeles County, CA (2008))

◇  Submitted an expert witness declaration concerning fee application in consumer class action (*Nicholas v. Progressive Direct*, Civil Action No. 06-141-DLB, U.S. Dist. Ct., E.D. Ky. (2008))

◇  Submitted expert witness declaration concerning procedural aspects of national class action arbitration  (*Johnson v. Gruma Corp.,* JAMS Arbitration No. 1220026252 (2007))

◇  Submitted expert witness declaration concerning fee application in securities case (*Drulias v. ADE Corp.,* Civil Action No. 06-11033 PBS, U.S. Dist. Court, D. Mass. (2007))

◇  Submitted expert witness declaration concerning use of expert witness on complex litigation matters in criminal trial (*U.S. v. Gallion, et al.*, No. 07-39 (WOB) U.S. Dist. Court, E. D. Kentucky (2007))

◇  Retained as expert witness on fees matters (*Heger v. Attorneys' Title Guaranty Fund, Inc.,* No. 03-L-398, Illinois Circuit Court, Lake County, IL (2007))

◇  Retained as expert witness on certification in statewide insurance class action (*Wagner v. Travelers Property Casualty of America*, No. 06CV338, Colorado District Court, Boulder County, CO (2007))

◇  Retained to provide expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2007))

◇  Testified as expert witness concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corporate Derivative Litigation*, Case No. 01098905, California Superior Court, Santa Barbara Cty, CA (2006))

◇  Submitted an expert witness declaration concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corp. Corporate Derivative Litigation*, Case No. CV-03-11 RSWL, U.S. Dist. Court, C.D. California (2006))

◇    Retained as expert witness as to certification of class action (*Canova v. Imperial Irrigation District*, Case No. L-01273, California Superior Court, Imperial Cty, CA (2005))

◇    Retained as expert witness as to certification of nationwide class action (*Enriquez v. Edward D. Jones & Co.,* Missouri Circuit Court, St. Louis, MO (2005))

◇    Submitted expert witness declaration concerning reasonableness of class certification, settlement, and attorney's fees (*Baird v. Thomson Elec. Co.*, Case No. 00-L-000761, Cir. Ct., Mad. Cty, IL (2000))

◇    Submitted expert witness declaration on procedural aspects of international contract litigation filed in court in Korea (*Estate of Wakefield v. Bishop Han & Jooan Methodist Church* (2002))

◇    Submitted expert witness declaration as to contested factual matters in case involving access to a public forum (*Cimarron Alliance Foundation v. The City of Oklahoma City,* Case No. Civ. 2001-1827-C, U.S. Dist. Ct., W. Dist. Oklahoma (2002))

### Expert Consultant

◇    Consultant on class action certification and related issues in mutli-state, multi-district litigation (MDL) consumer class actions (*In re Teflon Prod. Liability Litig.*, MDL No. 1733, U.S. Dist. Court, S.D. Iowa. (2008))

◇    Consultant/co-counsel on class action certification and related issues in nationwide anti-trust class action (*Brantley v. NBC Universal*, No.- CV07-06101 CAS (VBKx), U.S. Dist. Court, C.D. California (2008))

◇    Consultant on class action issues in complex multi-jurisdictional construction dispute (*Antenucci, et al., v. Washington Assoc. Residential Partner, LLP, et al.,* Civil No. 08-04194, U.S. Dist. Court, E.D. Pennsylvania (2008))

◇    Consultant on complex litigation issues in multi-jurisdictional class action litigation (*McGreevey v. Montana Power Company*, No. 08-35137, U.S. Court of Appeals for the Ninth Circuit)

◇    Consultant on class action and attorney fee issues in nationwide consumer class action (*Figueroa v. Sharper Image*, Case No. CV-05-21251, U.S. Dist. Court, S.D. Fla. (2007))

◇    Consultant on attorney's fees issue in complex class action case (*Natural Gas Anti-Trust Cases Coordinated Proceedings*, D049206, California Court of Appeals, Fourth District (2007))

◇    Consultant on remedies and procedural matters in complex class action (*Sunscreen Cases*, JCCP No. 4352, California Superior Court, Los Angeles County (2006))

◇    Consultant on complex preclusion questions in petition for review to California Supreme Court (*Mooney v. Caspari,* Supreme Court of California (2006))

