Robert J. Bonsignore (BBO # 547880)
BONSIGNORE & BREWER
193 Plummer Hill Road
Belmont, New Hampshire 03220
Telephone: (781) 391-9400
Facsimile: (781) 391-9496
Email: rbonsignore@class-actions.us
*Co-Lead Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE WAL-MART WAGE AND HOUR EMPLOYMENT PRACTICE LITIGATION | MDL 1735 |
| | 2:06-CV-00225-PMP-PAL (BASE FILE) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS EXCEPT KING v. WAL-MART STORES, INC., CASE NO. 07-1486-WY | |

## REPLY TO CO-LEAD COUNSEL CAROLYN BEASLEY BURTON, ATTORNEY ROBERT W. MILLS, AND ATTORNEY CAROL P. LAPLANT'S #737 SUBMISSION

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................. 2

II.     PROCEDURAL HISTORY ................................................ 4

III.    FACTS ............................................................................ 6

        A.      Bonsignore and Brewer were the Driving Force ...................... 8
                Behind this Complex MDL Long Before the
                Objectors Became Involved.

        B.      Burton Entered the Case with Limited Resources ................... 12
                and Involvement.

        C.      Burton Joined the Mills Firm 2008, and LaPlant ................... 12
                also Entered the Case.

        D.      The Mills Group Shouldered No Burden and Took No ........... 14
                Risk in this Massive MDL Matter.

        E.      At Burton's and Bonsignore's Request, Judge Phillips ........... 16
                Successfully Mediated a Settlement of the Wal-Mart
                MDL and was Appointed as the Arbitrator to Decide
                the Allocation of any Lump-Sum Plaintiffs' Attorney's
                Fees Award.

        F.      Co-Counsel's Inability to Agree on the Fee Split ................... 17
                Left the Binding Decision to Judge Phillips as
                Established by § 22.9 of the Settlement Agreement.

        G.      The Mills Group's Greed has Caused them to ......................... 18
                Falsely Impugn Judge Phillips' Fine Reputation
                in an Effort to Increase their Share of the Fee Award.

                1.      The Allegations About the Salvas ........................ 19
                        Case are Severely Overblown and

i

*Blatantly False.*

2.    *After Salvas Settled, Burton*.................................. 21
      *Continued to Support Judge Phillips'*
      *Service as Arbitrator in this Case and*
      *Clearly was Aware of the Scope of Judge*
      *Phillips's Involvement in Salvas.*

3.    *In June 2009, the Mills Group Urged* ................. 24
      *Judge Phillips to Withdraw due to his*
      *Salvas Work; Judge Phillips Declined the*
      *Request and Invited the Mills Group to File a*
      *Motion with this Court.*

H.   The Mill's Group is Awarded Almost 25% of........................ 26
     the Attorneys' Fees in Judge Phillips Allocation Order.

     1.......................................................................Local
          Class Counsel Submissions........................................... 27

     2.......................................................................Revie
          w of Co Lead Counsel Submissions .............................. 30

IV.  STANDARD OF REVIEW

V.   ARGUMENT

     A. ......................................................................Arbitr
          ation Awards Must be Confirmed Except ................................. 36
          in Limited Circumstances not Present in this Case.

     B..........................................................................No
          Grounds Exist for Vacating the Award.................................... 40
          Under §10(a)(1).

     C..........................................................................No
          Grounds Exist for Vacatur Under FAA §10(a)(2). .................. 48

          1. ......................................................................The
               Arbitrator did not Fail to Disclose ................................. 48

ii

Anything that Would Create a Reasonable
Impression of Bias.

a.................................................................*The
      Objectors Misrepresent and ............................ 48
      Overstate the Facts they Claim Support
      Their Bias Charge, Resulting in Not a
      Single Credible Allegation for Vacatur.*

b.................................................................*Objec
      tors' Subjective Belief that.................................. 53
      Judge Phillips does not Like Them Falls
      Far Short of Legal Bias.*

2.................................................................Objec
      tors Have Not Shown that Judge ................................. 54
      Phillips was Actually Biased.

a.................................................................*Objec
      tors Have Offered no Evidence of ...................... 55
      Improper Motives.*

b.................................................................*There
      is No Evidence that Judge Phillips..................... 57
      Violated Statutes or Ethical Rules.*

c. ...............................................................*Adver
      se Rulings do not Suggest Bias. ........................... 58*

d. ...............................................................*There
      is No Evidence of Prejudicial, ........................... 59
      Ex Parte Communications.*

e. ...............................................................*Judge
      Phillips did not Make Improper ......................... 59
      Public Comments that Impugns his Impartiality.*

f. ...............................................................*Objec
      tors' Early Challenges to the .............................. 60
      Arbitrator's Neutrality did not Pave the*

*Way for the Instant Challenge.*

D. ............................................................................................No
    Grounds Exist for Vacatur Under FAA §10(a)(3) .................. 61

    1. ...........................................................................The
        Arbitrator was not Guilty of any ................................... 62
        "Misconduct"

        a. ....................................................................*Objec*
            *tors Offer no Ethical Rule Violated* .................... 63
            *by the Alleged Oral Ex Parte Contact.*

        b. ...................................................................*There*
            *is no Overwhelming Evidence that* .................... 63
            *the Alleged Oral Ex Parte Contact did*
            *not Occur.*

        c. .......................................................................*The*
            *Allegations of Improper Written* ......................... 65
            *Ex Parte Contact are Similarly Baseless.*

    2. ........................................................................*Objec*
        tors Have Not Shown that the ...................................... 66
        Arbitrator's Alleged "Misconduct" Prejudiced
        Them.

E. ...............................................................................................No
    Grounds Exist for Vacating the Award Under 10(a)(4) ........... 67

    1. ..........................................................................*Manif*
        est Disregard of the Law is an ....................................... 68
        Extremely High Standard and Requires Proof
        that the Arbitrator Knew the Law but Ignored It.

    2. ...........................................................................*The*
        Objectors Cannot Demonstrate that Judge .................... 69
        Phillips Manifestly Disregarded Clear Law
        Governing Allocation of Attorneys Fee Awards
        in Common Found Cases

a. .................................................................................Judge
Phillips Properly Considered the ........................ 70
Relative Contributions of Counsel,
Lodestar Principles, and Multipliers.

b. .................................................................................Judge
Phillips Acted Well Within his............................. 73
Discretion when Evaluating the Objectors'
Fee-Allocation Submission Under these
Legal Principles.

F. ...........................................................................................The
Mills Group Waived their Right to Move to Vacate. ............... 77

1. ........................................................................................By
Failing to Timely Raise the Arbitrator ......................... 77
Bias Challenge, Objectors have Waived It.

2. ........................................................................................The
Mills Group Waived its Right to Object........................ 81
to the Arbitration Award When it Failed to
Timely Object to Judge Phillips's Previously
Disclosed Relationships

G. ...........................................................................................The
Mills Group Acted in Bad Faith by .......................... 83
Manufacturing Unsubstantiated Grounds to Vacate
Unfavorable Arbitration Award.

VI. ........................................................................................CON
CLUSION

# TABLE OF AUTHORITIES

**Cases**

*A.G. Edwards & Sons, Inc. v. McCollough,*
967 F.2d 1401 (9th Cir. 1992) ...................................................................38

*Balter v. RBC Dain Rauscher, Inc.,*
2006 U.S. Dist. LEXIS 28474 (D. Nev. 2006), .......................................58

*Barjon v. Dalton,*
132 F.3d 496 (9th Cir. 1997) ...................................................................80

*Bivens Gardens Office Bldg. v. Barnett Banks, Inc.,*
140 F.3d 898 (11th Cir. 1998) ......................................................... 83, 86

*Bosack v. Soward,*
586 F.3d 1096 (9th Cir. 2009)......................................................... 71, 78

*Bridgeport Music, Inc. v. WB Music Corp.,*
520 F.3d 588 (6th Cir. 2008) ...................................................................80

*Camacho v. Bridgeport Financial, Inc.,*
523 F.3d 973 (9th Cir. 2008) ...................................................................80

*Carbo Ceramics v. Norton-Alcoa Proppants,*
155 F.R.D. 158 (N.D. Tex. 1994) ...........................................................67

*Central Montana Rail v. BNSF Railway Company,*
No. 10-35439 (9th Cir. March 11, 2011)................................................36

*Clemens v. U.S. Dist. Court,*
428 F.3d 1175 (9th Cir. 2005)..................................................................56

*Cockerham v. Sound Ford,*
347 Fed. Appx. 279, 2009 U.S. App. LEXIS 12855 (9th Cir. 2009) ......................40

*Collins v. D.R. Horton, Inc.*,
505 F.3d 874 (9th Cir. 2007) ................................................................71

*Comedy Club, Inc. v. Improv West Associates*,
553 F.3d 1277 (9th Cir. 2009)................................................................71

*Compare U.S. v. Barnwell*,
477 F.3d 844 (6th Cir. 2007)................................................................68

*Coutee v. Barington Capital Group, L.P.*,
336 F.3d 1128 (9th Cir. 2003)................................................................71

*Cunningham v. Gates*,
45 F. Supp.2d 783 (C.D. Cal. 1999) ................................................................55

*Datagate, Inc. v. Hewlett-Packard Co.*
941 F.2d 864 (9th Cir. 1991) ................................................................83

*Durga Ma Corp.*,
386 F.3d at 1313................................................................81

*Employers Ins. of Wausau v. National Union Fire Ins. Co. of Pittsburgh*,
933 F. 2d 1481 (9th Cir. 1991) ................................................................ 38, 92

*Fid. Fed. Bank, FSB v. Durga Ma Corp.*,
386 F.3d 1306, (9th Cir. 2004) ................................................................ 38, 87, 88

*French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
784 F.2d 902 (9th Cir.1986) ................................................................ 36, 37

*Hall Street Associates v. Mattel, Inc.*,
552 U.S. 576 (2008)................................................................ 35, 36, 38

*Hoeft v. MVL Group, Inc.*,
343 F.3d 57 (2d Cir. 2003)................................................................71

*In re Agent Orange Products Liability Litig.*,
818 F.2d 216 (2d Cir. 1987)............................................................... 74, 81

*In re Ampicillin Antitrust Litig.*,
81 F.R.D. 395 (D.D.C. 1978)......................................................... 74, 75, 81

*In re Copley Pharmaceutical, Inc.*,
50 F. Supp. 2d 1141 (D. Wyo. 1999)............................................ 73, 75, 76

*In re Diet Drugs Products Liab. Litig.*,
401 F.3d 143 (3d Cir. 2005).....................................................................73

*In re FPI/Agretech Securities Litig.*,
105 F.3d 469 (9th Cir. 1997).......................................................... 73, 74

*In re Fraschilla*,
235 B.R. 449 (9th Cir. BAP 1999)............................................................83

*In re Guidant Corp. Implantable Defibrillators Products Liability Litigation*,
2008 WL 5382338, 2008 U.S. Dist. LEXIS 103736  (D. Minn. 2008)...................76

*In re High Sulfur Content Gasoline Products Liability Litigation*,
517 F.3d 220 (5th Cir. 2008) .......................................................... 75, 78

*In re Mason*, 916 F.2d 384 (7th Cir. 1990)........................................56

*In re The Roman Catholic Church of the Diocese of Tucson*,
2008 Bankr. LEXIS 4737, (9th Cir. B.A.P. 2002)....................................39

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
56 F.3d 295 (1st Cir.1995)............................................................. 74, 76

*In re Vitamins Antitrust Litig.*,
398 F. Supp. 2d at 224 ...........................................................................81

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
19 F.3d 1291 (9th Cir. 1994) ...................................................................79

*Johnson v. Gruma Corp.*,
14 F.3d 1062, 1069 (9th Cir. 2010) ........................................................90

*Johnson v. Wells Fargo Home Mortgage*,
No. 09-15937, No. 09-16815, 2011 U.S. App LEXIS 2908 (9th Cir. 2011) .........36

*Jordan v. Mulnomah County*,
815 F.2d 1258 (9th Cir. 1987)...................................................................78

*Kerr v. Screen Actors Guild, Inc.*,
526 F.2d 67 (9th Cir. 1975) ......................................................................75

*Kulas v. Flores*,
255 F.3d 780 (9th Cir. 2001 .....................................................................55

*Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*,
341 F.3d 987 (9th Cir. 2003) ........................................ 36, 37, 39, 71, 78

*L & M Creations v. CRC Info. Sys.*,
2011 U.S. Dist. LEXIS 36269 (D. Nev. 2011) ........................................39

*Lagstein*,
607 F.3d 634 .............................................................................................73

*Larson v. Palmateer*,
515 F.3d 1057, (9th Cir. 2008) .................................................................61

*Laxalt v. McClatchy*,
602 F. Supp. 214 (D. Nev. 1985)..............................................................55

*Litkey v. United States*, 510 U.S. 540, 555 (1994)...............................................61

*More Light Investments v. Morgan Stanley DW Inc.* ................................................. 86
2011 WL 121641 (9th Cir. 2011)

*N.Y. State Dept. of Law v. FCC,*
984 F.2d 1209 (D.C. Cir. 1993) ..................................................................... 64

*Ortiz v. Stewart,*
149 F.3d 923 (9th Cir. 1998) ........................................................................ 67

*Pacific & Arctic Ry. and Nav. Co. v. United Transp. Union,*
952 F.2d 1144 (9th Cir. 1991) .......................................................... 41, 42, 44, 45

*Positive Software Solutions, Inc. v. New Century Mortg. Corp.,*
476 F.3d 278 (5th Cir. 2007) ......................................................................... 56

*Poweragent Inc. v. Electronic Data Systems Corp.,*
358 F.3d 1187 (9th Cir. 2004) ...................................................................... 87

*Preston v. U.S.,*
923 F.2d 731 (9th Cir. 1991) .............................................................. 81, 82, 83

*Schoenduve Corp. v. Lucent Technologies. Inc.,*
442 F.3d 727 (9th Cir. 2006) ........................................................................ 37

*Todd Shipyards Corp. v. Cunard Lines, Ltd.,*
943 F.2d 1056 (9th Cir. 1991) ...................................................................... 71

*Toyota of Berkeley v. Auto Salesmen's Union, Local 1095,*
834 F.2d 751 (9th Cir. 1987) ........................................................................ 86

*Turner v. Murphy Oil USA, Inc.,*
582 F. Supp. 2d 797 (E.D. La. 2008) .............................................................. 76

*Reply Co-Lead Counsel Carolyn Beasley Burton, Attorney Robert W. Mills, and Attorney Carol P. LaPlant's #737 Submission*

*U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*,
591 F.3d 1167 (9th Cir. 2010) ....................................................... 38, 39, 69

*U.S. v. Burger*,
773 F. Supp. 289 (D. Kan. 1991) ...................................................... 65

*U.S. v. Enigwe*,
155 F. Supp.2d 365, 372 (E.D. Pa. 2001) ........................................ 63

*U.S. v. Rogers*,
119 F.3d 1377 (9th Cir. 1997) .......................................................... 83

*U.S. v. Studley*,
783 F.2d 934 (9th Cir. 1988) ............................................................ 63

*Van Skike v. Director, Office of Workers' Compensation Programs*,
557 F.3d 1041 (9th Cir. 2009) .......................................................... 80

*Verone v. Taconic Tel. Corp.*,
826 F. Supp. 632 (N.D.N.Y. 1993) .................................................... 55

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) .......................................................... 75

*Withrow v. Larkin*,
421 U.S. 35 (1975) ............................................................................ 67

*Wood v. McEwen*,
644 F.2d 797 (9th Cir. 1981) ............................................................ 83

*Woods*, 78 F.3d at 427 .................................................................... 58

**Rules**

9 U.S.C. § 10(a) ................................................................................................. 35, 42

9 U.S.C. § 10(A)(1)................................................................................................81

FRCP 60(b)(3)......................................................................................................42

## I.   INTRODUCTION[1]

The Federal Arbitration Act[2] requires confirmation of Judge Phillips's Attorneys' Fees

Allocation absent a demonstration that: (1) the decision was procured by corruption, fraud, or

undue means, (2) Judge Phillips employed evident partiality or corruption, (3) Judge Phillips was

guilty of misconduct because he refused to postpone a hearing, hear evidence pertinent and

material to the controversy, or engaged in other prejudicial misbehavior, or (4) Judge Phillips

exceeded his powers or that he so imperfectly executed those powers that a mutual, final, and

definite award upon the subject matter submitted was not made.[3]

Despite three months, their recent 99 page brief, and three bites at this apple,[4] Carolyn

Beasley Burton, Robert W. Mills, and Carol LaPlant ("the Objectors" or "the Mills Group") have

thoroughly failed to meet their burden.  Indeed, they have done little more than blatantly

misrepresent fact and law and selfishly and falsely malign both a respected jurist and respected

---

[1] As required by this Court's most recent order (# 736), the Objectors have included in their opposition to the Motion to Confirm (# 722) Judge Phillips's award the grounds they assert for vacating it pursuant to sections 10 and 11 of the Federal Arbitration Act ("FAA").  This matter is before the Court in response to the allocation award issued following a fee arbitration conducted pursuant to Paragraph 22.9 of the Settlement Agreement as approved by this Court on November 2, 2009 (# 491).  Objectors all joined in a Request for Final Approval that urged this Court to Approve Paragraph 22.9 and affirm the Hon. Layne Phillips (ret.) as the designated Arbitrator.  Final Approval of the terms of the Settlement Agreement (Settlement Agreement / Docket 304-3 / Filed 5/26/09 Order on Final Approval / Docket 491 / Filed 11/2/09) including Judge Phillips role as designated arbitrator was also supported by all Class Counsel and Defendant Wal-Mart Stores Inc.

[2] Title 9  Chapter 1-hereafter "FAA."

[3] In further support of the request to affirm the arbitration award, Class Counsel and Co-Lead Bonsignore rely on the following:  Judge Phillips January 10, 2011 Allocation Order and its attachments; a true and accurate copy of the Opinion Testimony of Richard Flamm; a true and accurate copy of the Chart Response of Robert J. Bonsignore to the Affidavit of Carolyn Beasley Burtons April 11, 2011 affidavit. (#737); a true and accurate copy of the Robert J. Bonsignore as to matters relating to the Salvas matter.

[4] The Mills Group has characterized the opposition Judge Pro authorized them to file by April 11, 2011 (Dkt. # 736) as both an Opposition and a Motion to Vacate.  It is the combination of these two potentially separate documents that, they state, justified their request to file an excessively long brief.  Here, the Mills Group has already filed one opposition to the Motion to Confirm, accompanied by several declarations and a litany of exhibits, and is essentially trying to get three bites at the same apple. The Mills Group has now filed two Oppositions to the Motion to Confirm, and one Motion to Vacate.

class counsel in the process.[5]

The scattered litany of fraud, corruption, and undue- means allegations including specious claims of arbitrator bias and corruption amount to nothing more than opinion, conjecture, and self-serving conclusions. The long-promised production of new evidence of legitimate bases for this challenge has been utterly unfulfilled. The caustic content and vitriolic tone shames all Plaintiffs' counsel as well as the Objectors. And the sheer volume of the submission that is dedicated to rehashing previously-rejected, and long-since-waived, claims of arbitrator bias and misconduct or that falls far outside the scope of the FAA review warrants the assessment of costs.

The Objectors' offering contains no sustainable evidence of arbitrator misconduct, refusal to hear pertinent and material evidence, or other prejudicial misbehavior.  Nor have they shown that he exceeded his powers. The task of the arbitrator was narrow and clearly defined by Paragraph 22.9 of the Settlement Agreement, which charged Judge Phillips with allocating the gross attorneys' fee awarded by this Court in the event that Co Lead Counsel, Robert Bonsignore and Carolyn Burton were unable to reach agreement.  When no agreement was reached and his responsibilities were triggered, Judge Phillips adeptly met the call.   He even invited the Objectors' input on the schedule and protocol of the fee-allocation arbitration and adopted the schedule and protocol advocated by Burton to carefully consider the approximately 20,000 pages of materials and the hotly-disputed claims to the available fees, in reaching his 37 page allocation decision.  *See* Kirchner 4/26/11 Aff. ¶ 5. Att. 5 List Of Materials placed into the record by Co

---

[5] While Judge Phillips's reputation and credibility is well known in the Ninth Circuit, it is an easily accomplished worthwhile exercise to contrast the Objectors with Class Counsel.  Class counsel are experienced and accomplished; they are comprised of past and present bar presidents and leaders, recipients of peer reviewed awards and honors for professional excellence, public service, and contributions to the bar and the civil justice system. *See* Docket # 434, exhibits L-1 through L-30. The Objectors have a lengthy history of adverse published opinions on fee and ethics

2

Lead Bonsignore and Class Counsel ("the extent to which the parties have litigated their fee dispute is unparalleled in my experience") Award at 2.   There is no dispute that the Paragraph 22.9 fee arbitration was fully litigated.[6]

The Objectors' disagreement with Judge Phillips's findings is a simple case of sour grapes for which no relief is available.  Judge Phillips perfectly fulfilled his role as a fair, neutral arbitrator and used a sound, analytical methodology to produce a comprehensive and well-reasoned allocation determination after fully evaluating the mountains of evidence presented to him.  Judge Phillips's service as arbitrator and his resulting Allocation Award are beyond reproach, and the Allocation Award should be immediately confirmed in its entirety.

# I.  PROCEDURAL HISTORY

This case was originally brought as a number of separate state-based wage-and-hour class actions against defendant Wal-Mart Stores, Inc. ("Wal-Mart"), which were consolidated by the panel for multi-district litigation into the instant action on February 16, 2006. The JPML initially ordered six cases transferred to MDL 1735. The JPML order was filed with the District Court of Nevada on February 17, 2006, as Docket #2 and transferred to this Court for disposition. The controversy was heavily litigated. Class Certification was denied on June 28, 2008. #249. An Appeal was taken. On or about December 14, 2008, Wal-Mart and the Plaintiffs executed a Term Sheet and thereafter negotiated a Settlement Agreement that was preliminarily approved by this court on May 28, 2009. # 322. On November 2, 2009, at the request of Co Lead Counsel

---

related matters, have practiced only a contextually short time or have little relevant experience, or have no record of professional excellence, contributions to the bar or the civil justice system, or peer reviewed honors or distinctions.
[6] For example, Judge Phillips first divided counsel into 3 discrete groups- non-titled class counsel, titled class counsel, and Co Lead Counsel. He thoroughly reviewed and considered the lodestar submissions as well as the other evidence, argument and law contained in the 20,000 pages making individual adjustments in the exercise of his discretion within each subgroup.