◇    Consultant on attorney fee issues in complex common fund case (*In Re Diet Drugs (Phen/Fen) Products Liability Litigation*, U.S. Dist. Court, E. D. Pa. (2006))

◇     Consultant on procedural matters in series of complex construction lien cases (*In re Venetian Lien Litigation*, Supreme Court of the State of Nevada (2005-2006))

◇     Consultant on class certification issues in countywide class action (*Beauchamp v. Los Angeles Cty. Metropolitan Transp. Authority*, Case No. CV-98-00402-CBM, U.S. Dist. Ct., Central Dist. Cal.)

◇     Consultant on class certification issues in state-wide class action (*Williams v. State of California*, Case No. 312-236, Cal. Superior Court, San Francisco)

◇     Consultant on procedural aspects of complex welfare litigation (*Allen v. Anderson*, U.S. Dist. Ct., Central Dist. Cal., *appeal dism. as moot*, 199 F.3d 1331 (9th Cir. 1999))

### *Publications on Class Actions & Procedure*

◇     NEWBERG ON CLASS ACTIONS (William B. Rubenstein, Alba Conte, Herbert B. Newberg) (sole author of supplements to 4th edition commencing in Fall 2008 and of 5th ed (forthcoming, 2010-2015))

◇     *Supreme Court Preview*, 3 CLASS ACTION ATTORNEY FEE DIGEST 307 (August 2009)

◇     *Supreme Court Roundup*, 3 CLASS ACTION ATTORNEY FEE DIGEST 259 (July 2009)

◇     *What We Now Know About How Lead Plaintiffs Select Lead Counsel (And Hence Who Gets Attorneys Fees!) in Securities Cases*, 3 CLASS ACTION ATTORNEY FEE DIGEST 219 (June 2009)

◇     *Beware Of Ex Ante Incentive Award Agreements*, 3 CLASS ACTION ATTORNEY FEE DIGEST 175 (May 2009)

◇     *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87 (March 2009)

◇     *2009: Emerging Issues in Class Action Fee Awards*, 3 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2009)

◇     *2008: The Year in Class Action Fee Awards*, 2 CLASS ACTION ATTORNEY FEE DIGEST 465 (December 2008)

◇     *The Largest Fee Award – Ever!*, 2 CLASS ACTION ATTORNEY FEE DIGEST 337 (September 2008)

◇     *Why Are Fee Reductions Always 50%?: On The Imprecision of Sanctions for Imprecise Fee Submissions*, 2 CLASS ACTION ATTORNEY FEE DIGEST 295 (August 2008)

◇     *Supreme Court Round-Up*, 2 CLASS ACTION ATTORNEY FEE DIGEST 257 (July 2008)

◇     *Fee-Shifting For Wrongful Removals: A Developing Trend?*, 2 CLASS ACTION ATTORNEY FEE DIGEST 177 (May 2008)

◇    *You Cut, I Choose:  (Two Recent Decisions About) Allocating Fees Among Class Counsel,* 2 CLASS ACTION ATTORNEY FEE DIGEST 137 (April 2008)

◇    *Why The Percentage Method?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 93 (March 2008)

◇    *Reasonable Rates: Time To Reload The (*Laffey*) Matrix,* 2 CLASS ACTION ATTORNEY FEE DIGEST 47 (February 2008)

◇    *The "Lodestar Percentage:" A New Concept For Fee Decisions?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2008)

◇    *Class Action Practice Today: An Overview, in* ABA SECTION OF LITIGATION, CLASS ACTIONS TODAY 4 (2008)

◇    *How Transparent Are Class Action Outcomes?: Empirical Research on the Availability of Class Action Claims Data, in* CAN INCREASED TRANSPARENCY IMPROVE THE CIVIL JUSTICE SYSTEM? (tentative title, joint publication of RAND Corporation and UCLA School of Law) (2008) (with Nicholas M. Pace)

◇    *The Public Role in Private Law Enforcement: Visions from CAFA* (forthcoming 2008)

◇    *Finality in Class Action Litigation: Lessons From Habeas,* 82 N.Y.U. L. REV. 791 (2007)

◇    *The American Law Institute's New Approach to Class Action Objectors' Attorneys Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 347 (November 2007)