*Reply to Co-Lead Counsel Carolyn Beasley Burton, Attorney Robert W. Mills, and Attorney Carol P. LaPlant's #737 Submission*

Bonsignore and Burton, Class counsel and the Class Representatives, this Court granted final

approval of the Settlement Agreement. (#491)

A component of the Settlement, agreed to unanimously by all – and urged by Co-Lead

Counsel Burton in her related filings (#416) - was that any disputes concerning the allocation of

any attorney fees awarded would be decided through a non-appealable, binding arbitration

conducted by Hon. Layne Phillips. See also # 302, 303 & 305.[7]This Court awarded Plaintiffs'

counsel the total sum of $28.3 Million in attorney fees and costs, by Order dated November 20,

2009. (#520).

Co-Lead Counsel Bonsignore and Burton attempted to reach a joint allocation

recommendation but were unable to agree on the appropriate allocation of fees. Consensus was

reached among all counsel but Burton (together with Robert Mills as they comprise the "Mills

Firm"), LaPlant, and Ravenholt.  The arbitration provisions of the Settlement were invoked,

pursuant to Section 22.9 of the Settlement.  Each Co Lead submitted a competing proposal for

the Procedure by which the Arbitration would be conducted for the scheduling of the related

submissions. Judge Phillips selected Co-Lead Burton's proposal over the objection of Co Lead

Bonsignore.[8]  *See* Kirchner Aff. 4/26/11 ¶ 6a. Arbitrator's Order dated September 9, 2010.

The Paragraph 22.9 arbitration[9] was fully litigated with all parties to the arbitration taking

full and unrestricted advantage of the opportunity to submit materials in support of their

---

[7] # 305 DECLARATION of Layn Phillips re: 302 MOTION Preliminary Approval of Settlement filed by Plaintiff Nancy Hall. (Beasley Burton, Carolyn) (Entered:05/26/2009);
#302 MOTION Preliminary Approval of Settlement by Plaintiff Nancy Hall (Beasley Burton, Carolyn) (Entered: 05/26/2009); and #303 MEMORANDUM filed by Plaintiff Nancy Hall re: 302 MOTION Preliminary Approval of Settlement. (Beasley Burton, Carolyn) (Entered: 05/26/2009).

[8] *See* Kirchner Aff. 4/26/11 at 6b and c.
[9] Although the parties did not expressly agree to submit to the FAA, this court correctly noted that further proceedings that such further proceedings depend on the exercise of the court's discretion under FAA sections 10 and 11.

4

positions and to reply to the materials submitted by the other parties under the procedure Burton

persuaded Judge Phillips to adopt.  As Judge Phillips observed:

> It is unlikely that any of the attorneys involved in this proceeding
> contemplated the nature of this arbitration when they agreed to arbitrate
> their differences. Of course, fees are important to attorneys, and many of
> the attorneys before me have waited five years or more for payment.
> However, the extent to which the parties have litigated their fee dispute is
> unparalleled in my experience. The parties have submitted more than
> 20,000 pages of material for my review, including multiple expert
> opinions, more than fifty evidentiary declarations, and hundreds of
> exhibits.

On January 10, 2011, Judge Phillips issued his allocation ruling and the related Opinion and

Order ("Allocation Order"). Thereafter, Co-Lead Burton notified Co-Lead Bonsignore that she

was opposing the distribution of attorney fees by the settlement administrator Rust Consulting

and that she would be moving for vacatur of the arbitrator's award. Burton notified Rust that she

would not consent to the distribution of attorney fees, and that they were prohibited from

distributing the fees in accordance with the Allocation Order.

## III. FACTS

In 2004, Bonsignore & Brewer ("B&B") began the process that would evolve over time

into the economic and non-economic relief eventually received by over 3.2 million hourly

employees of Wal-Mart. They did not do it alone. Reaching and bringing to fruition the generous

and complex resolution of MDL 1735 required the able assistance of accomplished counsel.

Robert Bonsignore ("Bonsignore") and his staff devoted thousands of hours and eventually

stewarded its successful resolution. These efforts included working with the 44 accomplished

class counsel firms whose collective efforts were instrumental in persuading Defendant Wal-

Mart Stores, Inc. ("Wal-Mart") to settle. Between 2004 and December 14, 2008, Bonsignore and

Brewer both staffed and funded the federal and state based litigation,

5

The forgoing summary of facts appeared to be undisputed until Judge Phillips awarded two associates and another lawyer, all of whom appeared in the case only after settlement was effectively reached, over $6 million of the $28 million gross fee award.  The complaints raised by Objectors Burton, Mills, and LaPlant, and alleged to somehow support vacatur as relating to class counsel and Co Lead Bonsignore are contradicted by their own prior representations.[10]  For example, in a complaint Burton filed in California Superior Court in 2008 Ms. Burton alleged "the MDL case had been initiated and funded by [Mr.] Bonsignore" and that by 2006, Mr. Bonsignore "was able to convince Wal-Mart to at least consider the opportunity for an informal resolution."  *See* Kirchner 4/26/11¶ 7. May 19, 2008, First Amended Complaint in Burton v. Furth, ¶ 106.  Similarly, in a 2006 declaration filed by Burton before Judge Pro in this case, Burton acknowledged that Mr. Bonsignore and local Class Counsel performed the substantive briefing in this matter. (#112) Specifically, Ms. Burton swore, under penalty of perjury, that Mr. Bonsignore "assumed primary responsibility for researching and drafting Plaintiffs' motion for class certification and opposition to Wal-Mart's motion [to] dismiss," and that she had "only devoted a small amount of time [to] editing the voluminous pleadings that had already been researched and drafted by the team of MDL attorneys."  *See,* # 112-3- Declaration of Carolyn Beasley Burton Filed in Support of Joint Response to Opposition to Carolyn Beasley Burton as Co-Lead Counsel, dated December 11, 2006, at ¶9. Even after joining up with Mills, Burton praised Bonsignore's efforts in the case.  In a December 12, 2008, email she wrote: "Robert B. likewise has a strong passion for the cases, and has always exhibited a desire to litigate, and complimentary/sincere lack of fear of Wal-Mart's claims, criticisms, and bullying approach." Kirchner 4/26/11 Aff. ¶ 9.

---

[10] There is no dispute that others do not share the Objectors view of the history of the litigation and settlement.  It is

6

**A.      Bonsignore and Brewer Were the Driving Force Behind this Complex MDL Long Before the Objectors Became Involved.**

The genesis of the eventual MDL 1735 occurred on April 4, 2004. While reading her Sunday Edition of the New York Times, attorney Robin E. Brewer came across a key corporate admission that filled a gap in proof. It is not disputed that soon after April 4, 2004 B&B began the process of consulting and strategizing[11] with potential class counsel, sorting through the then -- filed cases, contacting, researching and analyzing the wage-and-hour and class-certification law of each state, and formulating strategy. *Id. See also* Kirchner 4/26/11 Aff.  at ¶ 10.  Select Affidavits of Class Counsel.  B&B also researched, developed alternative strategies, and weighed the alternative pluses and minuses of both state and federally prosecuted (MDL) coordinated litigation against Wal-Mart for wage and hour alleged violations.

It is not disputed that:

1.   B&B's involvement in the wage and hour litigation against Wal-Mart began in early 2003 when Mr. Bonsignore was invited to participate in the Massachusetts litigation by Fred and Ben Furth[12];

2.   By April 2004 class certification had been denied in over a dozen cases;

3.   In April of 2004 and continuing, the litigation was categorized by contingency fee lawyers as highly undesirable because, among many other reasons of the risk of loss, the power and determination of the defendant not to pay claims, the lack of

---

contradicted by the testimony of class counsel. *See, e.g.* Kirchner 4/26/11 Aff . ¶ 8.

[11] Given the undesirability of the litigation, some sales work and convincing of potential class counsel was required also.

[12] Mr. Bonsignore served as a member of the Executive Committee in the *California Vitamins* case, which advanced antitrust claims on behalf of California businesses and consumers. #438-8.

7

supporting statutory and common law, the cost of advancing the litigation and the plethora of more desirable cases available to pursue. See # 426.

The process of generating interest as well as the complexity of the task at hand slowed, but did not stop the process. In 2005, Brewer who served on the then Association of Trial Lawyers of America's (ATLA) Legislative Committee, learned that the Class Action Fairness Act (CAFA) was certain to become law - soon. Although contested by the Objectors, class counsel supports the fact that after the passage of CAFA, B&B and class counsel finalized research, made final calls on strategy, and filed state based complaints and that additional complaints were filed federally and transferred to MDL 1735. Immediately thereafter, B&B, together with MDL 1735 class counsel finalized a national litigation strategy. State-based cases were filed with Fuston, Petiway and French (Alabama), the Harrelson Firm (Arkansas), Carter and Tate (Georgia), Shaheen and Gordon (New Hampshire) leading the charge.

Throughout this ongoing process, B&B facilitated interaction and fostered cooperation between the various states by providing research, support, and information and class counsel cooperated.  Robert Bonsignore of B&B negotiated, and class counsel worked with B&B, to create the 2005 document "sharing agreement" that effectively brought into MDL 1735 all discovery previously or subsequently produced anywhere else in the country; thus permitting discovery to be used in the state based cases in Alabama, Arkansas, Georgia, Massachusetts, and New Hampshire).

In 2004, 2005, and into 2006, B&B also reached out to counsel who had been litigating state based cases to test the waters as to whether they would be interested in jointly-prosecuting the wage and hour cases against Wal-Mart in an MDL setting. The response from the law firms already waging state based cases against Wal-Mart was a uniform and resounding **no** – a fact that

8

underscores the risk assumed by class who entered the litigation when all others, including counsel already invested in the litigation rejected the case. "The acceptance of risk is a highly significant factor…[and a] critical element that led to the relatively favorable result was the willingness of counsel to enter into an undertaking that they knew would be long, hard- fought and without any assurance of success." *See* Kirchner 4/26/11¶ 1-Allocation Order at 30.  It is a matter of public record that the class counsel in MDL 1735 accepted the challenge and rose and eventually conquered each set-back and challenge. #491.

Long before Ms. Burton made her appearance in the litigation, and while Ms. LaPlant was an associate of the Choate Law Firm, Class counsel worked with B&B to accomplish the following[13]:

1. The research, review, evaluation and analysis of the available state and federal law for the various states under consideration;

2.  The research, review, evaluation and analysis of same as well as the available evidence;

3.  The decision that the claim was meritorious, regardless of the risk and regardless of the wealth, power, and previous success of the Defendant;

4.  The decision to select and abandon certain claims among the many potential wage and hour claims;

5.  The research of the "state of the then-active litigation" and the selection of states to accelerate filings;

6.  The consensus to coordinate previously-filed state-based cases not subject to removal under CAFA with later-filed federal cases;

9

7.   The consent of Wal-Mart to enter into and the consent of all Plaintiff's Counsel to become subject to the "MDL 1735 Sharing Agreement," providing that all previously and subsequently produced discovery in any other case would be deemed produced in MDL 1735 and that discovery produced in MDL 1735 would be deemed produced in the state-based cases of Alabama, Arkansas, Georgia, Massachusetts and New Hampshire. See, #42 (1/17/2006).[14]

8.   The consensus to request the Judicial Panel on Multi District Litigation (JPMDL) to create MDL 1735 and to advocate before this Court and the Ninth Circuit to the JPMDL;[15]

9.   The consensus on Pre-Trial Order No. 2, which organized the litigation;

10.  The consensus as to the 2006 agreement to Phase Certification[16];

On April 25, 2006, this Court issued Pre-trial Order No. 2 ("PTO 2").  The requirements imposed on Lead Counsel by PTO 2 were clear and well considered. PTO 2 contained an important requirement for Co-Lead Counsel – the need to facilitate and foster cooperation among the myriad Plaintiffs' Counsel participating in this case.  PTO 2 recognized that, "cooperation by and among Plaintiff's counsel…is essential for the orderly and expeditious conduct of this litigation,"[17] and it required Co-Lead Counsel and all Plaintiffs' counsel to maintain detailed, hourly records because any ultimate award of attorneys fees would be based on lodestar, not a fee split. #42- PTO 2 at 6, § VII, ¶ D (#42).

---

[13] Robert Mills entered the litigation after it was effectively settled. For that reason, he merits no further mention during the recitation of events prior to the settlement.
[14] Mr. Bonsignore and Mr. Ravenholt appearing.
[15] It is not contested that Robert Bonsignore reached out and formed consensus among counsel, drafted and filed all related papers and then over the vehement objection of Wal-Mart- successfully argued the request to the JPMDL.
[16] It is not contested that Robert Bonsignore of B&B negotiated this. Mr. Ravenholt declined to join in this consensus.
[17] PTO 2, "IX.  Communication Among Counsel", p. 7.

10

**B.     Burton Entered the Case with Limited Resources and Involvement.**

Through November of 2007, the Furth Firm ("Furth") employed an attorney named Carolyn Beasley Burton ("Burton").  Burton had junior status due to her inexperience.  As evidenced by the time submission the Furth firm made in this case, in 2005, Burton had very little to do with the MDL[18]; however, in early 2006, the Furth firm assigned her some tasks related to the case.  In April of 2006, Burton, due to the support she received from Bonsignore and other plaintiffs' counsel at his request, was appointed to serve with Bonsignore as co-lead counsel.

Burton had no staff of her own at the time, and she bore little responsibility for any aspect of the case and had virtually no dealings with any class members or counsel.[19]  Rather, she worked on the case on a sporadic basis until November 27, 2006, when her employment with the Furth firm was terminated. *See* Kirchner Aff. 4/26/11 ¶ 11.

On January 4, 2007, Ms. Burton became employed in an "of counsel" position at a Walnut Creek California insurance defense firm, Glynn & Finley ("G&F"), which required her to work their caseload. *Id.* She admitted at the time she carried a full caseload. Kirchner 4/26/11 Aff.  at ¶ 11. Burton held herself out to be still working for G&F at a speaking engagement in Colorado in early 2008 (Kirchner 4/26/11 Aff.  at ¶ 11), but at some point that year, her relationship with that firm was terminated as well. *See* Kirchner 5/26/11 Aff. at ¶ 12.

**C.     Burton Joined the Mills Firm in 2008, and LaPlant also Entered the Case.**

After initially doing business out of her home during 2008 under the name "Beasley Law Group," Ms. Burton joined Robert Mills and practiced law under the name Mills Law Firm and Beasley Law Group. It would appear that the only person, other than Burton who has been held

---

[18] *See* Kirchner Aff. ¶ 10.

out to be a member of the "Beasley Law Group," was Carol LaPlant. Kirchner Aff. 4/26/11 ¶ 13. The web page on which this representation was made was ultimately taken down, and Ms. LaPlant has since disavowed having ever been affiliated with Burton in the practice of law.  She has, however, alternately been held out to be Burton's "attorney," her contract employee; and, after Burton signed on with Mills, as "a Mills Firm timekeeper." Kirchner 4/26/11 Aff.  at ¶ 14.

Despite adamantly denying any relationship, Ms. LaPlant appeared on the Beasley Law Group's website for a lengthy period of time. *See* Kirchner 4/26/11 Aff  at ¶ 13. During that and other relevant times, Ms. Burton and Ms. LaPlant made use of Bonsignore and Brewer legal research, staffing, and funding. *See* Kirchner Aff. ¶ 1-Allocation Order at p. 30.

Ms. LaPlant effectively never performed her duties as liaison but instead acted as Burton's assistant (*Id.*), LaPlant was "Charged with essentially administrative matters, such as communications between the court and other counsel (including receiving and distributing notices, orders, motions, briefs on behalf of the group), convening meetings of counsel, advising parties of developments, and otherwise assisting in coordination of activities and positions." (*Id.*)  But LaPlant did not perform her duties as Liaison as evident by the fact that "local class counsel consistently stated they never heard from LaPlant at all (*Id.*).

LaPlant's billing reflects 17 months of absence from MDL 1735 (Declaration of R. Deryl Edwards, Jr. In Opposition To the Declaration Of Carol P. Laplant In Support Of Motion To Vacate and In Opposition To Confirmation, paragraph 19 filed this date).  This is consistent with Ms. LaPlant's representation in an email dated June 27, 2008 wherein she stated "Going forward, I am willing to work *only* if there is a written agreement in place, specifying my compensation, in regard to both past and future work, and responsibilities."  No written agreement was ever

---

[19] Judge Phillips' allocation order confirmed this.  *See* Kirchner Aff. ¶ 1 at p. 20, 23.

offered to LaPlant.

Later, Judge Phillips would reduce Ms. LaPlant's bill by $157,312.50 because 259.25 hours were billed non-contemporaneously and 170.25 hours were non-compensable time- time spent mostly on intramural wars not to the benefit of the class (*See* Kirchner Aff. ¶ 1-Allocation Order at p.11, paragraph B).

Additionally Judge Phillips would not award Ms. LaPlant a multiplier because the vast majority of her time she spent after settlement and because she failed to perform of duties as Liaison by failing to keep local counsel informed (*Id.* at paragraph B2).  He finds that Ms. LaPlant acted as Ms. Burton's assistant (*Id.*).

**D.     The Mills Group Shouldered No Burden and Took no Risk in this Massive MDL Matter.**

Co Lead Bonsignore kept in regular contact with Defendant's national lead counsel, Brian Duffy, and attended in-person meetings with him during the summer of 2008.  It is not contested that not long thereafter, in August of 2008, Wal-Mart signaled an interest in entering into settlement negotiations; and on September 4, 2008, Mr. Bonsignore – with Ms. Burton's advance knowledge – met again with Wal-Mart's counsel in Las Vegas to gauge the seriousness of that interest.  The company's interest in settling at that time was genuine and that at the conclusion of their Las Vegas meeting, Mr. Bonsignore and Wal-Mart's counsel agreed to meet again at Wal-Mart corporate headquarters in Arkansas.

At some point after the meeting in Las Vegas, it appears as though Burton struck some sort of deal the then two-person Mills Law Firm ("Mills firm"),[20] the nature of which was not then and has never been disclosed to Co Lead Bonsignore, or any of the clients or class representatives or class counsel.  Ms. Burton's client requested to have the fee split agreement with Mills disclosed, and that the request was not met and remains outstanding.

Burton's fee request was based in part on an alleged massive "risk" she and Mills took in pursuing MDL 1735. Despite Burton's assertion of the risk she undertook, Judge Phillips found that Bonsignore and class counsel assumed the risk.  Allocation Order at 30. As to the risk Burton put forth she assumed, Judge Phillips found that her employer, the Furth firm, was entitled to recover the portion of Burton's lodestar that was associated with the time that she was employed with the firm.  *See* Kirchner Aff. ¶ 1-Allocation Order at p. 20.  Phillips found that time Burton billed after-the-fact was unreliable and disallowed it. *Id.* Such findings of fact suggest that any risk undertaken in pursuing MDL 1735 belongs squarely to the Furth firm.

B&B absorbed all costs and paid virtually all of the freight of the MDL during its pendency. The evidence established and Judge Phillips found that B&B and Class Counsel assumed most of the risk. *Id.* at p. 30.  Burton joined Glynn and Finley on January 4, 2007.  Contemporaneous billing records evidence that Glynn and Finley billed only a few hundred hours to MDL 1735 matters.

---

[20] It is not entirely clear whether Burton and Mills are, in fact, partners in the practice of law.  Burton's email address, cbeasley@beasleylawgroup.biz, would seem to suggest that she still practices as the "Beasley Law Group." *See* Kirchner Aff. ¶ 15- http://members.calbar.ca.gov/fal/Member/Detail/184753 (last visited 2/20/11). In addition, although the Mills firm's website lists Burton on its "firm leadership" page, it does not refer her to as a partner.  *See* http://www.millslawfirm.com/attorneys.html (last visited 2/20/11).  Burton told Bonsignore that she and Mills entered into a fee-splitting arrangement for the two Wal-Mart cases she and Mills have been involved in … Kirchner Aff. ¶ 105.  No such agreement between Mills and Burton has ever been publicly disclosed.

14

**E.    At Burton's and Bonsignore's Request, Judge Phillips Successfully Mediated a Settlement of the Wal-Mart MDL and was Appointed as the Arbitrator to Decide the Allocation of any Lump-Sum Plaintiffs' Attorneys' Fees Award.**

At the request of Defendant Wal-Mart and Plaintiff Co Leads Bonsignore and Burton, the Hon. Layn Phillips, a seasoned former federal district court judge with impeccable credentials,[21] presided over a successful mediation that resulted in the execution of a Term Sheet on December 14, 2008.[22]  The Term Sheet provided, *inter alia*, that any dispute concerning the allocation of attorneys' fees awarded would be decided by means of a binding, non-appealable arbitration conducted by Judge Phillips.[23]  This provision was ultimately incorporated into Section 22.9 of the Settlement Agreement.  All counsel (specifically including Burton, Mills, and LaPlant) advocated for the Court to approve the Settlement Agreement, and the Court ultimately approved it.  Indeed, Ms. Burton championed Judge Phillips during the period of February through March of 2009 when it appeared that not all signatories to the settlement agreement were in favor of the selection of Judge Phillips. *See* Schultz Decl. filed this day.  Burton even "demanded, as co-lead counsel, that the Honorable Layn Phillips serve as the arbitrator of any fee disputes, as set forth

---

[21] Judge Phillips is among the most called-upon providers of Alternative Dispute Resolution of Complex and Class Action Litigation in America.  Judge Phillips has resolved more disputes worth more than $100 million dollars than any other single provider of alternative dispute resolution services and had been mediating the Wal-Mart wage and hour practices cases, including those comprising MDL 1735 on an ongoing basis for several years. At or about the time of the MDL 1735 mediation, Judge Phillips had successfully mediated dozens of Wal-Mart wage and hour practices cases. Judge Phillips was specifically sought after and requested by the parties, with the Mills Firm advocating his selection notwithstanding knowledge of his prior and ongoing business relationships with Wal-Mart. Burton knew that Judge Phillips had previously mediated the *Smokeless Tobacco* cases in which Co Lead Bonsignore participated. *See* Kirchner Aff. ¶ 16- Exhibit 34A, p. 3.  Judge Phillips also disclosed it by reference it at the session.