◇    *The American Law Institute's New Approach to Class Action Attorneys Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 307 (October 2007)

◇    *"The Lawyers Got More Than The Class Did!": Is It Necessarily Problematic When Attorneys Fees Exceed Class Compensation?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 233 (August 2007)

◇    *Supreme Court Round-Up,* 1 CLASS ACTION ATTORNEY FEE DIGEST 201 (July 2007)

◇    *On The Difference Between Winning and Getting Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 163 (June 2007)

◇    *Divvying Up The Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 127 (May 2007)

◇    *On Plaintiff Incentive Payments,* 1 CLASS ACTION ATTORNEY FEE DIGEST 95 (April 2007)

◇    *Percentage of What?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 63 (March 2007)

◇    *Lodestar v. Percentage: The Partial Success Wrinkle,* 1 CLASS ACTION ATTORNEY FEE DIGEST 31 (February 2007)(with Hirsh)

◇    *The Fairness Hearing:  Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. REV. 1435 (2006)

◇    *Why Create Litigation?  A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. REV. 709 (2006)

◇    *On What a "Private Attorney General" Is – And Why It Matters*,  57 VAND. L. REV.  2129(2004)

◇    *The Concept of Equality in Civil Procedure*, 23 CARDOZO L. REV. 1865 (2002) (selected for the Stanford/Yale Junior Faculty Forum, June 2001)

◇    *A Transactional Model of Adjudication*, 89 GEORGETOWN L.J. 371 (2000)

◇    *The Myth of Superiority*, 16 CONSTITUTIONAL COMMENTARY 599 (1999)

◇    *Divided We Litigate:  Addressing Disputes Among Clients and Lawyers in Civil Rights Campaigns*, 106 YALE L. J. 1623 (1997) *(*excerpted in COMPLEX LITIGATION 120-123 (1998))

## Presentations

◇    *Unpacking The "Rigorous Analysis" Standard,* ALI-ABA 12th Annual National Institute on Class Actions, New York, New York, November 7, 2008

◇    *The Public Role in Private Law Enforcement: Visions from CAFA*, University of California (Boalt Hall) School of Law Civil Justice Workshop, February 28, 2008, Berkeley, California

◇    *The Public Role in Private Law Enforcement: Visions from CAFA*, University of Pennsylvania Law Review Symposium, Dec. 1, 2007, Philadelphia, Pennsylvania

◇    *Current CAFA Consequences: Has Class Action Practice Changed?,* ALI-ABA 11th Annual National Institute on Class Actions, Chicago, Illinois, October 17, 2007

◇    *Using Law Professors as Expert Witnesses in Class Action Lawsuits,* ALI-ABA 10th Annual National Institute on Class Actions, San Diego, California, October 6, 2006

◇    *Three Models for Transnational Class Actions*, Globalization of Class Action Panel, International Law Association 2006 Conference, June 6, 2006, Toronto, Canada

◇    *Why Create Litigation?:  A Positive Externalities Theory of the Small Claims Class Action*, UMKC Law Review Symposium, April 7, 2006, Kansas City, Missouri

◇    *Marks, Bonds, and Labels:  Three New Proposals for Private Oversight of Class Action Settlements*, UCLA Law Review Symposium, January 26, 2006, Los Angeles, California

◇    Class Action Fairness Act, Arnold & Porter, Los Angeles, California, December 6, 2005

◇    ALI-ABA 9th Annual National Institute on Class Actions, Chicago, Illinois, September 23, 2005

◇    Class Action Fairness Act, UCLA Alumni Assoc., Los Angeles, California, September 9, 2005

◇    Class Action Fairness Act, Thelen Reid & Priest, Los Angeles, California, May 12, 2005

◇  Class Action Fairness Act, Sidley Austin, Los Angeles, California, May 10, 2005

◇  Class Action Fairness Act, Munger, Tolles & Olson, Los Angeles, California, April 28, 2005

◇  Class Action Fairness Act, Akin Gump Strauss Hauer Feld, Century City, CA, April 20, 2005

SELECTED OTHER LITIGATION EXPERIENCE

*United States Supreme Court*

◇  Co-counsel in constitutional challenge to display of Christian cross on federal land in California's Mojave preserve (*Salazar v. Buono*, __ U.S. __ (2010))