[22] Only weeks earlier Robert Mills announced Ms. Burton had joined his firm.

[23] Both Burton and Bonsignore negotiated and executed the Term Sheet, which evolved into the Settlement Agreement that was eventually executed by all of the parties to this litigation. (#432-2).

15

in paragraph 22.9 of the settlement agreement, and that in her mind this was a non-negotiable position." *See* Schultz Decl. filed this day.[24]

### F.    Co-Counsel's Inability to Agree on the Fee Split Left the Binding Decision to Judge Phillips as Established by § 22.9 of the Settlement Agreement.

On November 29, 2009, this Court granted the Plaintiffs' counsel's collective request for a lump sum attorney's fees and costs award of more than $28 million, leaving for future determination the question of how to carve up the award between the dozens of attorneys and firms whose hard work and dedication to this once-losing prospect resulted in tens of millions of dollars in recovery to thousands of Wal-Mart employees.  Although the Settlement Agreement gave the first shot at this allocation to Bonsignore and Burton, their working relationship was so fraught with conflict by this time, and Burton's inflated sense of worth to this case was so out of whack, that no agreement could be reached.  So, the job fell to appointed arbitrator, Layn Phillips.  Settlement Agreement at ¶22.9.

Judge Phillips attacked the task with great detail and contemplative consideration.  He asked the attorneys for input into the scheduling and protocol for the fee-allocation arbitration, and he ultimately adopted the one proposed by Burton.  All parties to the arbitration, including Mills, Burton and LaPlant were given ample opportunity to submit materials in support of their positions, as well as to respond to materials submitted by other counsel. As Judge Phillips noted in his final Allocation Opinion and Order issued on January 10, 2011, the parties collectively submitted more than 20,000 pages for the Arbitrator to review, including "multiple expert opinions, more than 50 evidentiary declarations, and hundreds of exhibits."  *See* Kirchner Aff. ¶

---

[24] On May 26, 2009, Class Counsel submitted a brief signed by Co Lead Burton seeking Preliminary Approval of the Settlement Agreement. (#302).  In support, Burton attached the Declaration of the Hon. Layne R. Phillips.

16

1-Allocation Order at p. 2.  The Opinion and Order reflects that he carefully considered each claim, and, after doing so, substantially discounted many of them.[25]   But the two highest lodestar claims – the ones that had been submitted by the Mills firm and by B&B – were the ones that the Arbitrator took the knife to the most.  He discounted <u>each</u> of the firms' lodestar claims by more than $1 million.

## G.   The Mills Group's Greed Has Caused them to Falsely Impugn Judge Phillips's Fine Reputation in an Effort to Increase their Share of the Fee Award.

After the Allocation Award was issued, Burton notified B&B that she would be moving to vacate the award under § 9 of the FAA within the next few months, and the Mills firm advised the claims administrator, Rust Consulting, that it would not consent to the distribution of the allocated fees. B&B thereupon lodged a Motion for Distribution Pursuant to the Allocation Order. In response, Mills Group filed a brief which, while styled an "Opposition," repeatedly referred to themselves as "Moving Parties," and inappropriately included a prayer for "Interim Relief."  Opp. p. 14.

In a blatant effort to get a bigger slice of the attorneys' fees pie, the Mills Group now claims that the arbitrator they selected, supported, and many times went to for relief in this complex litigation matter, awarded them more than $7 million as *punishment*, and his Allocation Award is so tainted with bias, undue influence, and misconduct that it must be vacated.  The evidence, however, fails to support this story.  They demonstrate, quite to the contrary, that Burton and her Objector colleagues are making mountains into molehills in a last-ditch effort to

---

(#305).

[25] For example, attorney Edwards' lodestar was reduced from $2,465,129.17 to $1,750,000, and Carol LaPlant's was reduced from $890,718.75 to $733,406.25.

17

boost their fee award, and none of the situations they have identified offer real evidentiary

support for their selfish claims.

1.   *The Allegations About the Salvas Case Are Severely Overblown and Blatantly False.*

Burton did not become concerned about Judge Phillips' ability to impartially evaluate her firm's allocation request until after she submitted the first of her lodestar claims in this case. Burton attested that she first learned on May 13, 2009, that mediation had been scheduled in the *Salvas* case, which was to be presided over by Judge Phillips on May 16, 2009.  Mediations scheduled with Judge Phillips office on short notice was not out of the ordinary.  For example, the December 14, 2008, mediation that resulted in the settlement of this case was scheduled on only 4 days notice, even though the mediation required the arbitrator to fly to New York from California to attend it.  Burton and Mills were invited to attend, and Furth even offered to "fly them down" to the mediation location. *See* Kirchner 4/26/11 Aff.  at ¶ 17. Thus, no credible claim could be made that anyone (least of all Judge Phillips) was trying to do anything "behind Burton's back."

By Burton's own admission, she knew by no later than May 13, 2009, that Wal-Mart had asked Judge Phillips to serve as the *Salvas* mediator and expressed no concern at that time.  On that day, after learning from Wal-Mart counsel Brian Duffy that Burton would not be attending the mediation, Judge Phillips personally emailed Burton to convey his "preference that [she] be there, and [Duffy] agreed that he would rather have [her] there, but it is what it is, and this happens from time to time in class litigation.  I'm starting at 10am tomorrow with whoever shows up as that is what was booked through my office." Kirchner 4/26/11 Aff.  at ¶ 18. Burton eventually emailed back at 12:04 a.m. the following day (the morning of the scheduled

18

mediation) and complained, "I am not sure what is going on at your office tomorrow.  I have never spoken to Brian Duffy about any mediation in *Salvas*, and thus, thought Fred Furth was joking."  Kirchner 4/26/11 Aff.  at ¶ 19. She also expressed her view that attorneys who had agreed to the mediation did not have authority to represent the *Salvas* class.  She made no reference to the Massachusetts-based MDL 1735-only class members which were comprised of all Wal-Mart hourly employees hired after December 31, 2005, all Sam's Club employees from 1999 to present, and certain other specific categories of hourly employees that had been missed in the *Salvas* filing, who she represented through her position as MDL 1735 Co-lead Counsel. While Ms. Burton emphatically claims she was lead counsel in Massachusetts at that time, the Massachusetts docket sheet reveals otherwise. Kirchner 4/26/11 Aff  at ¶ 20.

Contrary to her assertions, Burton did not write that the arbitrator's agreement to mediate *Salvas* "posed a conflict with his role in MDL-1735."  She did not "remind" him that "she had serious concerns about the propriety of his decision to preside over the mediation under these circumstances and over her objections."  The contemporaneous writings establish that the only thing Burton said to Judge Phillips in that email regarding any "conflict" was that her co-counsel believed "that any mediation should be conducted with a neutral in the local area, and should be segregated and kept separate from the MDL mediation to avoid any appearance and objections regarding conflicts." Kirchner 4/26/11 Aff  at ¶ 20.

Nor did she "expressly advise" Phillips of her "concern that his participation in *Salvas* presented conflicts with his service as the MDL 1735 arbitrator." *Id.*  Regarding any concerns she may have expressed about his re-assumption of the role she and all other parties had requested that he perform as a mediator of the Massachusetts based wage and hour claims against Wal-Mart, Judge Phillips promptly responded.  He sent an email to Burton that same

morning, advising her expressly that he had not participated.[26]  Counsel who were present at Irell

& Manella on the day of the scheduled mediation have confirmed, under oath, that the scheduled

mediation did not, in fact, take place. This was for the simple reason that those who arrived the

evening before the scheduled mediation settled Salvas overnight.  Kirchner 4/26/11 Aff  at ¶ 21.

> **2.** **After _Salvas_ Settled, Burton Continued to Support Judge Phillips's Service as Arbitrator in this Case and Clearly Was Aware of the Scope of Judge Phillips's Involvement in _Salvas_.**

After _Salvas_ settled, Burton worked with, and later placed on file Judge Phillips's

declaration in support of the settlement. If approved, the express terms of the settlement

(Paragraph 22.9) expressly provided that Judge Phillips would serve as the binding arbitrator of

her firm's fee application.

On May 21, 2009, Michael Christian, an attorney with the Zelle Hoffman firm, wrote a

letter to the _Salvas_ court judge extolling the virtues of the settlement his firm helped broker.  Mr.

Christian stated in the letter that, "the settlement of this case comes after Wal-Mart has already

settled virtually all the wage and hour claims pending in various other states around the country.

The Honorable Layn Phillips (Ret.) served as the mediator in each of Wal-Mart's earlier wage

and hour settlements cases.  Thus, Judge Phillips is intimately familiar with these cases and

understands the dynamics of case valuation and settlement.  Judge Phillips has invited this Court

to call him directly to discuss the fairness of this settlement as compared to the earlier

settlements facilitated by Judge Phillips."  Kirchner 4/26/11 Aff.  at ¶ 22. Evidence shows that

Judge Phillips was unaware that such a letter had even been sent.  Judge Phillips did not

authorize the letter nor did he encourage Mr. Christian to send it.

---

[26] _See_ Kirchner 4/26/11 Aff.  at ¶ 21. Email from Judge Phillips to Co Lead Burton dated Saturday May 16, 2009·· "[a]s it turns out, our e-mail

20

Burton sent an email to Judge Phillips at 7:00 p.m that same evening. In it, she expressed no concern that he "openly and actively supported" the settlement:

> "Greetings Judge Phillips, We just got this letter from Michael Christian. It appears to be inconsistent with my understanding of your role. I am just about to get on a plane to Boston, but would like to get your thoughts before the hearing we have scheduled in *Salvas* at 2:00 pm EST on Plaintiffs' emergency motion. Kind regards, Carolyn."[27]

Within 3 hours of receiving that email, Judge Phillips responded.  He said:

> "Its after midnight east coast so I will just say this; as I told you the parties arrived at my office Saturday morning and told me they had settled the case. I said that I was pleased they had because I felt uncomfortable about becoming involved given my ongoing role in the MDL and your objection about conflicts which I received the night before the mediation. I returned to my office and had no other involvement. Period. End of story. I will be happy to speak to the Court and address any inquiries the Court may have. But I am mediating a securities case all day in Newport Beach beginning at 9am pacific and have conf calls prior to that."[28]

The following day (May 22nd), Burton followed up with another email, in which she expressly asked Judge Phillips to relieve her concern by assuring her that he had not, in fact, mediated the *Salvas* settlement, would not express any opinion as to the merits of that settlement, or act as an expert witness in that case.  Kirchner 4/26/11 Aff  at ¶ 23.  Judge Phillips confirmed that the case settled before the May 16th mediation could commence:

---

exchange was irrelevant. The parties arrived and announced they reached a resolution without the need for my participation."

[27] *See* Kirchner 4/26/11 Aff  at ¶ 23

[28] *Id.*.

21

Carolyn:  . . . I can state the following in response to your e-mail below: 1. I still have not had the opportunity to read Mr. Christian's letter and do not intend to get drawn into a correspondence dispute. 2. **I did not mediate the *Salvas* case last Saturday.** 3. I will not serve as any side's expert witness, and have not been retained to do so. 4. I did mediate the *Salvas* case previously and know the history associated with these negotiations. 5. I did serve as the neutral in many other Wal-Mart settlements and have a very solid understanding of the relative and comparative fairness of these resolutions. 6. Because I have agreed to make myself available to all of the judges who are presiding over the various Wal-Mart matters, I cannot agree to your request that I promise to never express an opinion on the fairness of the settlement in *Salvas* that was negotiated last Friday and Saturday, which I did not preside over. 7. If the *Salvas* judge would like to discuss that settlement with me at some point, I will do so, but that is the trial judge's call, not mine or yours. As I offered to you in my e-mail of last night, if asked, I will answer, as a neutral, any questions posed by any court.

Kirchner 4/26/11 Aff  at ¶ 23.

On May 28, 2009, less than a week after receiving this email, Burton and Mills attended a hearing before Judge Phillips that addressed disputes they had with co-counsel.  At the hearing, neither Burton nor Mills registered an objection to Judge Phillips's role as arbitrator.  At the conclusion of the hearing, Mills even went out of his way to compliment and thank Judge Phillips because he and Ms. Burton moved heaven and earth to keep him at the helm of this case. Mills concluded his comments by asking Judge Phillips how the MDL Class Counsel could

22

possibly compensate him for all the work he had done in the matter.[29]  *See* Kirchner Aff. ¶ 24-5/28/09 Transcript. The following day, May 29, 2009, Judge Phillips issued an order with respect to the relief Burton had requested at the hearing that was generally favorable to Burton and Mills.

> **3.     *In June 2009, the Mills Group Urged Judge Phillips to Withdraw due to his Salvas Work; Judge Phillips Declined the Request and Invited the Mills Group to File a Motion with this Court.***

In his June 5, 2009 letter, Burton's counsel Jonathan Bass, urged Judge Phillips to withdraw, in part, for the alleged "ex parte communications" he entertained in conjunction with *Salvas*.[30]  According to Bass, because of those "communications" which Bass made no effort to describe, as well as Judge Phillip's agreement to mediate the *Salvas* case without Burton's permission, Judge Phillips' disqualification was "required" by the "the governing arbitration statutes, rules and principles."  Bass neglected to draw Judge Phillips' to any statutes or rules; instead, Bass cited to the California Ethics Standards for Neutral Arbitrators in Contractual Arbitrators.  Bass did not show these Standards to have any applicability to arbitrations conducted in accordance with the FAA.  Bass also did not explain why, if Burton truly questioned the arbitrator's ability to be impartial, she had failed to mention that fact when she participated in a hearing before the Arbitrator the previous week.

On June 9, 2009, Bonsignore sent Bass an email in which he discussed some facts relevant to Bass's request for withdrawal.  Bass responded on June 10, 2009, with an email in

---

29 Mills⋅ contemporaneous, on the record comments conflict with Burton's subsequent claim that Judge Phillips had manifest bias and hostility to her at that hearing.  She claimed that Judge Phillips had received ex parte communications that were unquestionably unfavorable to her, as Phillips' manner, tone and statements revealed during an MDL proceeding held on May 28, 2009.

30 Bass's letter was itself "ex parte."  Although the letter was sent to the arbitrator on the evening of June 5th, copies of the letter were not contemporaneously served on any of the counsel in the case (except Bass' clients); and, in fact, were not sent to them by Bass's office until after the close of business three days later.

which he suggested that "anyone who wishes to participate in the process of resolving Judge

Philips's capacity to serve as the Section 22.9 arbitrator…agree on a procedure for submitting

briefs to him on the issue, and then inform him of our proposal."  Kirchner 4/26/11 Aff  at ¶ 25.

Bass had neither made a formal motion to the Arbitrator seeking his recusal, nor asked the

Arbitrator to allow briefing or argument on the issue.

On June 10, 2009, Andra Barmash Greene, the Managing Partner of Irell & Manella's

Newport Beach office, wrote Bass to inform him that Judge Phillips and the firm's Alternative

Dispute Resolution Center declined his request, and explained in detail the reasons for that

decision.  Kirchner 4/26/11 Aff  at ¶ 26. The next day, June 11, 2009, Judge Phillips wrote to

acknowledge his receipt of Bass's letter, noting that because Bass' letter was "based on factual

inaccuracies" and devoid of "legal merit," there was "no basis for me to withdraw." Kirchner

4/26/11 Aff  at ¶ 27.[31]

On August 19, 2009, Judge Phillips sent an email seeking to revisit the recusal issue.  A

week later, on August 26, 2009, just two days before a hearing on another matter in the case,

Bass wrote a letter to Judge Phillips on behalf of his clients "in response to" that email.  In a

footnote, Bass said:

> "[y]our email suggests that that matter is closed, since we have not
>
> presented it to Judge Pro for review.  That is not our analysis.  It is our
>
> position that, as and when a particular dispute is submitted to you in your

---

[31] In his June 5th letter Bass had said that he was inviting counsel "other than my clients" to "express their views" regarding Bass's claim that Judge Phillips should step aside so that he could  "make a fully informed decision and, if necessary, I can then present the issue to the Court" (emphasis added).  However, just as Bass did not formally move to recuse the Arbitrator, he never "present[ed] the issue" to Judge Pro.  Instead, after receiving the Arbitrator's response to his informal withdrawal request, Bass appeared to have dropped the matter until June 29, 2009, when he sent an email to Wal-Mart's counsel. On July 2, 2009 that email was forwarded to Judge Phillips, who responded to Bass with a letter the following day (July 3, 2009).  The arbitrator explained that he had already "ruled on this issue," and that he viewed his decision in this regard to be "final and non-appealable."  He also informed Bass that if he or his clients  Believed that "further proceedings" were necessary with respect to the withdrawal request, delay in "instituting such proceedings" would be "unfair to all parties affected."  The Arbitrator's letter clearly invited Messrs. Burton and Mills to raise any "conflict" concerns they might have with the Court; but, once again, no recusal motion was made by Bass or his clients, and they made no attempt to inform Judge Pro of their putative concerns about the Arbitrator.

24

role as a neutral, the requirement of disclosure of matters that give rise to
potential conflicts of interests or other grounds for disqualification will
arise, and each party will have the right to make whatever challenge he or
she deems appropriate."

Despite any concerns Burton claimed to have with Phillips's partiality, on October 1,
2009, Burton moved the Court for final approval to the Settlement Agreement which expressly
named Phillips as the fee arbitrator; and, on November 24, 2009 the Court, with Mills' and
Burton's blessing, gave final approval to the settlement.  Docket No. 519.  Neither co-lead nor
any class counsel appealed from the Order designating Judge Phillips as fee arbitrator.

Burton ultimately moved this Court to disqualify Judge Phillips from further participation
in this case. # 646.   After a hearing on June 25, 2010, Burton's Motion to Disqualify was denied.
# 685. This Court ruled from the bench: "I am simply going to observe what I think is, again,
very clear. That these are factors which have been known to the parties at the time they entered
and/or thereafter advocated approval before this court of the settlement.  Portions were
previously raised with the arbitrator and not there a year ago and not thereafter raised before this
court. The Court finds no basis to interrupt the arbitration proceedings to interfere with the
resolution [of the fee-allocation dispute]."  Burton did not appeal the order.

**F.    The Mill's Group is awarded almost 25% of the attorneys' fees in Judge Phillips
        Allocation Order**

In evaluating the lodestar submissions of all attorneys involved, Judge Phillips took in to
consideration all relevant factors.  He performed an analysis of the risk involved in the Firm's
pursuit of the suit, as well as their impact in assisting in litigation strategy and tactics.  These

considerations were carefully taken and resulted in Judge Phillips issuing an allocation order on January 10, 2011.

       1.      Local Class Counsel Submissions

Examining the lodestar submissions of local class counsel, Judge Phillips took in to account the significant risk that local counsel bore in being "on the hook" for trying their respective state cases against a defendant known for a "tenacious" defense against class action litigation. *See* Exhibit 1 at 6.  Judge Phillips determined that a 1.5 multiplier for class counsel was appropriate due to the risk of going to trial, as well as that Bonsignore sought the advice of these counsel on litigation strategy throughout the progression of the MDL.  Kirchner Aff. ¶ 1- Allocation Order at p.6.  Phillips agreed based on these two factors that Bonsignore's approach of largely accepting and advocating for local class counsels' lodestars was much more on the mark.  *Id.*

In determining that the risks appropriately merited a 1.5 multiplier for local class counsels' lodestar, Judge Phillips did individually assess local class counsels' submissions.  *See id*.  Clearly, Phillips took a proactive approach where he noted billing issues, and took three types of action: (1) Judge Phillips awarded a lesser or no multiplier if class counsel billed a disproportionately large amount of time after the settlement term sheet was executed because of the low risk born by these counsel; (2) Judge Phillips awarded a reduced award or no multiplier where he believe the time expended was "unusually high" for the activities described; and (3) Judge Phillips declined to award a multiplier where counsel did not provide "sufficient information" about their activities such that a multiplier was permitted. *See id.*

Judge Phillips described reductions in the submitted lodestar of three firms.  First, the Azar Firm's lodestar was reduced from $1, 216, 239.78 to $182,675.00 because Judge Phillips,

26

in his careful analysis of submissions, noted that the Azar Firm sought compensation connected to lawsuits unrelated to the MDL 1735 matter.  *See id.*  Second, Judge Phillips took action to disallow $93,695 from the Welsh & Welsh Firm's lodestar for "unnecessarily duplicative" work.  *See id.* at  9.  Finally, Judge Phillips also slightly reduced the lodestar of the Giatras Law Firm because the lodestar "appeared excessive for the work performed in 2009 and 2010.  *See id* at 9.

Additionally, Judge Phillips' Allocation Order details three issues with individual counsel where significant reductions were taken to their lodestar.  The examination of these counsels' lodestar show the depth that Judge Phillips took in issuing this allocation order.  Reductions in their fees were clearly taken to keep the allocation of fees fair and on an even playing field.

In evaluating the submissions of Ravenholt & Associates, Judge Phillips first rejected the Ravenholt Firm's assertions that it was entitled to 1/3 of the entire fee awarded to class counsel and allocation the Firm's fee using the same methodology as for other local class counsel. *See id.* at 9-10.  Judge Phillips rejected the Ravenholt Firm's argument that the Hall Agreement entitled it to the larger fee because: (1) the Hall Agreement related only to one action; (2) it stated nothing about attorneys' fees; (3) Ravenholt put forth no evidence that Burton, Bonsignore, or others were aware of such an agreement; (4) the attorney's who executed the Hall Agreement "had no authority to abrogate the rights…of the other attorneys"; and (5) Judge Phillips would have refused to honor any putative "equal split" agreement because it would have disproportionately awarded the Ravenholt Firm.  *See id*. at 9-10.

Further, in allocating fees to the Ravenholt Firm based on their lodestar, Judge Phillips noted that Burton had "a point" in arguing that Ravenholt's submitted lodestar was excessive.  *See id.* at 10.  While Judge Phillips found the lodestar "extraordinary" and "high", he deferred to Ravenholt's billing judgment and awarded the lodestar, but took the strong action of declining to

27

award a multiplier because of its size.  *See* Exhibit 1 at 10.  However, Judge Phillips did take the action of reducing the hourly rate for a paralegal from $200 per hour to $165 per hour.  *See  id.* at 11.  Judge Phillips also disallowed 29 attorney hours for time spent on a dispute regarding Co-Lead counsel, as he did for all attorneys submitting time on this issue.  *See id.* at 11.