◇  Co-authored *amicus* brief filed on behalf of constitutional law professors arguing against constitutionality of Texas criminal law (*Lawrence v. Texas*, 539 U.S. 558 (2003))

◇  Co-authored *amicus* brief on scope of *Miranda* (*Illinois v. Perkins*, 496 U.S. 292 (1990))

*Disability*

◇  Co-counsel in successful ADA challenge ($500,000 jury verdict) to the denial of health care in emergency room (*Howe v. Hull*, 874 F. Supp. 779, 873 F. Supp 72 (N.D. Ohio 1994))

*Employment*

◇  Co-counsel in challenges to scope of family benefit programs (*Ross v. Denver Dept. of Health*, 883 P.2d 516 (Colo. App. 1994)); (*Phillips v. Wisc. Personnel Com'n*, 482 N.W.2d 121 (Wisc. 1992))

*Equal Protection*

◇  Co-counsel in (state court phases of) successful challenge to constitutionality of a Colorado ballot initiative, Amendment 2 (*Evans v. Romer*, 882 P.2d 1335 (Colo. 1994))

◇  Co-counsel (and *amici*) in challenges to rules barring military service by gay people (*Able v. United States*, 44 F.3d 128 (2d Cir. 1995); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (en banc))

◇  Co-counsel in challenge to the constitutionality of the Attorney General of Georgia's firing of staff attorney (*Shahar v. Bowers*, 120 F.3d 211 (11th Cir. 1997))

*Fair Housing*

◇  Co-counsel in successful Fair Housing Act case on behalf of group home (*Hogar Agua y Vida En el Desierto v. Suarez-Medina*, 36 F.3d 177 (1st Cir. 1994))

*Family Law*

◇  Co-counsel in first "second parent adoption" in New York State (*Matter of the Adoption of A Child Named Evan*, 583 N.Y.S.2d 997 (Surr. Ct. 1992))

◇      Co-counsel in challenge to constitutionality of Florida law limiting adoption (*Cox v. Florida Dept. of Health and Rehab. Srvcs.*, 656 So.2d 902 (Fla. 1995))

### *First Amendment*

◇      Co-counsel in successful challenge to constitutionality of Alabama law barring state funding for university student groups (*GLBA v. Sessions*, 930 F.Supp. 1492 (M.D. Ala. 1996))

◇      Co-counsel in successful challenge to content restrictions on grants for AIDS education materials (*Gay Men's Health Crisis v. Sullivan*, 792 F.Supp. 278 (S.D.N.Y. 1992))

### *Health Care / Public Health*

◇      Co-counsel in case challenging hospital's denial of care to indigent patients (*Dallas Gay Alliance v. Dallas County Hospital District*, 719 F. Supp. 1380 (N.D. Tex. 1989))

### *Landlord / Tenant*

◇      Lead counsel in successful challenge to rent control regulation (*Braschi v. Stahl Associates Co.*, 544 N.E.2d 49 (N.Y. 1989))

### *Police*

◇      Co-counsel in case challenging DEA brutality (*Anderson v. Branen*, 27 F.3d 29 (2nd Cir. 1994))

### *Racial Equality*

◇      Co-authored *amicus* brief for constitutional law professors challenging constitutionality of Proposition 209 *(Coalition for Economic Equity v. Wilson*, 110 F.3d 1431 (9th Cir. 1997))

## SELECTED OTHER PUBLICATIONS

### *Editorials*

◊     *Follow the Leaders*, NEW YORK TIMES, March 15, 2005

◊     *Play It Straight*, NEW YORK TIMES, October 16, 2004

◊     *Hiding Behind The Constitution*,  NEW YORK TIMES, March 20, 2004

◊     *Toward More Perfect Unions,* NEW YORK TIMES, November 20, 2003 (with Brad Sears)

◊     *Don't Ask, Don't Tell. Don't Believe It*, NEW YORK TIMES, July 20, 1993

◊     *AIDS: Illness and Injustice*, WASH. POST, July 26, 1992 (with Nan D. Hunter)


## BAR ADMISSIONS

◊     Massachusetts (2008)

◊     California (2004)

◊     District of Columbia (1987) (inactive)

◊     Pennsylvania (1986) (inactive)