Second, Judge Phillips reduced lodestar hours, and did not award a multiplier to LaPlant. *See id.* at 11.  Here, Judge Phillips found that LaPlant's time records were unreliable and "reconstructed", where there was 259.25 or $97,000 worth of hours found on her time submissions during the arbitration that did not appear on her contemporaneous time submissions to Bonsignore & Brewer during the pendency of the action.  *See id.* at 11-12.  Judge Phillips specifically found that "LaPlant reconstructed her time records for the period May 15, 2007 to October 27, 2008 to substantially increase her compensable time".  *See id.* at 11-12.  Stating, "it seems apparent that LaPlant's 2010 submission included time that was not contemporaneously recorded – if it had been contemporaneously recorded, it would have been included in her October 27, 2008 time report to Bonsignore & Brewer. Rather, LaPlant retroactively reconstructed her time records for the period May 15, 2007 to October 27, 2008 to substantially increase her compensable time." *Id.* at 12.  Additionally, Judge Phillips disallowed 170.25 hours of "non-compensable time" which included time LaPlant erroneously billed the MDL for work done on *Salvas*, Burton's Emergency Request, and work on disputes between counsel, and time for work on a motion to strike the arbitrator's order, as well as to remove the arbitrator. *See id.* at 12.

In still awarding LaPlant a lodestar of $733,406.25, Judge Phillips refused to award a multiplier for two reasons: (1) most of LaPlant's compensable time was billed after a settlement agreement had been reached; and (2) Judge Phillips found that "LaPlant failed to fully perform

*Reply to Co-Lead Counsel Carolyn Beasley Burton, Attorney Robert W. Mills, and Attorney Carol P. LaPlant's #737 Submission*

her functions as Liaison Counsel, requiring others to do the job that the District Court appointed her to perform". *See id.* at 13.  This failure to coordinate the efforts of multiple class counsel and "communicate matters of significance" did not merit a multiplier.  *Id.*

In examining local class counsel submissions, Judge Phillips also reduced the lodestar submission of R. Deryl Edwards.  In awarding Edwards a reduced lodestar of $1,750,000, Judge Phillips found three areas that required reductions.  *See id.* at 14.  First, Judge Phillips reduced the excessive hourly rate Edwards billed for paralegal time from $300 per hour down to $165 per hour.  *See* Exhibit 1 at 14.  Second, Judge Phillips disallowed 47 hours for time spent responding to the Emergency Request, similarly to what he did for every attorney billing time for that task. *See id.* at 14.  Finally, Judge Phillips found that Edwards expended "excessive time" on "vaguely described tasks", and agreed with Burton's contention that billing for more than 1,600 hours researching and drafting complaints in various states was "excessive".  *Id.*

2.      Review of Co Lead Counsel Submissions

These close consideration continued in Judge Phillips review of the submissions of Co-Lead Counsel.  Judge Phillips carefully deconstructed his review of the Mills Firm's lodestar in the allocation order.  *Id* at 16-25.  While the examination of the Mills Firm's lodestar did result in reductions, there were also items where Judge Phillips agreed with the Mills Firm's submission.

First, Judge Phillips rejected the hourly rates submitted by the Mills Firm, and set their hourly rates at a lower rate in calculating the lodestar.  *Id* at 16-20.  Here, Judge Phillips reasoned that all attorneys had submitted historic rates, and therefore he took the Glynn & Finley rate on the February 12, 2007 invoice to represent the historic rate of Burton.  *Id.* at 16-17. Further, the rates submitted for other attorney's billing under the Mills Firm umbrella were

arbitrary, and therefore Judge Phillips used a rate comparable to the rate schedule of Bonsignore and Brewer, except for Robert Mills.  *Id.* at 17-20.  Judge Phillips found Robert Mills rate to be high, and a clear sign that the Mills Firm acted to top load their billing, with over 85% of the hours being billed by Mills and Burton, when the work could have been done by less expensive attorney's.  *Id.* at 19.  Therefore, Judge Phillips reduced Robert Mills rate to $450.  *Id.* at 19.  In reaching this decision Judge Phillips found the expert opinion of Richard Pearl to be irrelevant because lower rates could also be considered reasonable, and the comparison conducted of the San Francisco Bay Area was not appropriate where the comparative market should have been Nevada where most of the litigation took place.  *Id.* at 18.

Second, in evaluating the Mills Firm's time submissions, Judge Phillips reduced significant hours where the submissions attempted to bill for time that Burton performed while an employee at Furth, and Glynn and Finley.  *See id.* at 20-22.  The submissions billed for 341.7 hours during 2005 while Burton was employed at the Furth Firm.  *See id.* at 20.  In 2006 the Furth Firm had submitted its own fee claim related to MDL 1735, billing for 122.3 Burton hours. *See id.* at 20.  Judge Phillips rejected Burtons argument that this gross disproportion resulted from "private" time not entered into the Furth recording system.  *See id.* at 21.  Judge Phillips found her private recording system to be unreliable as it was not contemporaneous and consisted mainly of "after-the-fact reconstructions."  *See id.* at 21.

Additionally, Judge Phillips disallowed 214.1 Burton hours for time during 2007 while Burton was an employee of Glynn & Finley.  *See id.* at 21-22.  Here, Glynn & Finley billed for 638.15 Burton hours in 2007, while Burton submitted for 852.25 hours during that period, an increase of 214.1.  *See id.* at 21.  Burton argued that this time was "client development" time not allocable to Glynn & Finley, or in the alternative was due to typos and clerical errors resulting

from the manual timekeeping system.  *Id.*  Judge Phillips rejected both arguments in finding that most firms recording systems include client development time, which is contemporaneously maintained. *Id* at 22.

Judge Phillips did permit the Mills Firm to be compensated for time spent in submitting the fee application to the District Court, and in defending against the objectors' appeal in the Ninth Circuit.  *Id.*  Here, Judge Phillips reasoned that he was not compensating any attorneys for this work from the common fund, but allocating fees that were already taken from the fund.  *Id.*  Judge Phillips stated that if the Mills Firm was not compensated for its time on these matters, then other class counsel would benefit from the Mills Firm's uncompensated time.  *Id.*

Actions were taken to disallow hours the Mills Firm spent on disputes among plaintiffs' attorneys, including 112.2 Burton hours for her dispute with the Furth Firm regarding her status as Co-Lead Counsel, and 126.1 Burton hours for her "Emergency Request for Further Instruction Regarding Pre-Trial Order No.2", as well as 28.8 hours spent by J. Timothy Nardell in August 2009 on the "Emergency Request". *Id.*  While Judge Phillips disallowed those hours, he still permitted the Mills Firm to be compensated for its filings with the District Court and the Ninth Circuit.  *Id.*  Here, Judge Phillips reasoned that even though these duplicative filings were "wasteful", they were borne from disputes between Co-Lead Counsel; a dispute for which the Mills Firm was not solely at fault.  *Id.* at 22-23.

Judge Phillips permitted the Mills Firm to be compensated for 4,300 hours of paralegal time.  *Id.* at 23.  This was despite the fact that the Mills Firm provided no information concerning the experience, education or qualifications of these individuals.  *See Id.* at 23.  Judge Phillips found that there was sufficient evidence to establish that they performed compensable work on MDL 1735 matters.  *Id.* at 23.

31

Finally, Judge Phillips reduced the time the Mills Firm billed for personnel reviewing the time records of other class counsel to 500 hours.  *Id.* at 24.  Here, the Mills Firm personnel in 2009 and 2010 submitted at least 1,050 hours, and perhaps as much as 1, 300 hours reviewing the time records of other class counsel.  *Id.* at 23. However, Phillips found that the Settlement Agreement did contemplate Co-Lead Counsel reviewing the records, *See id.* at 24.

This careful consideration of the Co-Lead Counsel time submissions continued with Judge Phillips review of the Bonsignore & Brewer submissions.  Here, Judge Phillips accepted the hourly rates submitted by the Bonsignore & Brewer Firm, and used these rates in calculating the Firm's lodestar.  *See id* at 26.  Judge Phillips accepted these rates because the Bonsignore Firm disclosed its hourly rates and "did not make different representations regarding those rates". *Id* at 26.  Judge Phillips did go on to make reductions to the Bonsignore Firm time after he stated that instead of "dealing with thousands of modifications to billed time, I shall use dollars, rather than time, for reductions to Bonsignore & Brewer's lodestar."  *Id.* at 28 n. 6.

In evaluating the Bonsignore & Brewer compensable time Judge Phillips flatly rejected Burton's argument that Bonsignore & Brewer did little to contribute to the substance of the litigation effort and that she and her team shouldered most of the work.  *Id.* at 26.  Judge Phillips characterized this narrative as "false" and one that exaggerated her own contributions and minimized those of Bonsignore & Brewer.  *Id.* at 26-27.  He based his reasoning on Burton's previous declaration to the district court and on emails contemporaneous to the time in question. *Id.* at 26 n.5.

However, Judge Phillips did reduce Bonsignore & Brewers lodestar by $994,620. The $994,620 reduction ordered by Judge Phillips was a figure asserted by Burton.  *Id.* at 28.

*Reply to Co-Lead Counsel Carolyn Beasley Burton, Attorney Robert W. Mills, and Attorney Carol P. LaPlant's #737 Submission*

Additionally, Judge Phillips disallowed Bonsignore & Brewer's time spent in the dispute with Burton and the Mills Firm, specifically the time spent in opposing Burton's effort to disqualify the Arbitrator, and in responding to the Emergency Request.  *Id.* at 28.    Judge Phillips did go on to allow Bonsignore & Brewer's use of attorney's rather than paralegals to perform work because while attorneys are more expensive than paralegals, they may also be more efficient.  *Id.* at 28.  Opining that attorney's legal training may allow them to make better judgment calls than paralegals when reviewing documents, Judge Phillips deferred to Bonsignore & Brewers judgment.  *Id.* 1 at 28.

Judge Phillips only reached these conclusions after a careful analysis of all pertinent factors, including the risk taken in the litigation.  Stating, that "a critical element that led to the relatively favorable result was the willingness of counsel to enter into an undertaking that they knew would be long, hard- fought and without any assurance of success. This readiness to initiate a highly risky venture, and to persevere in the face of a tenacious defense, allowed the class claims to survive long enough that Wal-Mart finally decided to settle. This factor strongly favors Bonsignore & Brewer over Burton and the Mills Firm".  *Id.* at 30.  Further, "Robert Bonsignore knew that fighting Wal-Mart on multiple fronts would be an expensive undertaking that would make major demands on his firm's resources for years into the future. He also knew that the prospects of success were questionable. He nonetheless decided to take the plunge and commit his firm's lawyers and resources to a lengthy and hard-fought battle."  *Id.*

In reaching the final allocation Judge Phillips found that "by contrast, Burton took little risk. Her only contribution to the litigation was her time – for which she was paid. At the time the litigation commenced, Burton was a salaried employee of a law firm." *Id.* at 30.  When discussing the Mills Firm involvement, Judge Phillip's analysis "Similarly [showed] the Mills

Firm took virtually no risk in the litigation. It was not until September 24, 2008 that a Mills Firm timekeeper billed any time to the litigation. At that point, settlement negotiations had been conducted in earnest for more than a month." *Id.* at 30.  Clearly, these findings support the allocation Judge Phillips arrived at as there is a gross disparity in the time and risk undertaken by the Mills Group and Bonsignore & Brewer.

## II.  STANDARD OF REVIEW

In March of 2008, the U.S. Supreme Court resolved a circuit split and established that section 10 of the FAA lists the "exclusive grounds" upon which an arbitration award may be vacated.  *See, Hall Street Associates v. Mattel, Inc.*, 552 U.S. 576, 584 (2008).  9 U.S.C. §10(a) states that a court:

> "may make an order vacating the award upon the application of any party
> to the arbitration—(1) where the award was procured by corruption, fraud,
> or undue means; (2) where there was evident partiality or corruption in the
> arbitrators, or either of them; (3) where the arbitrators were guilty of
> misconduct in refusing to postpone the hearing, upon sufficient cause
> shown, or in refusing to hear evidence pertinent and material to the
> controversy; or of any other misbehavior by which the rights of any party
> have been prejudiced; or (4) where the arbitrators exceeded their powers,
> or so imperfectly executed them that a mutual, final, and definite award
> upon the subject matter submitted was not made."

9 U.S.C. §10(a).  The district court is required to confirm an arbitration award unless vacatur upon the exclusive grounds provided for in section 10 is warranted.  9 U.S.C. § 9; *Hall Street*

34

*Assoc.*, 552 U.S. at 582; *Central Montana Rail v. BNSF Railway Company*, No. 10-35439 (9th Cir. March 11, 2011); *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 997 (9th Cir. 2003) (en banc), cert. denied, --- U.S. ----, 130 S.Ct. 1522, (2010) (citation and internal quotation marks omitted); *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir.1986).  Many federal circuits recognize an additional ground upon which vacatur may be granted – where an arbitrator has "manifestly disregarded" the law.  *See, infra* § III.E. None of these grounds for vacatur are present here.

### III. ARGUMENT

### A.      Arbitration Awards Must Be Confirmed Except in Limited Circumstances Not Present in this Case.

Objectors begin their argument by opining about the standard by which district courts are to "review" arbitration awards.  Relying on *Johnson v. Wells Fargo Home Mortgage*, No. 09-15937, No. 09-16815, 2011 U.S. App LEXIS 2908 (9th Cir. 2011)  – which, they say, held that courts "must" consider such things as the "substance of the award" Oppo. 29:17-18 – Objectors advocate that courts have wide latitude in conducting this "review."  FAA 9 clearly states that "at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title."  The Ninth Circuit has held that the FAA standards "afford an extremely limited review authority."  *Kyocera Corp.*, 341 F.3d at 997-98.

It may be that a court should not simply "rubber stamp" an arbitration award;[32] but under the FAA, a court does not really "review" such an award in the sense of considering its "substance."[33]  Unless the award is vacated or modified as prescribed by the FAA, the court has no choice but to confirm it, *Schoenduve Corp. v. Lucent Technologies. Inc.*, 442 F.3d 727, 731 (9th Cir. 2006), "even in the face of erroneous findings of fact or misinterpretations of law." *French*, 784 F.2d at 906.

It is not difficult to discern why district courts have "limited review authority."  Although the common law distrusted arbitration, the attitude toward arbitration has shifted over time. Federal courts in general, and the Ninth Circuit in particular, have adopted a policy of "favoring the finality of arbitration awards."  *See, e.g., Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1313 (9th Cir. 2004).  The FAA itself reflects the "favored" status of arbitration.  *See, e.g., A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1404 n.2 (9th Cir. 1992).  As the United States Supreme Court pointed out in *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, the FAA "re-place[d] judicial indisposition to arbitration with a 'national policy favoring [it]." *See also U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1172-1173 (9th Cir. 2010).

Congress favors arbitrations and federal courts are reluctant to disturb arbitration awards except in the most egregious circumstances because parties typically choose to submit their dispute to arbitrators with the expectation of obtaining an inexpensive and expeditious determination by a tribunal with expertise in the particular subject matter of their dispute. *See, e.g., Employers Ins. of Wausau v. National Union Fire Ins. Co. of Pittsburgh*, 933 F. 2d 1481,

---

[32] Paragraph 22.9 further made clear that the parties intended to be bound by the merits of the decision, thus leaving open only that narrow grounds afforded by FAA 10 and 11. See # 736 footnote 1.

[33] In actuality, *Johnson* did not "hold" that a district court "must," or even may consider the "substance" of an arbitration award.  What *Johnson* said, and all it said, is that when district courts are faced with a timely motion to confirm or vacate they do not have the discretion to do nothing – they must "consider both motions according to the statutory standards and rule on them accordingly."  *Johnson* at 2511.

36

1490 (9th Cir. 1991).  One reason arbitrations are inexpensive and expeditious is that  parties to

arbitration often agree – as class counsel in this case has done – to give up their right to appeal an

adverse award.  *See, e.g., L & M Creations v. CRC Info. Sys.*, 2011 U.S. Dist. LEXIS 36269 (D.

Nev. 2011).  In a situation where "parties have agreed to binding, nonappealable arbitration,

courts should be extremely reluctant to review an arbitrator's decisions. Otherwise 'binding'

arbitration would become just another step in the litigation process."  *In re The Roman Catholic

Church of the Diocese of Tucson*, 2008 Bankr. LEXIS 4737, *12 (9th Cir. B.A.P. 2002).

As the Ninth Circuit recently observed, another reason why arbitration provides "a

relatively expeditious and inexpensive dispute resolution" is that arbitration is not governed by

the federal courts' strict procedural and evidentiary requirements."  *U.S. Life*, 591 P.3d at  1173;

*Kyocera Corp.*, 341 F.3d at  998 ("Arbitration is a dispute resolution process designed, at least in

theory, to respond to the wishes of the parties more flexibly and expeditiously than the federal

courts' uniform rules of procedure allow").  The same is not true of motions that seek to *vacate*

arbitration awards.

The FAA "presumes that arbitration awards will be confirmed."  *See, e.g., In re Roman

Catholic Church*, 2008 Bankr. LEXIS 4737 at  13.  Any party who seeks to overcome this

presumption has the burden of proving that cognizable grounds for vacatur exist.  *See

Cockerham v. Sound Ford*, 347 Fed. Appx. 279, 2009 U.S. App. LEXIS 12855, *5 (9th Cir.

2009).  This can only be done by making an evidentiary showing that one of the four enumerated

grounds for vacatur under FAA § 10(a) exists.  These are the exclusive grounds under which an

arbitration award may be vacated.[34]

---

[34] Objectors argue that, because the arbitration award was issued in a class action, this Court has "an independent
duty to ensure that the fees from the common fund are allocated fairly." Oppo. 29:23-24.  To the extent they may be
suggesting that this "independent duty" gives the Court the right to vacate an arbitration award for any reason other
than those enumerated in the FAA, they are plainly mistaken.

In a prior motion, Objectors urged that their challenge of Judge Phillips should be decided in accordance with Nevada and/or California law.[35]   They now concede that the FAA "governs this proceeding," Oppo. 29:1, and seem to realize that the FAA – not California or Nevada law – sets forth the exclusive standards for vacating arbitration awards.[36]  Perhaps not surprisingly, however, given the lack of restraint with which they have attempted to tar and feather a respected former federal judge in the past, Objectors have not been particularly judicious in identifying the FAA grounds for which they claim warrant vacatur.

In the apparent belief that, if they make enough charges, one may stick, Objectors claim that not merely one ground for vacatur exist in this case, but that "each of these prongs is satisfied."  Oppo. 29:17.  They claim that: (1) the award was procured by corruption, fraud, or undue means; (2) there was evident partiality or corruption in the arbitrator; (3) the arbitrator was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; and (4) so exceeded his powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.  Oppo. 29:6-15.

---

[35] Memorandum of Law in Support of Carolyn Beasley Burton's Motion to Disqualify Layn R. Phillips as the Fee Arbitrator and to Enjoin him from Exercising Arbitral Authority Without Leave of the Court, Docket no. 646, June 8, 2010.

[36] While Objectors, in attempting to make their case for vacatur, mainly discuss the FAA, they also cite provisions of California's Evidence Code, Oppo. 35:24, and Ethics Standards for Neutral Arbitrators, Oppo. 35:27, as well as "state law in Nevada and California." Oppo. 35:26.  More confusing is the "declaration" that was submitted, in the form of a "report and opinions," by their ethics expert. Geoffrey Hazard, in purporting to opine about arbitrator "ethical standards," adverts to a Nevada mediation statute and California Evidence Code section, but omits reference to the FAA, any federal rule except FRE 408, any federal case, or any ethical rules, not least the ABA AAA Code of Ethics for Arbitrators in Commercial Disputes (2004).

Objectors argue that these grounds for vacatur are satisfied in multiple ways. They contend, for example, that the arbitration award was procured by both "fraud," *and* "undue means." They even go so far as to argue that the arbitrator does not merely "appear" to be biased, but was actually biased. These are serious allegations not to be considered lightly. However, even a cursory view of the arguments reveals that the Objectors have failed to carry their burden to show that any real and cognizable ground for vacatur exists.

**B.     No Grounds Exist For Vacating the Award Under §10(a)(1).**

Objectors back into an argument that the award issued by Judge Phillips was procured by means of "corruption, fraud, or undue means." They avoid directly accusing Judge Phillips of being "corrupt" or that the award was the product of actual "fraud." Instead, they assert that the arbitrator "engaged in conduct that, when viewed as a whole, is **tantamount** to fraud." Oppo. 38:12 (emphasis added). Then, in reliance on a single case [*Pacific & Arctic Ry. and Nav. Co. v. United Transp. Union,* 952 F.2d 1144 (9th Cir. 1991)], Objectors argue that "[p]ursuant to relevant case law, the existence of ex parte communications, undisclosed business relationships, advocacy for a party, and improper coercive tactics – all of which are present here – satisfy this prong." Oppo. 38: 13-14. Objectors' argument is toothless. The facts of *Pacific & Arctic Ry.* have nothing in common with the facts present here, but Objectors rely on a strained and distorted reading of *Pacific & Arctic Ry.*, claiming that the "Ninth Circuit affirmed the district court's finding that 'the awards were tainted by the functional equivalent of fraud.'" Oppo. 38:24-39:1-2.

This is simply not true. While the district court in *Pacific & Arctic Ry.* found that the award was tainted by the "functional equivalent" of fraud, on appeal, the Ninth Circuit did not affirm that finding, or even discuss the lower court's "equivalent" holding. *Pacific & Artic R. &*

*Nav. Co.* at 1147. Rather, the Court said that "[t]he standard of review we employ is whether the award was obtained by fraud." *Id*. It then evaluated whether actual fraud – not its "equivalent" – existed in the case, and noted that, while the applicable statute did not define fraud, the FAA required "that fraud be proven by clear and convincing evidence." *Id*. at 1148.