◊     U.S. Supreme Court (1993)

◊     U.S. Court of Appeals for the D.C. Circuit (1993)

◊     U.S. Court of Appeals for the Fifth Circuit (1989)

◊     U.S. Court of Appeals for the Ninth Circuit (2004)

◊     U.S. Court of Appeals for the Eleventh Circuit (1993)

◊     U.S. District Court for the Central District of California (2004)

◊     U.S. District Court for the District of the District of Columbia (1989)

# EXHIBIT B

# LIST OF REVIEWED DOCUMENTS

1. PACER Docket of MDL Action
2. Amended Class Action Complaint and Jury Demand
3. Defendant's Motion to Dismiss or Motion for Judgment on the Pleadings with Respect to Conversion, Unjust Enrichment and Statutory Wage Claims
4. Defendants' Motion to Dismiss or Motion for Judgment on the Pleadings with Respect to Plaintiffs' Claims for Conversion, Unjust Enrichment, Statutory Wages, and Memorandum of Law in Support Thereof
5. Opinion of Judge Pro Regarding Defendants' Motion to Dismiss or Motion for Judgment on the Pleadings, 490 F.Supp.2d 1091 (D.Nev. May 23, 2007)
6. Memorandum of Points and Authorities in Support of Plaintiffs' Consolidated Motion for Class Certification of the First Phase Cases
7. Order Denying Plaintiffs' for Class Certification of the First Phase Cases
8. Stipulation Regarding Stay of Proceedings (Jan. 2nd, 2009)
9. Class Action Settlement Agreement and Release of Claims
10. Notice of Proposed Class Action Settlement and Release of Claims
11. Plaintiffs' Notice of Motion and Motion for Preliminary Approval of Proposed Settlement
12. Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Proposed Settlement and Related Declarations of Layn Phillips; Erica Bayardo; Nancy Hall; Ivy Frignoca; Dan Ambrose; Glen Neeley; Gary Nitsche; Michael Noonan; Mark Choate; Paul Echohawk; Matthew Tobin; and Laurence Stinson
13. Plaintiffs' Proposed Order on Motion for Preliminary Approval of Proposed Settlement
14. Plaintiffs' Proposed Order for Conditional Certification and Preliminary Approval of Proposed Settlement
15. Order Preliminarily Approving Settlement, Conditionally Certifying Class for Purposes of Settlement, Approving Form and Manner of Notice, and Scheduling Hearing on Fairness of Settlement Pursuant to Fed. R. Civ. P. 23(e)
16. Letter from James J. Robinson
17. Notice of Conventional Filing by Michael Weiler
18. Notice of Appearance by Michael Weiler
19. Notice of Insufficiency of Class Member Notification Prejudicing Proposed Settlement Outcomes by Michael Weiler
20. Preliminary Objection to Preliminary Proposed Class Action Settlement & Release of Claims Oral Argument Request by Michael Weiler
21. Judicial Notice of Potential Criminal Activity by Michael Weiler
22. Preliminary Objection to Attorneys Fees & Costs by Michael Weiler
23. Motion to Intervene and Memorandum in Support by Michael Weiler
24. Motion for Expedited Discovery & Memo in Support of by Michael Weiler
25. Production of Documents by Michael Weiler
26. Interrogatories by Michael Weiler
27. Request for Admissions by Michael Weiler
28. Letter from Christopher Dennis
29. Letter from Dana L. Olson
30. Letter from Stephanie D. Cousins
31. Letter from Dan Darnell
32. Letter from Doug Anderson
33. Objection to Settlement filed by Objector Clifford Ferguson
34. Objection filed by Objector Deborah Maddox
35. Objection to Class Settlement and Application for Attorney's Fees and Expenses filed by Objector Jessica Lynn Goana
36. Objection to Class Settlement and Application for Attorney's Fees and Expenses filed by Objector Jason Hunt
37. Objection to Class Action Settlement and Request for Attorney's Fees, and Notice of Intent to Appear filed by Objector Fatima Andrews
38. Objection to Class Action Settlement and Request for Attorney's Fees, and Notice of Intent to Appear filed by Objector Stephanie Swift
39. Wal-Mart settlements in collateral class actions listed in Table A, settlement approvals, and other documents available at settlement web sites