The respondents in the case argued that because of the strong federal policy favoring arbitration, fraud under the applicable statute should require "an extremely high degree of improper conduct," such as dishonesty. The Ninth Circuit agreed: "We agree and adopt as the test for fraud the common law definition as modified by the Arbitration Act. That Act modifies the common law by requiring a greater level of improper conduct. We believe this is required because of the limited power of review we have over arbitration awards under the RLA." *Id*. The court continued: "[f]raud properly embraces a situation in which the supposedly neutral arbitrator exhibits a complete unwillingness to respond, and indifference, to any evidence or argument in support of one of the parties' positions," and found that the neutral's "conduct easily fits within that definition." *Pacific & Arctic R. & Nav. Co.* at 1148. Later, the Court again made it clear that it based its ruling on the conclusion that the record demonstrated the existence of actual fraud, not its equivalent: "the district court found that [the "neutral"] totally disregarded the railroad's arguments in arriving at his decision…such conduct is, as a matter of law, fraud." *Id*. at 1149. It concluded that the conduct of the union and "neutral" arbitrators "was fraud for purposes of RLA § 153."

Properly read, *Pacific & Arctic Ry.* does not stand for the proposition that conduct "tantamount" to fraud warrants vacatur; in fact, it supports the contrary idea – that only "an extremely high degree of improper conduct" warrants a finding of fraud sufficient to warrant vacatur. There is an even more fundamental problem with Objectors' "fraud" claim. In *Pacific*

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*& Arctic Ry.*, the Court made a point of noting that "both the Federal Arbitration Act, 9 U.S.C. § 10(a), and FRCP 60(b)(3) require that fraud be proven by clear and convincing evidence." *Id.* In this case, Objectors' fraud claim is not only unsupported by "clear and convincing evidence," it is not supported by <u>any</u> evidence. Rather, like most of Objectors' claims it is supported only by idle speculation.

*Pacific & Arctic Ry.* involved a two-day grievance hearing over which an arbitrator presided. After the first day, the "neutral" arbitrator attended and paid for dinner with the union arbitrator. This occurred only after the "neutral" declined an invitation to dine with the railroad's arbitrator, and after the union and "neutral" arbitrators had time together alone in the "neutral's" hotel room. The next morning the union arbitrator and "neutral" were "seen together at breakfast;" when the hearing reconvened the railroad promptly objected to the ex parte contacts between the union arbitrator and "neutral," and "requested an explanation." *Id*. at 1147. The "neutral" became "angry and hostile," and "a heated exchange" took place. The "neutral" then advised the railroad that it "had no right to know" about his activities with the union arbitrator, and refused to let the railroad make a record. *Pacific & Arctic R. & Nav. Co.* 952 F.2d at 1147.

While in *Pacific & Arctic Ry.*, the railroad was present at the hearing, and therefore in a position to know whether an opportunity for "ex parte" contacts had arisen, in this case, Objectors – having elected not to attend the May 16, 2009, mediation – were in no position to know whether Judge Phillips dined with counsel on that day or, if he did, who paid the bill. Objectors certainly did not extend an invitation to Judge Phillips to dine that he declined in favor of dining with Objectors' "adversaries."

The events that took place after the alleged "ex parte" communications took place are more telling. In the labor case, the railroad immediately objected and tried to put its objections

on the record.  Objectors in the instant case did nothing.  In her Motion to Disqualify, Burton testified that she learned at the May 28, 2009 hearing that Judge Phillips had entertained ex parte communications from her co-counsel on May 16, 2009, and that, as a result, he had become "hostile" and "biased."  This "hostility" and "bias," she said, was "revealed" in his "manner, tone and statements" on and off the record.[37]  But, unlike in the *Pacific & Arctic Ry.* neither Burton nor Mills – both of whom were both present at the May 28th Hearing – interposed any objection.

The Objectors do not allege, moreover, that the arbitrator refused to allow them to make a record, or that the matter wound up in a "heated exchange."  In fact, despite the "bias" and "hostility" Burton later claimed had been "revealed" on that day, Mr. Mills inexplicably chose that particular occasion to tell the arbitrator that Mills had "moved heaven and earth to keep [him] at the helm of this case" because he "believed that without [him] in this case, it would have just crashed and burned."  Exh. pp. 94:23-95:3.[38]

Objectors' current brief also accuses the arbitrator of growing "hostile and angry" at Burton and Mills, Oppo. 39:20, but their account of what transpired has changed over time.  In the current incarnation of their "partiality" challenge, they do not claim that Judge Phillips' "hostility" and "anger" had its source in his receipt of ex parte information about them.  Rather, they claim that he "grew angry and hostile" when "*confronted with the inappropriateness* of the ex parte communications."  Oppo. 39:21 (emphasis added).  Also, while Burton had previously been very specific as to when the arbitrator's "anger" and "hostility" had "revealed" itself to her (at the May 28th Hearing), the Objectors' new filing fails to specify when his "anger" and "hostility" manifested.  A close look at their brief reveals that Objectors are now saying that this

---

[37] No corroborating exhibits were put forth supporting these contentions.

[38] The claim that "Phillips's receipt of a stream of ex parte communications from Bonsignore disparaging Burtons' work and ethics" that would support a "finding of fraud," Oppo. 38:18, are so ludicrous as to not merit discussion.  It

42

occurred when he "summarily dismissed their challenge to his neutrality without the benefit of briefing and a record."  Oppo 39:22.  Objectors neglect to say when that took place, but that "summary dismissal" occurred on June 11, 2009 – two weeks after they previously claimed that the arbitrator had become angry and hostile at them.

The lone "fraud" case Objectors rely on makes one other point that Objectors failed to heed.  The *Pacific & Arctic Ry.* Court noted that, while the applicable statute did not define fraud, the FAA required that the fraud "not be discoverable by due diligence before or during the proceeding."  952 F.2d at 1148.  In the instant case, the "facts" on which Objectors' ex parte communications claim – as well as its claims that the arbitrator became angry with Objectors, advocated for the settlement, and was interested in the outcome proceeding– were not only "discoverable," but actually "discovered" by Objectors in May or June of 2009.  Yet, on October 1, 2009, they moved this Court for approval of the settlement.

According to Objectors, Judge Phillips' "fraud" consists not only of his receipt of ex parte communications, but his "advocacy for and assistance to Bonsignore in both the MDL and *Salvas* cases."  Oppo. 38: 16.  As will be discussed, this claim of inappropriate advocacy – just like their "ex parte" conduct complaint – is devoid of any evidentiary support.  As a preliminary matter, however, it should be noted that Objectors' "advocacy" claim has undergone a nearly total metamorphosis over time.

Burton's initial "improper advocacy" claim was based on a May 21, 2009, letter that attorney Christian of  Zelle Hoffman sent to the *Salvas* court, in which he wrote that:

> the settlement of this case comes after Wal-Mart has already settled virtually all the wage and hour claims pending in various other states around the country. The Honorable Layn Phillips (Ret.) served as the mediator in each of Wal-Mart's

---

should be noted, however, that the communications Objectors refer to were all "discovered" by them, but not objected to, before they moved this Court for final approval.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> earlier wage and hour settlements cases. Thus, Judge Phillips is intimately familiar with these cases and understands the dynamics of case valuation and settlement. Judge Phillips has invited this Court to call him directly to discuss the fairness of this settlement as compared to the earlier settlements facilitated by Judge Phillips.

Oppo. Exhibit 15.  In the declaration she filed in support of her Motion to Disqualify, Burton alleged that this letter somehow made it "appear to her" that the arbitrator "openly and actively supported" the proposed *Salvas* settlement.[39]  As Professor Flamm points out, a reasonable observer would readily understand that this letter was written by an attorney who was advocating for the settlement Burton opposed, not by Judge Phillips; in fact, when asked about this letter by Burton, the arbitrator informed her that he had not even been aware that such a letter had been sent.[40]  Christian did not state, moreover, that Judge Phillips would "advocate for" the proposed settlement; he simply stated that Judge Phillips was willing to discuss how the proposed settlement compared with others he had been involved in mediating.  *See* Oppo. Exhibit 15.

Nor did Christian say that Judge Phillips was willing to discuss the "dispute" that had arisen as to whether the proposed *Salvas* settlement should be accepted.  *See* Oppo. Exhibit 10-B. Judge Phillips did nothing to "facilitate" the *Salvas* settlement, much less assume the "role of a proponent" of it.  What he did – and all he did – was offer "to speak to the [*Salvas*] Court" in order to "address any inquiries the Court may have."  *See* Oppo. Exhibit 10-B.  Objectors were well aware of Christian's letter long before they moved this Court to finally approve the settlement that appointed Judge Phillips to be the MDL fee dispute arbitrator without registering a complaint.  Nonetheless, in their latest filing, Objectors assert that Judge Phillips "assumed an

---

[39] No corroborating exhibits were put forth supporting these contentions.
[40] No corroborating exhibits were put forth supporting these contentions.

44

advocate's role" by confirming "his willingness to speak" with the *Salvas* judge about the settlement "dispute."  Oppo. 33:19.

Objectors also make additional "advocacy" claims.  They urge, for example, that Judge Phillips improperly advocated "for approval of class counsel's fee award" Oppo.3:27, that he manifested his "advocacy" by issuing an "Order and Opinion for Bonsignore to convey to the Court," Oppo.40:9-12; and that he issued a ruling saying that Burton "deserved to be sanctioned."  Oppo.40:26.  In every instance, the "facts" on which these claims are based were known to Objectors long before this Court finally approved the MDL settlement.

Objectors' contention that the arbitrator improperly "advocated" against them by agreeing to advocate "for approval of class counsel's fee award" is, not surprisingly, unsupported by citation to record evidence.  But this claim – like their related contention that Judge Phillips "agreed to be employed by the settlement's proponents in the potentially lucrative role of arbitrator over disputes that might arise in that settlement" Oppo. 3:26-27 – would appear to derive from the fact that the May 16, 2009, *Salvas* Term Sheet proposed that Judge Phillips would perform a similar role in *Salvas* to the one he had been asked to perform here.

Objectors have not shown that Judge Phillips was even aware of the fact that the *Salvas* "Term Sheet" provided for the possibility that he might one day arbitrate future disputes between the counsel in *Salvas* – much less that his knowledge of the existence of that provision motivated him to, in Objectors' words, become a "proponent" of the settlement.  Oppo. 3:19.  Conversely, Wal-Mart counsel Duffy testified on June 22, 2009, that Judge Phillips did not "review or comment on any of the settlement terms or on the Term Sheet."  *See* Kirchner Aff. 4/26/11 ¶ 23.

Although Objectors have not shown that Judge Phillips was aware of the terms of the Term Sheet, the same cannot be said of the Objectors.  Although they neglect to tell the Court

when and how they received a copy of the Term Sheet that was attached as Exhibit 14 of the Objectors Motion, Duffy has testified that a copy of that Term Sheet was provided to Burton on or shortly after May 16, 2009 (the date on which it was signed).  In fact, Duffy testified he had a conference call with Mills and Burton on June 4, 2009, in which he "walked everyone through" the Term Sheet; and, on the same day, Mills and Burton wrote the *Salvas* court a letter "rejecting the Term Sheet."  In other words, by no later than June 4, 2009, Objectors were aware of the possible role the Term Sheet envisioned Judge Phillips might play in *Salvas* in the future; yet, when Bass sent his recusal request to Phillips the following day (June 5, 2009) he did not mention that his clients had any concern about that role.  Perhaps more to the point, before moving for final approval Objectors never once mentioned to this Court having any concern about Judge Phillips's "interest in" or "advocacy for" the *Salvas* settlement.

Finally, even if Judge Phillips' *had* agreed to advocate "for approval of class counsel's fee award" in *Salvas*, as Objectors claim he did, this would not show that he engaged in impermissible "advocacy" *against* their interests.  The Term Sheet provided only that class counsel would get fees, not who would get what – allocation was to be left, as here, to a later point in time. Thus, advocating "for approval of class counsel's fee award" would have been *in* the Objectors' interests, not *adverse* to them.

Judge Phillips did not also act as an "advocate" against Objectors merely because he issued rulings that they did not like.  It is true that the arbitrator manifested understandable frustration with litigants who first asked him to issue orders in their favor, then claimed that he had no jurisdiction to issue any relief when he was asked to do so by others; but nothing in any of the rulings he issued manifests that he had become an "advocate" for any party.  *See* Kirchner Aff. 4/26/11 ¶ 2.  Moreover, while, because of an extension they requested, the last of the rulings

46

they complain about were issued a day after they moved for final approval Oppo. 22:8, at no time before the Court issued final approval seven weeks later did Objectors complain to this Court.

**C.      No Grounds Exist for Vacatur Under FAA §10(a)(2).**

**1.      The Arbitrator did not Fail to Disclose Anything that Would Create a Reasonable Impression of Bias.**

*a.      The Objectors Misrepresent and Overstate the Facts they Claim Support their Bias Charge, Resulting in Not a Single Credible Allegation for Vacatur.*

Just as Objectors contend that proof of their "actual bias" claims can be found in the opinion of their expert, they look to Hazard to supply the evidentiary basis for their claim that Judge Phillips' "failed to abide by" applicable disclosure standards.  Oppo 36:14.  It should be noted that, while Hazard alleged in conclusory fashion that Judge Phillips "did not notify Ms. Burton of his relationships with other counsel" [Hazard Decl. Para. 18], he did not opine that the arbitrator failed to disclose anything that would give "a reasonable impression of bias;" thereby warranting vacatur under FAA § 10(a)(2).  In fact, as noted above, neither the FAA nor the word "bias" appear in Hazard's declaration.  All Hazard said, based on "facts" he "assumed" to be true, is that Judge Phillips "disregarded his obligations as fee arbitrator."  Hazard Decl. Para. 16.

According to Hazard, the first way Judge Phillips did this was by not giving "prior notice to Ms. Burton before scheduling a mediation session in Salvas."  Hazard. Decl. Para. 18.  This is a strange claim not only because Hazard cites no authority for the proposition that a neutral is "obliged" to give "prior notice" before scheduling a mediation, but because Objectors, in their prior challenges to Judge Phillips, relied on authority that says he does not.   In his June 5, 2009, recusal letter, Bass urged that Standard 12 of the California Ethical Standard for Neutral Arbitrators required Judge Phillips's disqualification.  In their current filing, Objectors refer to

47

the same Standard.  Oppo. 36:38.  Although Standard 12 does not apply to an FAA arbitration, under it, neutrals are <u>not</u> required to give "prior" notice; they have 10 days to make any disclosure required.

In the brief she filed in support of her disqualification motion, Burton alleged that Judge Phillips had been retained to mediate *Salvas* in April of 2009.  But, in a declaration she lodged 8 months earlier, she demonstrated that she knew this was not so.  In it, she testified that Judge Phillips had been retained to conduct that mediation: "[a]t some point *after* May 4, 2009."  In their current filing, Objectors do not say when, exactly, they found out about the scheduled mediation, but Burton previously testified that she learned of it on May 13, 2009.  In other words, while Objectors strive to make it appear otherwise, they knew very well that Judge Phillips had been asked to (re) mediate *Salva*s within 10 days of when the mediation was scheduled with his office.

In the next paragraph of his declaration Hazard – seemingly confusing the role of expert and percipient witness – testifies about facts he has no personal knowledge of.  He says that the arbitrator "agreed to take on additional functions in the *Salvas* matter as set forth in the Salvas Term Sheet," and to "support" Furth's and Bonsignore's "application for attorneys fees."  Hazard Decl. Para. 19.  But, Objectors have not shown that Judge Phillips was even aware of the Term Sheet provision that called upon him to "take on additional functions" in *Salvas*; much less that he "agreed to take on" those functions.  They have likewise failed to substantiate their claim that he "agreed to support" the fee claims of their "adversaries."

The last paragraph of Hazard's declaration that Objectors rely on to support their claim that Judge Phillips "failed to abide by" applicable disclosure standards, paragraph 20, is a head-scratching choice.  In it, Hazard discussed the arbitrator's agreement to serve as a neutral in the

48

*Smokeless Tobacco* cases but said nothing about any purported failure to *disclose* that retention. It would appear, therefore, that Hazard's declaration provides no support for Objectors' claim that the arbitrator "failed to" comply with any requirement to disclose that retention.

It may not be all that surprising that Hazard declined to opine that the arbitrator did anything wrong by "failing to disclose" his *Smokeless Tobacco* retentions. In forming his opinions, Hazard admittedly "assumed the accuracy of the statements of fact" in Objectors' briefing. Hazard Decl. Para. 5. But when it comes to *Smokeless Tobacco*, Hazard could not even "assume" the accuracy of that briefing.

In the brief Burton filed in support of her Motion to Disqualify she acknowledged that, even assuming that Standard 12 applies, "failure to make the Standard 12(b) disclosure" would only "preclude the arbitrator from **subsequently** 'entertaining or accepting such offers 'from the time of appointment until the conclusion of the arbitration.'" Motion to Disqualify 37: 16-19, citing Standard 12(c) (emphasis added). Burton recognized, in other words, that in order to establish a violation of that Standard, it would be incumbent upon her to show that the arbitrator accepted the offer to mediate *Smokeless Tobacco* <u>after</u> he was appointed to arbitrate this case.

And the declaration she filed in support of her Opposition to the Motion to Vacate, Burton made a concerted effort to make it **appear** that such was the case. She declares that Plaintiffs' Memorandum in Support of Motion for Preliminary Approval in the Massachusetts Smokeless Tobacco case was "filed on February 5, 2009" [Burton Decl. 21:20-25], that the Settlement Agreement in the New Hampshire *Smokeless Tobacco* case was entered into in January 2009, and that the order approving that settlement was entered on March 13, 2009." [Burton Decl. 21:21-27]. If these things were true, it would at least be plausible that Judge Phillips's December 2008 retention in this case *might* have pre-dated his *Smokeless Tobacco*

49

retentions and, therefore, that she was not being disingenuous when she said, in the brief she filed in support of her Motion to Disqualify, that the fact that the arbitrator had accepted this "additional employment" with "Mr. Bonsignore" had given her "additional reason to believe that Judge Phillips would not be impartial in any dispute" between her firm and B&B. *Id.* at 17:21-25.

The problem with Burton's declaration, as even a cursory review of the exhibits she cited reflects, is that it is <u>not</u> true. Each of the three documents she testified to having been filed (or entered into) in 200**9** were actually lodged with the Court in 200**8**. *Compare* Burton Decl., ¶ 50 *with* Exhibits 34, p. 8 and 34A, p.38. Moreover, as a closer inspection of the cited exhibits themselves reflects, the mediation role Judge Phillips performed in the *Smokeless Tobacco* cases actually took place in 200**7**, long before he was retained to work on this case. Oppo. Exhibit 34A, p. 3. Thus, contrary to what Objectors would have this Court believe, *Smokeless Tobacco* did not involve a "new" or "additional" retention.

Burton has also been less than candid in informing the Court as to when and how she "discovered" the existence of those retentions. In a footnote buried on page 33 of her disqualification brief she states, in the last sentence, that "[t]he Massachusetts and New Hampshire Smokeless Tobacco involvements were discovered only because the settlement documents were published as part of the required notice to class members." *Id.* at 33 n.26. This inscrutable statement gave little hint as to when those documents were "discovered" by Burton. Likewise, in the declaration she filed in support of her Motion to Disqualify, Burton failed to offer evidence of when she first became aware of Judge Phillips's role in the *Smokeless Tobacco* cases or, in fact, that his roles in them had not been disclosed.

Burton was also less than forthcoming about when she "discovered" the arbitrator's role in the *Smokeless Tobacco* cases in the brief and declaration she filed in support of Objectors' first Opposition to B&B's "Request for Allocation."  Burton said that "movants have learned that Phillips has recently served as a mediator in other cases for Wal-Mart, Bonsignore [and Michael Noonan]…None of these relationships have ever been disclosed by Phillips, and movants learned of them from outside sources," but she did not say what those outside sources were, or when she learned of them.  Similarly, in her declaration in support of that brief Burton testified that Judge Phillips "never disclosed" that he had been retained by Bonsignore, Wal-Mart, or other Class Counsel in "other matters." Again, however, she neglected to attest to how and when she learned that he had been retained in those "other matters."

In their current filing, Objectors say that "Phillips's participation in the Massachusetts and New Hampshire Smokeless Tobacco settlements [should have been disclosed] but was not." Oppo. 37:1-2. But in her latest declaration Burton claims that she "discovered" his participation in those cases in a new way:  she was "unaware of Mr. Phillips's involvement in this matter until she received [] briefing from local counsel in Massachusetts during the course of the fee allocation briefing in *Salvas*."  Burton Decl., Para. 50.  According to Robert Bonsignore, this is untrue; Burton knew of Judge Phillips's involvement in *Smokeless Tobacco* in 2007.[41]

In light of the U.S. Supreme Court's 2008 recognition that FAA § 10 lists the "exclusive grounds" upon which an arbitration award may be vacated.  *Hall Street Associates*, 552 U.S. at 584 and Objectors' concession that the FAA "governs this proceeding" Oppo. 29:2, it is somewhat difficult to know what to make of their claim that Judge Phillips's alleged "failures to

---

[41] Objectors rely on a vintage Eleventh Circuit Court case for the proposition that *Commonwealth Coatings* has been interpreted as "somewhat analogous to a per se rule or irrebuttable presumption requiring the award to be set aside" in certain circumstances."  Oppo. 37: 7-9.  While the Eleventh Circuit mentioned that a district court had interpreted

51

make necessary disclosures" as "required" by "Nevada and California law, and related ethical cannons [sic] for arbitrators, constitute evidence of bias, and provide **independent grounds** to vacate the arbitration ruling."  Oppo. 38: 7-9 (emphasis added).  The short answer would appear to be that there are no "independent grounds" to vacate the arbitration ruling – either Objectors have articulated FAA grounds for vacatur or they have not; and, in this case, they have not.

### b.    Objectors' Subjective Belief that Judge Phillips does not Like Them Falls Far Short of Legal Bias.

Finally, Objectors seems to believe that a "reasonable impression of bias" has been created in this case simply because they believe (or at least claim to believe) that Judge Phillips does not like them.  It is true that the term "possible impression of bias in an arbitrator" has not been defined with precision but it has long been recognized that, because some people see goblins behind every tree, there is a significant difference between a lawyer's or client's perception of bias and the appearance of bias generally.  *See, e.g., Cunningham v. Gates*, 45 F. Supp.2d 783, 785 (C.D. Cal. 1999) ("[f]or parties who are personally and emotionally involved with the judge's decisions, it is far too easy to conclude that the judge's perceived bias is" personal);  *cf. Verone v. Taconic Tel. Corp.*, 826 F. Supp. 632, 634 (N.D.N.Y. 1993) ("through the subjective eye of the unsuccessful litigant, it is difficult to see what is" justice).

As a result, while there are rare circumstances in which a possible appearance of bias may be so great that an adjudicator should be disqualified, and his orders not permitted to stand; the subjective belief or fear of a party or his counsel that an adjudicator is biased is insufficient to support a well-founded impartiality challenge. *Laxalt v. McClatchy*, 602 F. Supp. 214, 217 (D. Nev. 1985).  The standpoint for determining whether an appearance of bias exists is that of a

---

*Commonwealth Coatings* in that way, because FAA § 10(a) is a permissive, not a mandatory statute, there is no

reasonable, objective observer.  *See Kulas v. Flores*, 255 F.3d 780, 787 (9th Cir. 2001).  "The 'reasonable person'…means a 'well-informed, thoughtful observer,' as opposed to a 'hypersensitive or unduly suspicious person.'" *Clemens v. U.S. Dist. Court*, 428 F.3d 1175, 1178 (9th Cir. 2005), (quoting *In re Mason*, 916 F.2d 384 (7th Cir. 1990)).

Determining whether an "appearance of bias" or a "reasonable impression of bias" exists in a particular case is not always a simple task.  But in *Commonwealth Coatings Corp.*, Justice White made it plain that an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." *Id.* at 151.  *See Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 476 F.3d 278, 282-283 (5th Cir. 2007) ("[n]ondisclosure alone does not require vacatur of an arbitral award for evident partiality. An arbitrator's failure to disclose must involve a significant compromising connection to the parties.").  In the Ninth Circuit's most recent pronouncement on the subject, the Ninth Circuit made a similar point.  It noted that "[u]nder the FAA, vacatur of an arbitration award is not required simply because an arbitrator failed to disclose a matter of some interest to a party."  Instead, the arbitrator "was required to disclose only facts indicating that he 'might reasonably be thought biased against one litigant and favorable to another." *Lagstein* at 646.

Objectors have made many conclusory allegations; however, they have not shown that Judge Phillips failed to disclose any facts creating a "reasonable impression of bias."  Flamm Decl. Para.  They have, therefore, established no basis for vacatur under FAA § 10(a)(2).

## 2.    Objectors Have Not Shown That Judge Phillips Was Actually Biased.

It is important to bear in mind the distinction the Ninth Circuit has drawn between actual bias  and "impression of bias" when one reviews the Objectors' expert declaration.  They say

situation in which an award <u>must</u> be set aside – only those in which <u>may</u> be.  *See* Kirchner Aff. 4/26/11 ¶ 2 at ¶ 105 .

that there are "a myriad of facts demonstrating" that Judge Phillips was actually biased against them, then recite 13 bullet points that purportedly constitute the "most notable" of these.  Oppo. 31:5-33:5.  Objectors claim that "[a]ny one of these instances, on its own, is sufficient to demonstrate actual bias and warrant vacatur under § 10 of the FAA," citing Hazard's declaration as support.  Oppo. 33:7-8.  But Hazard did not so much as *mention* the FAA in his declaration.  In fact, he did not use the word "bias" – much less opine about whether any of the "facts" Objectors told him, if true, would demonstrate "actual bias" under FAA § 10(a)(2).  All Hazard said  – based on facts he was told were "undisputed," and therefore "assumed to be true" – was that he thought Judge Phillips's conduct "indicates a reasonable doubt about his impartiality as arbitrator."  Hazard Decl. Para 5.

Moreover, while Hazard opined that Judge Phillips engaged in "a partisan intervention" by "proposing" to disclose matters he should not have [Hazard Decl. Para.11], he never said that the arbitrator improperly *failed to disclose* anything.  Thus, Hazard's thesis – that "Phillips' conduct…indicates a reasonable doubt as to his impartiality" – is not only erroneous, but irrelevant to any of the "conduct" about which he purported to opine.  The cases Objectors rely on also do not support their "actual bias" argument.  In one of them (*Pacific & Arctic Railway*), vacatur was ordered not on the basis of "actual bias," but for fraud; in the other two, vacatur was ordered not for "actual bias" but because the arbitrator failed to disclose facts that created a possible impression of partiality.  Oppo 33: 14-16.

### a.    *Objectors Have Offered no Evidence of Improper Motives.*

After getting off to such a rocky start, one might think that Objectors' "actual bias" challenge would have nowhere to go but up, but this "actual bias" argument – like most of Objectors' claims – flounders on the shoals of untimeliness and is wholly unsupported by their

expert.  In an "actual bias" case the party who alleges evident partiality must show "specific facts which indicate improper motives."  *Balter v. RBC Dain Rauscher, Inc*., 2006 U.S. Dist. LEXIS 28474, *22 (D. Nev. 2006), citing *Woods,* 78 F.3d at 427.  Although Objectors' brief came fully loaded with conclusory allegations, not one of their bullet points is supported by any record evidence that would show that the judge had any improper motive to rule against them.

As for their first three bullet points, it is not true that, by agreeing to mediate *Salvas* on May 16, 2009, Judge Phillips accepted a "new business relationship."  As Objectors well know because they were there, Judge Phillips first began to mediate *Salvas* on December 14, 2008.  As far as he was concerned, when Wal-Mart contacted his office to set up another day of mediation, that was simply a continuation of the mediation that had already begun.  Also false is Objectors' claim that the *Salvas* re-mediation was not "disclosed" to them.  Although the arbitrator's office may have relied on Objectors' co-counsel to get the word out, Objectors were aware that the mediation was scheduled soon after (and possibly even before) he was.  Bonsignore Decl. Para. 6.

As for bullet points 4 & 5, the contemptuous claims that Judge Phillips "misrepresented, and attempted to conceal, the true nature of events" that took place on May 16, 2009, and that he "agreed to support" the settlement that was reached on that day, are not only unsupported by any record evidence, but contradicted by all competent evidence that has been adduced.  Also, while Judge Phillips did offer to speak with Judge Murtagh on an ex parte basis (bullet point 6), that offer was neither improper nor manifests any "bias" against Objectors.

Bullet points 7 and 8, are also immaterial as Objectors have not shown that Judge Phillips received *any* ex parte communications (except, perhaps, from them) much less that, if he did, he did so improperly and became actually "biased" as a result.  There has also been no showing that

55

he "attempted to expand his arbitral jurisdiction" (whatever that means) much less that, having done so, he issued rulings that reflect "actual bias" against Objectors (bullet points 9-11) or that his *request* to see the filing in which Objectors challenged his neutrality (bullet point 12) was actually a *demand* that manifests "actual bias" against them.  Finally, as to their last bullet point, as Professor Flamm explains, Judge Phillips was quite right in calling their Motion to Disqualify "frivolous."  The arbitrator neither violated any ethical rule nor manifested bias against Objectors by saying so.  Also, while their motion was not only frivolous but sanctionable, he never "suggested" that this Court rejected it on its merits.

### b.      There is no Evidence that Judge Phillips Violated Statutes or Ethical Rules.

The "actual bias" claims that follow Objectors' "bullet points" may be less "notable," but are equally baseless.  First, contrary to what Objectors say, there has been no showing that "Phillips assumed 'an advocate's role'" in this case.  Oppo. 33:17.  But Objectors go further, claiming that the arbitrator not only assumed such a role but, in so doing, "violated numerous ethical rules and statutes preventing neutrals from revealing mediation confidences."  Oppo. 33:23-25.  For "evidence" to support this charge, Objectors turn, yet again, to Geoffrey Hazard.

The claim that the arbitrator violated any statutes or ethical rules is unsubstantiated by any record evidence.  First, while Hazard cites a Nevada *mediation* rule, as well as a federal rule of *evidence* [Hazard Decl. Para. 8], nowhere in his declaration did he so much as mention any "ethical rule,"  So his declaration does not provide any support for Objectors' claim that the arbitrator "violated numerous ethical rules."

As for "statutes," while Hazard cites a California Evidence Code provision and a Nevada law for the proposition that "[m]ediators are prohibited from disclosing anything presented in a mediation" [Hazard Decl. Paras. 7-8], he does not explain how these laws apply to a proceeding

56

that Objectors have conceded is "governed by the FAA," and they do not.  But the claim that the arbitrator "violated numerous statutes" suffers from a more basic problem.  Objectors have not even alleged that Judge Phillips actually *disclosed* "anything presented in a mediation" – all they say is that he offered to have a talk with Judge Murtagh.  Although Objectors make a point of mentioning that Judge Murtagh said that Judge Phillips "invited this Court to call him directly" Oppo. 11: 20, they artfully omit the fact that Judge Murtagh *declined to speak with Judge Phillips*.  *See* Oppo. Exh. 17 (5.22.09 Transcript 73: 6-9.) It is clear, therefore, that Judge Phillips disclosed nothing to the *Salvas* court so he could not have violated either of the statutes Hazard cited, even if they applied.  Judge Phillips's conduct certainly did not run afoul of the only *federal* authority mentioned by Hazard.  FRE 408 says nothing about mediators or disclosure; it deals only with the admissibility of evidence.

### c.       *Adverse Rulings do not Suggest Bias.*

Objectors' other "actual bias" charges are scattershot, and  many of them derive from Judge Phillips' rulings that Objectors consider to have been adverse to them.  *See, e.g.,* Oppo. 20:6 ("Phillips issued an adverse opinion here concerning events in *Salvas*"); Oppo. 21:7 ("Phillips issued another ruling adverse to Burton").  *See also* Hazard Decl., 6:17-22 ("prior to the time of arbitration of the fee dispute in this matter, Mr. Phillips issued several adverse rulings at Mr. Bonsignore's request concerning Ms. Burton's conduct").  Others stem from comments Judge Phillips made that the Objectors did not like.  *See, e.g.,* Oppo 20:17 and 40:3.  The fact that so many of Objectors' "actual bias" claims are based on the arbitrator's rulings and comments is significant because it has long been recognized that neither the discretionary rulings an adjudicator makes in the course of presiding over a matter, nor the random remarks he utters while doing so, provide a cognizable basis for questioning his ability to be impartial.

57

### d.      There is no Evidence of Prejudicial, Ex Parte Communications.

The Supreme Court has held that a judge's random remarks will not provide the basis for a cognizable bias challenge.  *See Litkey v. United States*, 510 U.S. 540, 555 (1994). As the Ninth Circuit has made clear, this is so even where, as here, the complained of comments have been characterized as being "hostile" to the moving party.  *See, e.g., Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (absent "any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are critical or disapproving of, or even hostile to, counsel, the parties, or their cases").  Objectors simply have not shown that any comment the arbitrator made derived from any extrajudicial "bias" or manifested the requisite degree of antagonism to justify setting aside his award.

### e.      Judge Phillips did not Make Improper Public Comment that Impugns his Impartiality.

Yet another indicia of the arbitrator's "actual bias," Objectors say, is that he "publicly commented" about the merits of their challenge to the arbitrator, "first calling their motion 'frivolous,' and then incorrectly suggesting that the Court had rejected it on its merits."  Oppo. 33:5-6.  Objectors' ethics expert apes their claims in this regard, opining that "Judges and neutrals are prohibited from commenting publicly on pending matters."  Hazard Decl. 6:14-16. It is somewhat odd that Hazard, who was a draftsman for an early version of Model Code of Judicial Conduct, would testify that adjudicators are prohibited from commenting publicly on pending matters without drawing the Court's attention to the rule which contains this prohibition.

**Canon 3(B)(9) of the current version of the ABA Code instructs that a judge "shall not, while a proceeding is pending or impending in any court, make any public comment that might reasonably be expected to affect its outcome or impair its fairness or make any**

58

**nonpublic comment that might substantially interfere with a fair trial or hearing."** As Professor Flamm explains, Judge Phillips did not violate this rule. First, Phillips was not serving as a judge, and Objectors have made no showing that Canon 3(B)(9) or any analogous provision forbids "public comment" by an arbitrator. Second, the disqualification motion Judge Phillips commented about was not "pending" at the time his comment was made; as Objector's own exhibit reflects, it had been denied months before, and that denial was never appealed. Lastly, Objectors have not established that Judge Phillips's characterization of the motion as having been "frivolous" – a contention which Professor Flamm has found to be "accurate" – "might reasonably be expected" to affect the outcome of the arbitration itself. The comment was made 11 days *after* the arbitration award was entered. *See* Oppo. Ex. 35-A, p (showing quoted article published January 31, 2011).

> **f.**   **Objectors' Early Challenges to the Arbitrator's Neutrality did not Pave the Way for the Instant Challenge.**

The Objectors claim one last indicia of "actual bias" on the arbitrator's part. According to them, "[t]he Disqualification Motion and Burton's challenges to his neutrality, which commenced in 2009…necessarily influenced Phillips during the fee arbitration" Oppo 34:23-35:2. In other words, by challenging Judge Phillips's neutrality, they believe they created valid grounds for challenging his award. This is a cynical and legally unsupported claim. Although judges are expected to recuse themselves when they are actually biased, a judge is not required to recuse merely because a party "challenges his neutrality" or makes a disqualification motion. As Professor Flamm points out, if the rule were otherwise a party would  be able to create grounds for disqualifying a judge or other adjudicator whenever it wished, merely by making an intemperate or scurrilous attack on him. This is, quite clearly, not the law. *See, e.g., U.S. v. Studley*, 783 F.2d 934, 939 (9th Cir. 1988).

**D.      No Grounds Exist for Vacatur Under FAA § 10(a) (3).**

Objectors' initial (June 5, 2009) challenge to Judge Phillips was predicated upon the "conflict of interest" that supposedly arose when he agreed to mediate the *Salvas* case (for a second time) on May 16, 2009.  Objectors also fault the arbitrator for assuming the role of an "advocate" between the parties Oppo. 21:24-25, and for committing "ethical breaches" generally. Oppo. 2:27. Curiously, however, the <u>only</u> allegation of the arbitrator's "misconduct"  that Objectors claim warrants vacatur under FAA § 10(a)(3) is his "engagement" in ex parte communications. Oppo. 41:16.

Objectors' "ex parte" misconduct claim is without merit.  As fully explained *supra*, the Objectors fail to provide proof of a single ex parte communication that Judge Phillips purportedly "engaged" in, much less any evidence that the communications were either "improper" or "prejudicial" to them, this "ex parte" misconduct claim is based on pure speculation.  *See U.S. v. Enigwe*, 155 F. Supp.2d 365, 372 (E.D. Pa. 2001) ("[the] assertion that the Court had ex parte communications with [counsel] is based on hearsay statements, opinions, inference and conclusory assertions").

In the absence of any concrete evidence from which it could conclude that the mediation that Objectors allege took place on May 16, 2009, actually occurred, and in the face of irrefutable proof that it did not, this Court is not free to do as Professor Hazard apparently did, and simply assume that Judge Phillips conducted a mediation on that day.  But even if Judge Phillips had conducted such a mediation – and even if, in the course of doing so, he had received negative information about Objectors – this would not mean that he engaged in any

60

"misbehavior."[42]  Oral ex parte contacts do not comprise all of the communications an adjudicator verbally receives, but only those that were entertained in a situation in which all interested parties did not receive notice and an invitation to attend.  Even assuming that Judge Phillips "engaged" in ex parte communications, Objectors nevertheless fail to meet their burden of establishing grounds for vacatur under FAA § 10 (a)(3) because they have failed to show that the alleged communications constituted "misbehavior" and that such "misbehavior" caused their rights to be "prejudiced." Oppo. 29:9-12.

### 1.    The Arbitrator was not Guilty of any "Misconduct."

There are two distinct types of ex parte communications. Oral ex parte communications are those which all parties to a proceeding have not been given notice of and afforded the opportunity to hear.  *N.Y. State Dept. of Law v. FCC*, 984 F.2d 1209, 1217 (D.C. Cir. 1993) (an oral contact is ex parte if the parties are not given advance notice and the opportunity to be present).  Written "ex parte" communications, in contrast, are those concerning a proceeding that less than all the attorneys of record have contemporaneously received copies of.  *See U.S. v. Burger*, 773 F. Supp. 289, 292 (D. Kan. 1991).  In this case, because Objectors have failed to identify with specificity any ex parte communication which the arbitrator purportedly "engaged" in, it is difficult to know for certain whether the ex parte contacts they allege were oral or written. Reading between the lines, it appears as though Objectors suggest that the arbitrator engaged in both types of ex parte communications.  Objectors contend that Judge Phillips "received" oral ex parte communications during the course of his putative "involvement in the rejected *Salvas* settlement;" and they assert that he "received" ex parte communications when he

---

[42] Ex-parte communications with a mediator are essential to the mediator's work of getting the parties to agree to a settlement. Ex-Parte communications are part and parcel of any mediation. It is senseless for Objectors to suggest

61

"secretly communicated with Bonsignore about Burton's challenge to his neutrality and thereafter had communications with Bonsignore throughout the summer." Oppo. 42:13-15. Objectors also allege "months of inflammatory, ex parte communications that Phillips received." Oppo. 42: 19-20.

### a.    Objectors Offer no Ethical Rule Violated by the Alleged Oral Ex Parte Contact.

Oddly, while Objectors ask this Court to find that Judge Phillips was guilty of misconduct by engaging in ex parte communications, neither they nor their ethics expert identify any ethical rule that he supposedly infringed. But assuming that "engaging" in ex parte communications might constitute misconduct in certain circumstances, the communications Objectors accuse Judge Phillips of engaging in fail to constitute such misconduct. As Professor Flamm has explained in his declaration, not every contact a judge has with a party or its counsel outside the presence of the other parties is properly characterized as "ex parte" and, in this case, the contacts Objectors accuse Judge Phillips of having "engaged" were not. Kirchner Aff. ¶   2 at ¶  17, 47, 50.

### b.    There is Overwhelming Evidence that the Alleged Oral Ex Parte Contact did not Occur.

Objectors' oral ex parte communications claim turns on their belief that Judge Phillips mediated the *Salvas* case on May 16, 2009, and that, in the course of doing so, he acquired ex parte information uncomplimentary to Objectors. Oppo. 9:2. Although they do not acknowledge as much, Objectors have a serious foundational problem with this charge: Judge Phillips did not mediate *Salvas*, it settled without him. *See*, Motion, Exhibit 10. And several court officers –

---

that there something is wrong with that practice. Moreover, FAA 10 has nothing to do with mediations because it only governs arbitrations.

including Wal-Mart counsel Brian Duffy, who has no interest in the dispute between Objectors and their "adversaries" – have confirmed, in detail and under oath, Judge Phillips's account of what took place. Duffy Affidavit (Exhibit "6") at Para. 24 ("Although we met at Judge Phillips's office, **Judge Phillips did not participate in any way in the discussions**") (emphasis added).

Despite mounds of solid evidence to the contrary, Objectors continue to claim that a mediation took place and that Judge Phillips presided. As Burton stated in the Memorandum of Law she submitted in support of her June 8, 2010, Motion to Disqualify: "[a]lthough the parties involved later *claimed* that the settlement had been negotiated privately prior to the scheduled mediation with Judge Phillips, their internal billing records and invoices, and statements to the *Salvas* court, *tell a conflicting story***."** *Id*. at p. 12 (italics added). *See also* Oppo. 31:20-21 ("Phillips misrepresented, and attempted to conceal, the true nature of events that occurred in his office on [that] date"). Although Objectors are entitled to their own world view, federal courts "abide by the general presumption that judges are unbiased and honest." *Ortiz v. Stewart*, 149 F.3d 923, 938 (9th Cir. 1998). The same presumption extends to adjudicators who, like Judge Phillips, are not Article III judges. *See, e.g., Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (noting "that there is "a presumption of honesty and integrity in those serving as adjudicators")], as well as to those like Messrs. Bonsignore, Christian, Duffy, who are court officers. *Carbo Ceramics v. Norton-Alcoa Proppants*, 155 F.R.D. 158, 164 (N.D. Tex. 1994) ("[w]hile it is within the realm of possibility that unethical conduct has occurred in this case, it is appropriate to recall another presumption; that is, that a person who makes statements under oath or penalty of perjury is presumed to tell the truth... Surely no less should be presumed with regard to such statements given by attorneys who in addition have taken an oath to uphold the law as officers of the

63

court"). With such overwhelming evidence to suggest that this alleged contact did not even happen, this cannot serve as a basis for vacatur.

Even, assuming *arguendo*, that such a mediation had taken place, Judge Phillips presided, and he *did* receive negative information about Objectors, such circumstances hardly rise to the level of "misbehavior." Oral ex parte contacts do not comprise all of the communications an adjudicator verbally receives, but only those that were entertained in a situation in which all interested parties did not receive notice and an invitation to attend. Objectors concede that Burton and Mills received notice of the *Salvas* mediation several days before it was scheduled to take place. Oppo. 8:6. They admit that they were even invited to attend it. Oppo. Exhibit 10. In fact, the person who notified Burton and Mills of the scheduled mediation, Fred Furth, went so far as to offer to fly them down to Orange County in order to be able to attend. Ex parte communications simply could not have occurred in where Objectors were invited to attend a mediation, and nothing prevented them from being present in Judge Phillips's office on the day of the scheduled mediation to insure that that they would be in a position to know and meet any claim that might have been made by any attorney whom Objectors have deemed to be an "adversary." . Kirchner Aff. ¶ 2 at 39. They were hardly "mushrooms kept in the dark." *Compare U.S. v. Barnwell*, 477 F.3d 844, 851 (6th Cir. 2007). As Professor Flamm has explained, the fact that, for their own strategic reasons, they chose not to attend that mediation would not render any discussion Judge Phillips might have had with those who did attend "ex parte," or otherwise improper.

        **d.**        ***The Allegations of Improper Written Ex Parte Contact are Similarly Baseless.***

Objectors' claim that Judge Phillips engaged in "prejudicial misbehavior" by improperly entertaining *written* communications is similarly speculative and erroneous. First, Objectors have not identified (much less attached exhibited) any written communication the arbitrator supposedly received on an "ex parte" basis, leaving this Court in no position to find that the arbitrator entertained any such communication – much less that doing so caused "prejudice" to the Objectors. Second, as noted above, written ex parte communications are not just any communications an adjudicator receives, but only those which concern a proceeding that less than all the attorneys of record have contemporaneously received copies of. Objectors not only failed to prove, but have not even *alleged* that they did not contemporaneously receive copies of the vast majority of emails which they claim the arbitrator improperly "engaged." In fact, they have made it clear beyond peradventure that they received copies of the supposedly objectionable emails – they simply chose not to object to the arbitrator receiving them. As Mr. Mills explained in comments he made to the arbitrator during a May 28, 2009, Hearing: "we have held our fire and not responded to a stream of e-mails that's been coming to you for months." *Id.* at 88:16-18.

### 2. Objectors Have Not Shown that the Arbitrator's Alleged "Misconduct" Prejudiced Them.

Since Objectors have not shown that Judge Phillips "engaged in" any oral or written communications that were actually "ex parte," much less that he "misbehaved" by "engaging" in such communications, their FAA § 10 (a)(3) claim is wholly devoid of merit. Nevertheless, even if Objectors had been able to show that the arbitrator entertained ex parte communications and had done so "improperly," their § 10 (a) (3) claim would nevertheless fail because they have failed to demonstrate that such "misbehavior" prejudiced them. *See, e.g., U.S. Life*, supra at

1177 ("U.S. Life failed to establish that the ex parte meeting and subsequent process constituted misbehavior to its prejudice as required by § 10(a)(3's) last prong").

The Objectors have alleged in conclusory fashion that the supposed "fact" that the arbitrator received "ex parte" communications prevented them "from receiving a fair arbitration of their fee allocations." Oppo. 41:19-20. They have failed to make, however, any showing of prejudice.  As Exhibit A to the Bonsignore declaration reflects, and Judge Phillips Allocation Order shows, the arbitrator found that the Objectors' lodestar claims had been improperly inflated by, inter alia, retroactively manufacturing time sheets  – a practice Burton has herself decried as a "red flag." Oppo. 49. *See also* Kirchner Aff. ¶ 1 at p. 20-22 (discussing Burton double billing time); *Id.* at p. 11-12 (discussing LaPlant retroactively manufacturing timesheets). Despite making this finding, however – and even though the Objectors clearly overstated both the "risk" they undertook in prosecuting this litigation, and the "contributions" they made to its successful resolution – the arbitrator awarded them nearly $7 million in fees and costs. Objectors have failed to explain how the arbitrator prejudiced their rights by awarding them a near $7,000,000 fee, much less how any such alleged prejudice can be attributed to ex parte communications he supposedly engaged in with their adversaries.

**E.      No Grounds Exist for Vacating the Award Under 10(a)(4).**

Although the Mills Group devotes a great deal of their memorandum to arguing that the arbitrator's decision demonstrates a "manifest disregard of the law" and was "irrational," their memo examines and criticizes the arbitrator's decision as though it were the ruling of a lower court, and treats this Court's role as that of an appellate court reviewing a district court

66

opinion.[43]  However, the scope of review under the Federal Arbitration Act is far more constrained and deferential.

### 1.  Manifest Disregard of the Law is an Extremely High Standard and Requires Proof that the Arbitrator Knew the Law but Ignored It.

Assuming that an arbitrator's "manifest disregard of the law" remains a permissible ground for vacatur after the Supreme Court's *Hall Street* decision, review under that standard is extremely limited.  The Ninth Circuit has said that "for an arbitrator's award to be in manifest disregard of the law, '[i]t must be clear from the record that the arbitrator[ ] recognized the applicable law and then ignored it.'" *Comedy Club, Inc. v. Improv West Associates*, 553 F.3d 1277 (9th Cir. 2009).  Some courts have elaborated, stating that the moving party "must prove that: '(1) the arbitrator[] knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrator[] was well defined, explicit, and clearly applicable to the case.' *Hoeft v. MVL Group, Inc.*, 343 F.3d 57 (2d Cir. 2003).  *See also Collins v. D.R. Horton, Inc.*, 505 F.3d 874, 879-80 (9th Cir. 2007).  It is not enough that the arbitrator failed to understand or apply the law or made an erroneous misinterpretation of law.  *Todd Shipyards Corp. v. Cunard Lines, Ltd.*, 943 F.2d 1056, 1060 (9th Cir. 1991).  Nor is "manifest disregard of the facts" a ground for vacatur.  *Coutee v. Barington Capital Group, L.P.*, 336 F.3d 1128 (9th Cir. 2003).  Whether the arbitrator's findings are supported by the evidence in the record is beyond the scope of the court's review.  *Bosack v. Soward*, 586 F.3d 1096, 1105 (9th Cir. 2009), *Kyocera Corp.*, 341 F.3d 987 (unsubstantiated factual findings do not justify court

---

[43] The Objectors also make the striking statement that in addition to the standards of review set forth in § 10(a)(4) of the FAA, "the Court has an independent obligation under the ... law to ensure that the fees awarded are allocated fairly and in compliance with the law requiring allocations to be correlated with contributions."  Mov. Oppo. 43:15-17.  However, as Objectors' recognize elsewhere, case law in this area is concerned with court scrutiny of private fee arrangements of class counsel.  See Oppo. 29-30:23-2.  The "obligation" to allocate fees in this case was placed

67

review of arbitration award).

**2.      The Objectors Cannot Demonstrate that Judge Phillips Manifestly Disregarded Clear Law Governing Allocation of Attorneys Fee Awards in Common Found Cases.**

Although they reference the "manifest disregard of the law" standard, the Objectors spend most of their time contesting the arbitrator's evaluation of the facts and his conclusions, without clearly pinpointing the specific "applicable law" the arbitrator recognized but ignored. This likely is because the principles governing allocation of a common fund fee award are not well-settled.

While there are certain well-established principles that govern a court's discretion at the fee award stage, as well as a great deal of case law discussing those principles,[44] there is not a significant amount of case law discussing the principles applicable to allocating a fee award

---

on the arbitrator, and review of his decision is solely under the standards established by the FAA and decisions interpreting the FAA provisions.

[44] In fee-shifting cases, where the opposing party pays any fee award, well-established Circuit and Supreme Court case law mandates the use of the lodestar method in calculating the fee; thus, a close analysis of fee submissions is generally required.  *See City of Burlington v. Dague*, 505 U.S. 557 (1992); *Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008); *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145 (9th Cir. 2001); *Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1992).  In common fund cases, the Ninth Circuit has unequivocally held that a court has the discretion to use either the percentage-of-the-fund method or the lodestar method to determine the fee award. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002); *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994); *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990) (no abuse of discretion in awarding fee based on percentage of fund); *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989).  And where the percentage method is used, a lodestar cross-check is not required. *Craft v. County of San Bernardino*, 624 F. Supp. 2d 1113, 1122 (C.D. Cal. 2008) ("A lodestar cross-check is not required in this circuit, and in some cases is not a useful reference point."). *See also In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 379 (9th Cir. 1994) (percentage award affirmed; no indication lodestar cross-check performed); *Arata v. Nu Skin International, Inc.,* 1993 U.S. App. LEXIS 21747 (9th Cir. 1993) (court rejects contention that detailed time records should have been submitted in support of the fee award; since under the settlement agreement, attorneys' fees were to be calculated as a percentage of the recovery, "it is not clear what purpose submission of time records would have served"); *Woo v. Home Loan Group, L.P. Chase Ventures Holdings, Inc.,* 2008 U.S. Dist. LEXIS 65144 (S.D. Cal. 2008)  (in common fund case, court concludes that percentage method is appropriate in making fee award, "particularly because counsel has not provided information from which counsel's lodestar could be determined.  While district courts sometimes use a lodestar cross-check to evaluate the reasonableness of a percentage calculation, even then they often engage in an "informal" lodestar analysis, rather than the rigorous analysis required under fee-shifting statutes. *See, e.g., Glass v.*

68

among the attorneys in a common fund case. *See, e.g., In re FPI/Agretech Securities Litig.*, 105 F.3d 469, 474 (9th Cir. 1997) ("There is very little case law concerning the allocation of attorneys' fees among co-counsel"); *In re Copley Pharmaceutical, Inc.*, 50 F. Supp. 2d 1141, 1150 n.8 (D. Wyo. 1999), *aff'd*, 232 F.3d 900 (10th Cir. 2000) (noting "the dearth of applicable law" on the issue of allocating a percentage fee award); *In re Diet Drugs Products Liab. Litig.*, 401 F.3d 143 (3d Cir. 2005) (Ambro, J., concurring) ("our Court has offered little guidance on how fees should be allocated among counsel in MDL class actions").  As a result, it is unclear that a well-defined body of law even applies to such a situation, and virtually impossible to hold that the arbitrator identified and disregarded any law that might be applied.  Perhaps this is why the Objectors have not cited any such applicable law that the arbitrator recognized and ignored. *See Lagstein*, 607 F.3d 634 (stating that the district court found "manifest disregard of the law" without citing any applicable law that the arbitration panel recognized and ignored, and that on appeal the appellee did not cite a single pertinent statute or decision that the panel manifestly disregarded). Thus, it cannot be said that Judge Phillips's reasoning exhibits disregard for the law when no law has been clearly established that mandates the method to use in determining how a common fund fee award should be allocated among counsel.[45]

> ### a.    *Judge Phillips Properly Considered the Relative Contributions of Counsel, Lodestar Principles, and Multipliers.*

To the extent that there are any guiding principles in the fee allocation area, the concept most encouraged is that, in making its allocation, the tribunal should take into account the

---

*UBS Financial Services, Inc.,* 331 Fed. Appx. 452, 456, 2009 U.S. App. LEXIS 10328 (9th Cir. 2009) (noting that the district court "performed an informal lodestar cross-check").

[45] Judge Phillips was well aware of the significant difference between the fee award stage and the fee allocation stage. He was also cognizant of the fact that principles applicable to fee awards, such as the lodestar concept, are only analogously relevant at the allocation stage.  *See* Kirchner Aff. ¶ 1 at 4.

69

respective contributions counsel made in obtaining the ultimate result.  *See, e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir.1995); *In re Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 225 (D.D.C. 2005); *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 400 (D.D.C. 1978), *see also In re FPI/Agretech Securities Litig.*, 105 F.3d at 474 (relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing to approve a fee allocation proposal).  The law recognizes that assessing the relative contributions of counsel often involves subjective factors.[46]  *In re Agent Orange Products Liability Litig.*, 818 F.2d 216 (2d Cir. 1987); *In re Ampicillin Antitrust Litig.*, 81 F.R.D. at 400 ("it is recognized that allocation among counsel must depend at least in part upon the more subjective factors of the relative contributions of the attorneys").  In his decision, the arbitrator recognized that the relative contributions to the results achieved was an important consideration, as well as the inherently subjective nature of the allocation process, and took these principles into account in allocating the surplus. *See* Kirchner Aff. ¶ 1 at 29.

Courts have also recognized that factors used to determine a lodestar calculation, or in evaluating the reasonableness of a percentage award, may also be taken into consideration when making a fee allocation.  *In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 229-230 (5th Cir. 2008); *In re Copley Pharmaceutical, Inc.*, 50 F. Supp. 2d at 1150 (*Johnson* factors).  Such factors include the risk of non-payment undertaken by counsel.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002); *Kerr v. Screen Actors Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975).  Here, again, the arbitrator recognized that the risk factor may be taken into consideration, and utilized it as part of his allocation process.  Arb. Op.

---

[46] The Objectors make several references to Phillips' use of "subjective" factors and imply that this is impermissible. *E.g.*, Oppo. 59:7-10.  They also assert that Judge Phillips "relied upon what he characterized as a set of 'subjective intangibles'" to support his allocation. Oppo. 59:13-14.  To the contrary, Phillips's never references the quoted term

at 30-31.

Courts use, or approve the use of, a number of methods to allocate a fee award among counsel in a common fund case.  Some courts have followed a lodestar approach, and calculated a lodestar for each firm, then adjust the lodestar depending on its assessment of the firm's contribution to the recovery.  *E.g., In re Guidant Corp. Implantable Defibrillators Products Liability Litigation,* 2008 WL 5382338, 2008 U.S. Dist. LEXIS 103736  (D. Minn. 2008).  Other courts have ignored, or at least de-emphasized, the lodestar analysis, and, while referencing the number of hours put in by the firm, awarded amounts that it found to be fair after evaluating the firm's contributions as well as other factors.  *E.g., Turner v. Murphy Oil USA, Inc.*, 582 F. Supp. 2d 797 (E.D. La. 2008); *In re Copley Pharmaceutical, Inc.*, 50 F. Supp. 2d 1141.  Still other courts have eschewed the lodestar approach entirely and apportioned fees using the percentage method.  *E.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295 (noting the potential for an inappropriate result if the lodestar method is rigidly used in allocating an already-awarded common-fund fee).

Judge Phillips used a combination of these approaches.  He calculated a lodestar for each firm, and applied multipliers to the lodestars of most class counsel.  However, for the two Co-Lead Counsel, he then took the surplus remaining and divided it among them according to his assessment of their relative contributions and other factors.  There is no body of law prohibiting such an approach.  *See id.* (common-fund fee allocation case; court states that the discretion granted to a district court may involve using a combination of the lodestar and percentage methods when appropriate).

Judge Phillips arrived at the same result as a court might come to if it used a traditional

---

"subjective intangibles" in his opinion.  Even if he had, the use of intangible factors in the allocation process is

71

lodestar-plus-multiplier approach for all attorneys.  The amount awarded to the Burton/Mills Group equals their lodestar, as adjusted by Judge Phillips, multiplied by approximately 1.2; the B&B award is the firm's lodestar, as adjusted by Judge Phillips, multiplied by approximately 1.8. If Judge Phillips's assessment of relative contributions is accepted, as it must be on review, it is reasonable to apply respective lodestars of 1.2 and 1.8 to arrive at the fee awards.  In fact, expert Declarations submitted during the arbitration proceeding stated that applying a multiplier of 2.0 to Bonsignore & Brewer's lodestar figure was appropriate, as was reducing the lodestar of the Mills attorneys.  *See* "Conclusions" to Declaration of Robert L. Rossi in Support of Request of Bonsignore & Brewer for Allocation of Attorneys' Fees, and Supplemental Declaration of Robert L. Rossi in Support of Bonsignore & Brewer Proposed Allocation of Attorneys' Fees.

Judge Phillips properly recognized that he should consider relative contributions, and that he may consider other factors, including risk and intangible factors in determining the allocation. He evaluated all of these factors in making his decision.  By disagreeing with the factors Judge Phillips took into consideration in reaching his conclusion, the Objectors are actually disagreeing with Judge Phillips's conclusions.  Such an attack on an arbitrator's award is impermissible.  To the extent that the Objectors assert that the arbitrator's findings as to the degrees of risk undertaken by each attorney or firm and their relative contributions to the recovery are not supported by the evidence, that is a matter beyond the scope of the court's review.  *Bosack,* 586 F.3d at 1105.  And to the extent they contend that the arbitrator made erroneous legal conclusions based on these issues, that is also not a permissible basis for vacatur.  *Kyocera Corp.*, 341 F.3d 987.

### b.      *Judge Phillips Acted Well Within His Discretion when Evaluating the*

---

completely permissible.  *See In re Copley Pharmaceutical, Inc.*, 50 F. Supp. 2d 1141, 1149, 1152 (D. Wyo. 1999).

72

***Objectors' Fee-Allocation Submission Under these Legal Principles.***

In attacking the arbitrator's decision, the Objectors spend a substantial amount of time on lodestar issues, arguing that one of the most glaring errors in Judge Phillips's ruling was his failure to scrutinize the billing submissions of all class counsel, and instead defer to the judgment of local counsel in calculating their lodestars.  Oppo. 47-48:22-17.  However, despite their extensive citations of cases, they point to no "applicable law" in the Ninth Circuit that mandates an arbitrator scrutinize these submissions at the fee-allocation stage of a common fund case. Rather, here, as they do throughout their memorandum, Objectors principally cite fee award cases in which the district court calculated the fee by using the lodestar method, either because the case involved a fee-shifting statute requiring the use of a lodestar[47] because the case was a common fund case in a circuit that required the use of the lodestar method[48] or because the case was a common fund case in which the district court chose, in its discretion, to use the lodestar method.[49]  However, as noted above, in common fund cases in the Ninth Circuit, either the percentage method or the lodestar approach may be used at the fee award stage, and if the percentage method is used, a lodestar cross-check is not mandated.  Thus, since a lodestar calculation, and the concomitant scrutiny of billing records, is not required even at the fee award stage, it is disingenuous to argue that the arbitrator manifestly disregarded the law when, at the allocation stage, he did not closely analyze class counsel's billing records and instead deferred to their judgment.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d at 1050-1051 (in upholding

---

[47] *E.g., Jordan v. Mulnomah County*, 815 F.2d 1258 (9th Cir. 1987) (Oppo. 48:11).
[48] *E.g., In re High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220 (Oppo. 47-48:22-1).
[49] *E.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994) (Oppo. 48:5-6). Objectors also cite several securities class action cases.  *E.g., In re Tut System, Inc. Securities Litig.*, 319 Fed. Appx. 681 (9th Cir. 2009); *In re Cendant Corp. Securities Litig.*, 404 F.3d 173 (3d Cir. 2005).  However, as *Cendant* recognized, "the [Private Securities Litigation Reform Act] has significantly altered the landscape of attorneys' fee awards in securities class actions," supplanting principles traditionally applied in common fund cases.  *Id.* at 180.

73

percentage fee award in common fund case, court notes that in making lodestar cross-check, district court found nothing in the record to suggest that any of the hours claimed by counsel should be disallowed).  *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d at 1294 n. 2 (noting that in awarding fees in common fund cases, neither the lodestar nor the percentage method "should be applied in a formulaic or mechanical fashion").

The Objectors also take issue with the arbitrator's calculation of the respective lodestars for Co-Lead Counsel, claiming that the arbitrator "gutted" their lodestars (Oppo. 44:9-12) and awarded Bonsignore a lodestar that "dwarfed" that of Burton's firm (Oppo. 59:7).  In fact, the arbitrator analyzed and reduced the lodestars for both the Burton and Bonsignore attorneys in a similar fashion.  He reduced the Burton group's claimed lodestar of $6,466,355.25 to $5,120,456.25, and reduced Bonsignore's lodestar from $7,305,258.75 to $6,299,536.25. Burton's lodestar was hardly "gutted," nor was it "dwarfed" by that of Bonsignore.   Objectors fail to point out that the arbitrator rejected several serious challenges to the Mills Group's hours which would have further decreased their lodestar (Arb. Op. at 22-24).  Objectors also fail to recognize that a major portion of the lodestar reduction was attributable to the arbitrator's well-reasoned decision to reduce the hourly rates for several Mills Group attorneys (Arb. Op. at 17-20).[50]

---

Thus, those cases also do not represent the "applicable law."

[50] The Objectors take issue with the arbitrator's reduction of the hourly rates of some of the Mills Group attorneys, asserting that while they alone supported their rates by the opinion of a legal expert, the arbitrator applied a different standard to their submissions when he reduced their rates and left the rates of other counsel untouched.  Oppo. 67:23-27 (n.85).  However, the arbitrator's reasons for reducing the rates cannot be in "manifest disregard of the law," or "irrational."  He took note of the fluctuating rates utilized by the Mills' attorneys on various occasions, and rejected the opinion of the Mills expert that the various attorney rates provided by Mills were "within the range of market rates being charged in the San Francisco Bay Area."  In rejecting this opinion, the arbitrator acted in full conformity with the law governing hourly rates in a lodestar calculation.  As the arbitrator recognized, the law in the Ninth Circuit accords with the prevailing rule that when determining a reasonable hourly rate, the relevant community is generally the forum in which the district court sits, and the burden is on the fee applicant to produce satisfactory evidence of the relevant market rate. *Van Skike v. Director, Office of Workers' Compensation Programs,* 557 F.3d 1041 (9th Cir. 2009); *Camacho v. Bridgeport Financial, Inc.,* 523 F.3d 973 (9th Cir. 2008); *Barjon v.*

74

---

In their arbitration filings, the Objectors argued that they performed the bulk of the significant work that contributed to the recovery.  It was within Judge Phillips's purview as arbitrator to reject this position.  Additionally, Bonsignore & Brewer, as well as virtually every other class counsel, expressed that the Bonsignore firm was primarily responsible for the ultimate recovery, and supported this view with evidence.  Again, the arbitrator was permitted to reject the Objectors' view of the facts and agree with Bonsignore and the other Plaintiffs' attorneys.  Objectors' claims that class counsel agreed to support Bonsignore in return for his support of their fees is just nonsense (*see, e.g.*, Oppo. 1-2:20-4; Oppo. 25-28:14-2, Oppo. 46:24-27 (n. 53), Oppo. 47:1-2).  The arbitrator's decision accorded with the evaluation of respective responsibilities expressed by virtually all class counsel, all of whom were intimately involved with the case and whose opinions should be given a great deal of weight, as they were in the best position to assess the relative contributions of counsel.  *See In re "Agent Orange" Product Liability Litig.,* 818 F.2d at 223; *In re Vitamins Antitrust Litig.,* 398 F. Supp. 2d at 224; *In re Ampicillin Antitrust Litig.,* 81 F.R.D. at 400 ("In the context of this litigation, which has extended over an eight-year period, it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk").  It is incongruous to argue that the arbitrator's evaluation should be overturned merely because the Objectors self-servingly assert  that they, not the Bonsignore firm, were the prime movers in the case.

---

*Dalton*, 132 F.3d 496, 500 (9th Cir. 1997).  Here, the district court sits in Nevada.  The Mills attorneys did not submit evidence demonstrating that their rates were reasonable market rates in the Nevada area, nor did they give the arbitrator any reason to depart from the general forum rate rule.  Thus, the arbitrator's refusal to apply hourly rates that were allegedly market rates in the San Francisco area could not be considered a "manifest disregard of the law."  Likewise, the arbitrator's reduction of Robert Mills' rate on the ground that his firm's staffing was top-heavy, and that another "four star general" was not needed, also accorded with accepted legal principles.  *See Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588 (6th Cir. 2008) (district court reduced lodestar by 25% due to "top-heavy billing by partners for work that could have been performed by associates").

The Objectors place extensive reliance on the opinion of expert Kenneth Feinberg they submitted to the arbitrator in connection with the fee allocation process, and cite his Declaration throughout their memo.  However, no principle of law requires the arbitrator to accept Feinberg's opinions on either the law or the facts.  As set forth elsewhere in this memo, the arbitrator's opinion reflects that he recognized pertinent principles in the fee-allocation area, such as relative contributions and risk, and made his determinations accordingly.  Feinberg's Declaration that "Bonsignore's fee under the original agreement should have been dramatically reduced due to his failure to contribute commensurately to the litigation work" should be of little value to this Court in reviewing the arbitration award.  Oppo. 46:19-26 (n. 52).  As Feinberg stated at the outset of his Declaration, his opinions relied on information furnished to him by Burton and Mills.  The arbitrator weighed conflicting evidence and opinions about which attorneys performed the key work and were most responsible for the recovery, and he also had a great deal of familiarity with the case, having been involved in mediating the settlement as well as ruling on several pre-allocation matters as an arbitrator.  He was entitled to make factual determinations without any reference to the opinion of an attorney with no familiarity with the case who was brought in solely at the fee-allocation stage.

**F.     The Mills Group Waived Their Right to Move to Vacate.**

**1.     By Failing to Timely Raise the Arbitrator Bias Challenge, Objectors Have Waived It.**

The Objectors' assertion that vacatur is warranted because Judge Phillips's ruling was biased due to undisclosed prior relationships with Co-Lead Counsel Bonsignore and *ex-parte* communications between Judge Phillips and Co-Lead Bonsignore is also meritless because it has been waived. This is an invocation of FAA § 10(a)(2). A claim of bias under FAA § 10(a)(2) is

waived if not timely raised by the party seeking vacatur.[51]   To be equitably applied, a claim of

bias must be filed with reasonable promptness after the ground for such a motion is

ascertained.[52]   If the claim is not timely made, courts have held that parties waive their right to

later assert the claim.[53]   Courts are specifically scrutinous of a claim, and more likely to

determine the party has waived their claim, where the party was aware of potential bias conflicts,

but waited to raise the claim until after a decision has been rendered that is adverse to the party.[54]

The practical reason for the waiver rule is that without it, a party would be able to take his

chances on receiving a favorable decision, secure in the knowledge that, if he did not, he could

obtain a "do over" in front of another arbitrator by asserting that the first one was biased.[55]

    The Objectors have had actual knowledge of the "facts" upon which the Motion to Vacate

is based upon since May 2009.  If Mills and Burton were actually concerned about arbitrator

bias, they should have formally brought a complaint much earlier, and they had chances to do so.

In a June 5, 2009, letter, Mills's outside counsel Bass informally requested Judge Phillips to

withdraw from serving as arbitrator.  This letter was did not recite any relevant authority or the

---

[51]   While most cases on timeliness of bias claims involve judicial bias, the Ninth Circuit has made it clear that delay in objecting to an arbitrator's purported bias can constitute a waiver of the parties claim in the arbitration setting as well.  *Johnson v. Gruma Corp*., 14 F.3d 1062, 1069 (9th Cir. 2010) (holding party waived objection by not raising waiver claim in a timely fashion in an arbitration case).

[52]   See *Preston v. U.S.* 923 F.2d 731, 733 (9th Cir. 1991) (holding recusal motions should be filed with reasonable promptness after the ground for such a motion is ascertained).

[53]   See, e.g., *Wood v. McEwen*, 644 F.2d 797, 802 (9th Cir. 1981) (waiting 16 months after discovering the grounds for recusal resulted in a waiver); Datagate, Inc. v. Hewlett-Packard Co. 941 F.2d 864, 871 (9th Cir. 1991) (holding that, even if the judge should have recused, movant waived its right to have the judgment vacated by failing to timely move for disqualification).

[54]   See *U.S. v. Rogers*, 119 F.3d 1377, 1382 (9th Cir. 1997) (defendant's "failure to make any formal motion until more than one and one-half years after he was aware of the grounds for disqualification - and almost nine months after his resentencing - renders his motion untimely").  Cf. In re Fraschilla, 235 B.R. 449, 459 (9th Cir. BAP 1999) ("[o]ne who waits to raise an impartiality issue until after adverse decisions [have been issued] undermines the weight that will be ascribed to the evidence of bias").

[55]   See, e.g. *U.S. v. Rogers*, supra at 1380 ("Absent a timeliness requirement, parties would be encouraged to 'withhold recusal motions, pending a resolution of their dispute on the merits, and then if necessary"), Bivens Gardens Office Bldg. v. Barnett Banks, Inc., 140 F.3d 898 (11th Cir. 1998) ("The recusal provision was intended to be a shield, not a sword.  An issue involving recusal cannot be used as an insurance policy to be cashed if a party's assessment of his litigation risks turns out to be off and a loss occurs").

known "facts" upon which the Motion to Vacate was based.  After getting this letter, therefore, Judge Phillips saw no reason to stand down, but stated he would welcome Mills bringing the recusal issue directly to Judge Pro if Mills saw fit.  Mills never pursued this option or submitted any briefs about Judge Phillips's capacity to serve.

The Mills Group did however take affirmative action suggesting they had no problem with Judge Phillips's service in this case.   On October 1, 2009, they filed their final approval motion, requesting supposedly "biased" and "conflicted" Judge Phillips to arbitrate any fee disputes without raising any concern about that "bias" or "conflict" when they had full knowledge of it.  Thus, the Objectors cannot now, after Judge Phillips issued his decision, go back and claim arbitrator bias because they waived their right to make a claim of bias by not bringing it in a timely matter.

Co-Lead Burton makes the following five specific contentions of bias on the part of Judge Phillips in her Motion, each of which has been waived by the Objectors' affirmative support of Judge Phillips's appointment as arbitrator or other conduct that demonstrates their belief in the absence of his bias:

**Phillips' involvement in the Smokeless Tobacca Litigation.**  Objectors reference Judge Phillips' involvement in the New Hampshire Smokeless Tobacco Settlement Agreement entered into in January 2008, and the Massachusetts Smokeless Tobacco Settlement Agreement dated April 29, 2009, as a source of bias.  But Burton knew of Judge Phillips' involvement and Co-Lead Bonsignore's participation in the Smokeless Tobacco Litigation prior filing the Motion for Final Approval.[56]  If Burton was truly worried about potential arbitrator bias, she should have made it an issue.  Instead, she supported Judge Phillips and moved this court to appoint name

---

[56] Burton was contemporaneously advised of each alternative dispute resolution session and the result.

him as the fee arbitrator in the Wal-Mart settlement agreement.  Only now, after suffering what she considers an adverse result, does Burton bring her claim, a classic example of waiting to see if she won, and if not, claim bias and try to win in front of another arbitrator.

**Phillips' involvement in the related *Salvas* case.**   Burton also claims that Judge Phillips's involvement with the Massachusetts Wal-Mart wage-and-hour case of *Salvas* demonstrates his bias against her.  But she was well aware of this involvement, had the opportunity to bring them to the district court in the summer of 2009, chose not to do so, and thereafter fully supported Judge Phillips's appointment as the fee arbitrator.

**Alleged ex parte communications with Bonsignore and other counsel.**  This allegation is based upon copies of polls purportedly conducted by Mr. Bonsignore in the summer of 2009 and copied on Judge Phillips.  Burton spends an inordinate amount of her Motion attacking both Co-Lead Bonsignore and Judge Phillips on the basis of a number of such polls regarding her conduct prior.  Once again, Burton admits that she knew of this issue prior to her support of Judge Phillips as fee arbitrator, and continued to support him anyway.

**Judge Phillips's September 5, 2009 Supplement to Opinion and Order**. Similarly, Burton claims that Judge Phillips's "Supplement to Opinion and Order" dated September 5, 2009, supports her contention that Judge Phillips was biased against her. Although she was furnished with a copy of this Order when it was issued, by her own admission, she failed to raise it as an objection to the appointment of Judge Phillips at the Final Approval Hearing over a month later.

**Judge Phillips's September 9, 2009 Order directing Burton to provide Mr. Bonsignore with the expert declarations necessary to complete the final approval briefing.** In a similar vein, Judge Phillips's September 9, 2009, Order regarding expert materials, and his

follow-up Order of October 2, 2009, finding that Burton intentionally disobeyed his September 9, 2009, Order provide no more support for vacatur. Both occurred well before Final Approval and were fully known to Burton when she advocated for Judge Phillips's appointment as the fee arbitrator at the Final Approval Hearing.

Thus, each of the Objectors' bias claims Burton relies upon information known to them prior to Final Approval of the Settlement - and § 22.9 under which the arbitration was conducted - and was waived when instead of objecting to the appointment of Phillips as the fee arbitrator, she actively supported his appointment in filings to this Court. It is well-settled that a party must raise any known issues regarding the impartiality of the arbitrator prior to the selection of the arbitrator, or those objections are waived.[57] In failing to object to Judge Phillips prior to his approval, and instead keeping those objections pocketed for a later attack in the event she was unpleased with the Mills Group's fee award, Burton has engaged in the very conduct found to result in waiver of a claim of bias under FAA § 10(a)(2) by every court to consider the matter. Therefore, no grounds exist for vacating the award under 9 U.S.C. § 10(A)(1).

### 2. The Mills Group Waived its Right to Object to the Arbitration Award When it Failed to Timely Object to Judge Phillips's Previously Disclosed Relationships.

A party waives its right to challenge an arbitration award based on evident partiality if it fails to timely object to "the arbitrator's appointment or his failure to make disclosures until after an award is issued." *Durga Ma Corp.*, 386 F.3d at 1313. While there is no bright-line rule for determining the timeliness of a partiality challenge, most courts have held that the party who believes a judge to be biased must move to disqualify him as soon as practicable after

---

[57] See *Preston v. U.S.* 923 F.2d at 733 (holding must motion with reasonable promptness after the ground for such a motion is ascertained)..

discovering the grounds on which its challenge is based. *Preston v. U.S.,* 923 F.2d 731, 733 (9th Cir. 1991).

The waiver doctrine applies even where a party to arbitration has *constructive* knowledge of a potential conflict but fails to timely object.  In *Fidelity Fed. Bank*, Fidelity sought vacatur of an adverse arbitration award issued by a panel of arbitrators based on allegations of evident partiality.  *Fidelity Fed. Bank*, 386 at 1308.[58]  The Ninth Circuit stated, "[h]olding that the waiver doctrine applies where a party to an arbitration has constructive knowledge of a potential conflict but fails to timely object is the better approach in light of our policy favoring the finality of arbitration awards."  *Id.*  In *Fidelity Fed. Bank*, the process for choosing the panel of arbitrators involved each party appointing its own arbitrator who then selected a third neutral arbitrator.  *Id.* at 1312-13.  The Ninth Circuit reasoned that each party was on notice that the party-appointed arbitrators were "likely to have some personal or professional connection" to the parties or their attorneys; therefore, vacatur was not justified.  *Id.*

Even assuming that Judge Phillips failed to disclose his previous arbitration activities, which he did not, the Mills Group had actual or constructive knowledge that he arbitrated the Smokeless Tobacco cases based on contemporaneous phone calls that took place between Mills and Attorney Bonsignore.  During these phone calls, Attorney Bonsignore repeatedly referenced Judge Phillips's mediation of the Smokeless Tobacco matters.  Mills's failure to object, therefore, is strikingly analogous to Fidelity's failure to object in *Fidelity Fed. Bank*, where the

---

[58] The case required the Ninth Circuit to address for the first time whether a party can waive its right to challenge an arbitration award based on evident partiality if it fails to object in the initial stages of the arbitration process. *Fidelity Fed Bank* at 1313.  In upholding the district court's denial of the vacatur motion, the Ninth Circuit identified the varied treatment the circuits afford to the question of waiver.  *Id.*  Some of the federal courts hold that a failure to object to the evident partiality of an arbitrator before an award is issued does not amount to waiver unless the party has "real, actually knowledge of the conflict."  *Id.*  Other courts have found waiver where the objecting party "either knew or should have known of the facts indicating partiality of an arbitrator but failed to raise an objection prior to the arbitration decision."  *Id.*  The Ninth Circuit adopted the latter approach

court found that Fidelity waived its right to object.  The court should come to the same

conclusion here and find that the Mills Group has waived its right to object, too.

**G.     The Mills Group Acted in Bad Faith by Manufacturing Unsubstantiated Grounds to Vacate Unfavorable Arbitration Award.**

The actions taken by the Mills Group throughout this litigation show that there was never

a good faith belief that Judge Phillips's actions were biased, conflicted, prejudicial, or amounted

to misconduct requiring disqualification.  Rather, the Mills Group's actions reveal that each step

to disparage Judge Phillips was taken with the sole intention of creating a record that would be

necessary in the event that the Mills Group ultimately decided to challenge the award.

Creating the record began with the June 5, 2009 letter from Mills Group counsel Jonathan

Bass, citing unsubstantiated grounds of conflict and ex parte communication, urging Judge

Phillips to voluntarily recuse himself.  This ex parte letter to Judge Phillips went on to state that

if he did not elect to voluntarily recuse himself, the Mills Group would follow with a formal

presentation to the court.  Yet, this was never done.  Not only did the Mills Group voluntarily

elect not to go forward with this formal presentation to the court, they argued that Judge Phillips

forbade it, prohibited it, threatened action against it, and basically became a one-man crew

blocking all their efforts.  Only this is not the case, what really happened is that the Mills Group

had no real dissatisfaction with Phillips, had no issues of bias, corruption, undue means, conflict

or misconduct that they could move forward with, and elected not to file a formal presentation to

the court.

Acting in gross disparity with Bass's allegations, the Mills Group continued to welcome

Judge Phillips's services whenever it suited their needs.  On April 24, 2009, at the request of the

Mills Group, Judge Phillips conducted a telephonic hearing to resolve a dispute between Co-

Lead Counsel.  Additionally, on May 28, 2009, when all of the alleged grounds for the June 5,

2009, letter existed, the Mills Group urged Judge Phillips once again to take up the role of neutral in arbitrating a dispute.  Here, there is a situation of the record being formed one way to suit the potential future need of the Mills Group and their actions speaking volumes in the opposite direction.

While the Mills Group continued to allude to phantom conflicts and unsubstantiated ex parte communications, they also evaded filing any formal documentation at this time to challenge Judge Phillips.  In September 2009, the Mills Group filed a memorandum of law in support of their "Emergency Request for Further Instruction re Pre-Trial Order No. 2."  In the first sentence, Burton requested the Court's assistance "to resolve a serious conflict that has been developing for some time…" *Id.* at 5:18-21.  From that point the "serious conflict" became clarification on Pre-Trial Order No. 2, and any mention of a conflict with Judge Phillips was pushed to a footnote in a supplemental briefing filed in September 2009.

The continued burying of these supposed conflicts, ex parte communications, misconduct, misapplication of law, bias, and prejudice speaks only toward the Mills Group's true intention of creating a record of such alleged behavior in bad faith.  Had these allegations been in good faith, the Mills Group would have done more than concocted mysterious filings referencing elusive harms.  So long as Judge Phillips's decisions benefited the Mills Group, they found no need to challenge his neutrality.  As clearly shown by their October 2009 actions in filing a motion for Final Approval without raising any issues concerning Judge Phillips being named as the dispute arbitrator for a Section 22.9 fee-allocation dispute, there were no issues with his appointment.  The issues that did exist were vague, unclear, and existed only in the Mills Group's pleadings as an insurance policy against a potential decision they might ultimately dislike.

Only eight months later, after advocating for and pushing through the settlement terms, and with a fee dispute looming, did the Mills Group feel the need to bring forward their claims of bias, ex parte communication, and conflict that they had known about for more than a year.  This Court made clear in a June 25, 2010 hearing on this issue "that these are factors which have been known to the parties at the time they either entered and/or thereafter advocated approval before this court to the settlement." *Id.* at 5:3-8.  This motion was never meant to win and was brought only to augment the record of bias and conflict the Mills Group had been in action to create for months.  It was filed without citation to any issue, any specific conduct, or any pertinent case law.  In fact, the pertinent case law would have made clear that this challenge under the FAA could not succeed and could only properly be brought as a motion for vacatur.  Instead, this motion was filed with the court to delay and to augment the record that the Mills Group was in the process of creating.  Had Judge Phillips decided the fee arbitration another way, this issue would have never been brought again before the court.  Here, the parties deliberately and tactically sought to deploy thorns that could later be used to tear up any adverse decisions.  These bad faith actions to undermine arbitration proceedings have no place in American jurisprudence.

The Ninth Circuit has made clear that a motion for vacatur should not always be taken at face value.  The reasons put forth for vacatur may seem in accordance with grounds under FAA § 10(a), but often they are misguided by tactical decisions designed to perform an end run around the arbitration process.  As the Ninth Circuit expressed in *Johnson v. Gruma Corp.*, 14 F.3d 1062, 1069 (9th Cir. 2010), where a party is aware of the alleged issues the "failure to raise the issue until after the arbitrator ruled suggests two things: First, it suggests that [the party] did not himself believe that the relationship rose to a level that required disclosure under any of the applicable standards; Second, it suggests that [the party] may have been sandbagging, holding

84

his objection in reserve in the event that he did not prevail in the arbitration."  Similarly, the Mills Group sat on any objection, alluding to unsubstantiated and phantom claims of ex parte communications, misconduct, and bias without ever indicating a specific instance or occurrence showing these allegations.  Instead, what exists here is a party that did not prevail in the arbitration attempting to erase an agreement they do not feel benefits them.

This form of improving their odds is akin to forum or judge shopping, and should not be allowed as "an insurance policy to be cashed in if a party's assessment of his litigation risks turns out to be off and a loss occurs."  *See Bivens Gardens Office Bldg. Inc. v. Barnett Bank of Fla.*, 140 F.3d 898 (11th Cir. 1998).  Allowing this type of action would be an end run on the public policy favoring resolving disputes by arbitration.  *See Toyota of Berkeley v. Auto Salesmen's Union, Local 1095*, 834 F.2d 751, 758 (9th Cir. 1987) (stating that "arbitration is favored as a matter of policy").  Parties elect arbitration because it is inexpensive, provides a tribunal with expertise in a particular subject matter and is an expeditious dispute resolution process.  *See Employers Ins. of Wasau*, 933 F.2d at 1490.  Judicial review of arbitration decision on unidentifiable grounds manufactured in bad faith is exactly what the Ninth Circuit worried could render informal arbitration a mere road block to judicial intervention.  *See Kyocera Corp.*, 341 F.3d at 998 (stating that "broad judicial review of arbitration could well jeopardize the very benefits of arbitration, rendering informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process").  Indeed, "review of [an arbitration] award is 'both limited and highly deferential' because arbitration is a favored form of dispute resolution."  *See More Light Investments v. Morgan Stanley DW Inc.*, 2011 WL 121641 (9th Cir. 2011).

Allowing this type of end run around the arbitration process would allow the Mills Group an unjustified second bite at the apple.  "Having affirmatively urged the arbitrators to decide

arbitrability and asserted their authority to do so, [a party] cannot await the outcome and, after an unfavorable decision, challenge the authority of the arbitrators to act on that very issue." *Poweragent Inc. v. Electronic Data Systems Corp.,* 358 F.3d 1187 (9th Cir. 2004).  Therefore, the Court should not allow the Mills Group to circumvent Judge Phillips's decision through their manufactured and unsubstantiated claims.

## VI.  CONCLUSION

The FAA presumes that arbitration awards will be confirmed, and they must be confirmed except in limited circumstances.  Those circumstances are not present in this case.

No grounds exist for vacating the award under §10(a)(1) because objectors have failed to show that the award was procured by means of "corruption, fraud, or undue means."  Judge Phillips not only did not receive any ex parte communications, he did not improperly advocate for either party.  No grounds exist for vacating the award under §10(a)(2) because the Judge Phillips did not fail to disclose anything that would create a reasonable impression of bias.  In making their claim, objectors misrepresent and overstate the facts they claim support their bias charge.  Their subjective believe that Judge Phillips does not like them falls far short of an impression of legal bias.  Objectors have likewise failed to show that Judge Phillips was actually biased – they have offered no evidence of improper motives nor have they pointed to any evidence that Judge Phillips violated statutes or ethical rules.  Contrary to what objectors would have this court believe, adverse rulings in no way support a claim of bias.  Objectors have further failed to show bias in that they have failed to present evidence of prejudicial ex parte communications.  No grounds exist for vacating the award under § 10(a) (3) because objectors have failed to show that any alleged communications constituted misbehavior that prejudiced their rights.  Not only is Judge Phillips not guilty of any misconduct, but objectors offer no ethical rule that he violated with any alleged oral ex parte contact that may have taken place.

Even so, there is overwhelming evidence that the alleged oral ex parte contact did not occur.  No grounds exist for vacating the award under 10(a)(4) because the objectors cannot demonstrate that Judge Phillips manifestly disregarded clear law.  In making his determination about the allocation of attorneys' fees in this case, Judge Phillips properly considered the relative contributions of counsel, lodestar principles, and multipliers.  In making his award, Judge Phillips acted well within his discretion when evaluating the objectors' fee allocation submission under such legal principles.

Finally, objectors waived their right to vacate the award by failing to timely raise their bias challenge and by failing to timely object to Judge Phillips' previously disclosed relationships.  In making their allegations, objectors acted in bad faith by manufacturing unsubstantiated grounds to vacate the arbitration award that was unfavorable to them.

For the foregoing reasons, objectors have failed to meet their burden of making an evidentiary showing that one of the four enumerated grounds for vacatur under FAA § 10(a) exist.  As a result, the motion to vacate the arbitration award should be denied.

**Respectfully submitted 26th day of April 2011**

**Co-Lead Counsel:**

/s/  Robert J. Bonsignore

Robert J. Bonsignore (BBO # 547880)
BONSIGNORE & BREWER
193 Plummer Hill Road
Belmont, New Hampshire 03220
Telephone: (781) 391-9400
Facsimile: (781) 391-9496
Email: rbonsignore@class-actions.us

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2011, a copy of the foregoing *Reply to Co-Lead Counsel Carolyn Beasley Burton, Attorney Robert W. Mills, and Attorney Carol P. LaPlant's #737 Submission* to the Extent Necessary was filed electronically [and served by mail on anyone unable to accept electronic filing].  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept electronic filing].  Parties may access this filing through the Court's system.


/s/ Robert J. Bonsignore
Robert J. Bonsignore